1            IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3                     SOUTHERN DIVISION

4   UNITED STATES OF AMERICA,      ) CRIMINAL
                                   ) NO. PWG-19-545
5            Plaintiff,            )
                                   )
6   v.                            )
                                   )
7   DARRYL COLTON FRAZER,          )
                                   )
8            Defendant.            )

9         TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 3
               BEFORE THE HONORABLE PAUL W. GRIMM,
10        UNITED STATES DISTRICT JUDGE, AND A JURY
               WEDNESDAY, NOVEMBER 2, 2022; 9:03 A.M.
11                     GREENBELT, MARYLAND
    APPEARANCES:
12
    FOR THE PLAINTIFF:
13
               OFFICE OF THE UNITED STATES ATTORNEY
14             BY:  ADAM K. AKE, ESQUIRE
               BY:  JOEL CRESPO, ESQUIRE
15             BY:  PATRICK KIBBE, ESQUIRE
               6406 Ivy Lane
16             Suite 800
               Greenbelt, Maryland  20770
17             (301) 344-4340

18  FOR DEFENDANT DARRYL COLTON FRAZER:

19             BRENNAN, McKENNA & LAWLOR, CHARTERED
               BY:  MICHAEL E. LAWLOR, ESQUIRE
20             BY:  ADAM C. DEMETRIOU, ESQUIRE
               6305 Ivy Lane
21             Suite 700
               Greenbelt, Maryland  20770
22             (301) 474-0044

23  OFFICIAL COURT REPORTER:
    Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227
24
          ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
25

1          THE DEPUTY CLERK:  This Honorable Court now resumes

2     in session.  The Honorable Paul W. Grimm presiding.

3          THE COURT:  Good morning, everybody.

4     (Counsel reply, "Good morning, Your Honor.")

5          THE COURT:  Folks, we will have a copy of the revised

6     jury instructions that we will have brought into you in a bit.

7     We are making them copies now.  We haven't put in the extra

8     instructions that you want, but we want to make sure we have

9     that one good, and then we can talk about those instructions

10    when the evidence is at the point now where we have all the

11    facts before us to know the applicability.  So we will have

12    that all set.

13         But for right now, the jury is here on time, and let's

14    bring them in and continue on, please.

15         MR. KIBBE:  Your Honor, I believe there were two

16    evidentiary issues to raise if we have time before the jury

17    comes in.

18         THE COURT:  I hope they don't take long.

19         MR. KIBBE:  Your Honor, defense counsel informed us

20    last night that they -- let me back up.

21         As Your Honor knows from the binder, we had 40 some text

22    messages from Shamire Moore's phone.

23         THE COURT:  Right.

24         MR. KIBBE:  We have cut that down to five.  Defense

25    counsel notified us that they are objecting to those being

1   introduced, and so we'd like to --

2            THE COURT:  Those being what?  Reduced?

3            MR. KIBBE:  Introduced.

4            THE COURT:  All right.

5            MR. KIBBE:  And so we'd like to raise that with Your

6   Honor.

7            THE COURT:  Well, I have already ordered that those

8   are admissible, have I not?

9            MR. KIBBE:  I believe so, Your Honor.

10            THE COURT:  Well, if I have ordered that they are

11   admissible, then I have ruled on it already.

12            MR. LAWLOR:  Well, Your Honor, there are specific

13   objections.  For example, some of these contain coded language,

14   which the Court ruled could not be admitted.

15            THE COURT:  No.  I didn't rule it couldn't be

16   admitted.  I said that they couldn't get an expert to testify

17   what the language meant.

18            MR. LAWLOR:  Well, our argument, Your Honor, is if it

19   has coded language, it shouldn't come in because it has no

20   relevance.  You are sort of inviting the jury to speculate on

21   what it means is our position.

22            THE COURT:  Where are they?  I can't look at exhibits

23   in the abstract and determine whether they are relevant or what

24   they say, so do we have those five?

25            MR. KIBBE:  Your Honor, I can put them on the

1   projector.

2          THE COURT:  That's fine.

3          MR. KIBBE:  Your Honor, this is Exhibit 21.28, and

4   what I'd like to note first is that this is a text message from

5   the defendant, Darryl Frazer, to Shamire Moore, the charged

6   coconspirator, and the relevance of this text, Your Honor --

7          THE COURT:  Well, actually, the texts is so small, I

8   can't read it.  Can we make that bigger, the first one?  Which

9   one is to start it, the one on the left or the right?

10          MR. KIBBE:  Yes.

11          THE COURT:  And this is --

12          MR. KIBBE:  And the real relevance here is on the

13   next page, Your Honor, where the defendant texts two pictures,

14   and so I can show those to Your Honor.

15          THE COURT:  So this is from the -- from 3062, and

16   that's whose phone?

17          MR. KIBBE:  This is from Shamire Moore.

18          THE COURT:  Okay.

19          MR. KIBBE:  To Mr. Frazer.

20          THE COURT:  "Did you holla at you sis about pooh

21   yet?"  All right.  And what's the next one?  And that's from

22   what?

23          MR. KIBBE:  That is from Darryl Frazer to Shamire

24   Moore.

25          THE COURT:  And what is it that I am -- what's the

1    evidentiary significance of this one, of the second one?

2              MR. KIBBE:  This -- Your Honor, these first two

3    messages are just purely for context.  On the next page is what

4    the government wants to focus on, and these are actually the

5    next two exhibits is he texts two pictures -- the defendant

6    texts two pictures to Shamire Moore.

7              THE COURT:  So -- okay.

8              MR. KIBBE:  And if you will give me a second, Your

9    Honor, I will pull that up next to this exhibit.

10             THE COURT:  What are we seeing -- we see Mr. Moore.

11             MR. KIBBE:  So Mr. Moore here (indicating) with the

12   money, and then behind him is Mr. Frazer, with the bag that he

13   was arrested with, making a gun gesture.

14             THE COURT:  Okay.  All right.  Is that the same

15   picture from both places?

16             MR. KIBBE:  It's similar, Your Honor.  I will pull

17   that up.  And here again on the right, we have Mr. Frazer and

18   then Mr. Moore behind him with gun gestures.

19             THE COURT:  All right.

20             MR. LAWLOR:  And Your Honor, if we could sort of take

21   these one at a time, would that be all right?

22             THE COURT:  Well, no.  I want to see if this is the

23   entire exhibit and then know what the government intends the

24   relevance is before I do anything else.

25             MR. KIBBE:  So those are the first three exhibits,

1   Your Honor.  The text chain is 21.28.  The first picture is

2   21.29.  And the third picture is 21.30.  And the relevance,

3   Your Honor, is that these were pictures texted from the

4   defendant to the charged coconspirator in this case, which

5   shows that they have a connection, which shows that they know

6   each other, and specifically they are texting pictures where

7   he's -- where Mr. Frazer, in the first one, he is wearing the

8   bag where the drugs and the gun were located.

9       In both of the pictures, there is gun gestures.  And in

10  the first picture, there is also charged coconspirator with the

11  money.  And, Your Honor, we'd argue this is relevant to the

12  charged conspiracy.

13          THE COURT:  Well, there is no coded language in any

14  of that.

15          MR. KIBBE:  No.

16          THE COURT:  Then if that's the basis for the

17  objection, there is no --

18          MR. LAWLOR:  No, Your Honor.  That's not the basis

19  for the objection.  The basis for the objection is, number one,

20  there is nothing relevant about this.

21          THE COURT:  No, it's relevant.  The objection is

22  overruled.  They have to show a connection between the two of

23  them.  So far, the connection that they have shown is the

24  videos of what happened that day and to show that the two of

25  them are there and they are in the pictures together does

 1  connect the two of them together.  That's relevant.

 2      I don't know how much it proves, but it's certainly

 3  relevant.

 4          MR. LAWLOR:  Can I also then state, Your Honor, that

 5  we would submit that this is inadmissible under Rule 403

 6  because, you know, they are trying to show these gun gestures

 7  because it's provocative in order to show that these are sort

 8  of bad guys.

 9          THE COURT:  Well, the -- the connection between the

10  two of them -- first of all, the charge includes possession of

11  a firearm in furtherance of a drug trafficking offense, so the

12  notion of firearms is not exactly foreign to the issues in this

13  case.

14      There is also a felon in possession count.  So the fact

15  that individuals who are charged with possessing a firearm in

16  furtherance of a drug trafficking offense might have exchanged

17  pictures where one of them is making a gun gesture and another

18  one is fanning out money like a deck of cards is surely

19  prejudicial, but it's not unfairly prejudicial.  It is designed

20  to prove the connection in both the conspiracy and the drug

21  aspects of the charges.  So the objection as to these exhibits

22  is overruled.

23      Next.

24          MR. KIBBE:  Your Honor, the next two text messages

25  are from the -- they end with --

1          THE COURT:  For what?

2          MR. KIBBE: -- the dates of the defendant's arrest.

3   So this text message, this is Exhibit 21.34.  And on -- excuse

4   me.  Just to orient the Court, the right, the green text is the

5   coconspirator, Mr. Moore.

6          THE COURT:  And which conversation was first?  Blue?

7          MR. KIBBE:  Blue.  So blue texts, Where ya at, "WYA,"

8   and it starts on July 19th, which is part of the time period of

9   the conspiracy, of the charged conspiracy.

10      Mr. Moore says, "Who is this"?

11      The person responds, This is Karen.  "Lil Kay."

12      Mr. Moore responds, "Oak."

13      Karen responds, "Yea."

14      And Mr. Moore responds, "Da oak."  As Your Honor will

15   recall, this is in the White Oak neighborhood.

16      And here, Your Honor, is the first coded language.  Karen

17   says, "Need pressure."  Now, we do not intend to offer, Your

18   Honor, testimony about what pressure means, what that coded

19   term means.

20      Karen then says, These people act like they are not

21   Gucci, paraphrasing, Your Honor.

22          THE COURT:  Yes.

23          MR. KIBBE:  Mr. Moore says, "What you got?" over

24   here.

25      Karen says, "$100.  I'm in the 30s where you seen me the

1  other day with Fred.  Where ya at.  Meet me by the pool."  And

2  this is now on July 19th the conversation has gone.

3       After that, there is some texts back and forth.  This is

4  July 20th, "I was trynna see you."  You were MIA.

5       Mr. Moore says, "I'm good."  I'm tryna get a couple

6  dollars."

7            THE COURT:  So who are these between?  The same Karen

8  and --

9            MR. KIBBE:  -- and Mr. Moore.

10           THE COURT:  Right.

11           MR. KIBBE:  And then skipping through page 7, Your

12  Honor.  And page 8, it says, "Good morning."  What are you

13  doing.

14       Here, Karen says, "Need more."  Tell em to hit my phone

15  now.

16       Mr. Moore says, All right.

17       Then Karen texts, "$160."

18       Mr. Moore says, 100 -- "hunnit," 100 -- bout to call you.

19       And he says, "Gas out here."  That's another coded word,

20  Your Honor, "gas out here," and we do not intend to offer

21  specific testimony about what the word "gas" means.  That's

22  July 21st.

23       And then after that on July 24th, the day before

24  Mr. Moore and Mr. Frazer were arrested, Mr. Moore texts, "Gas

25  on deck."

1          The next day, July 25th, Karen says, "Yo."

2          Mr. Moore says, "Call me."  This is July 25th.

3          July 25th, "Bring me some swerves on da gas and I got

4     you."

5          And that's this exhibit, Your Honor.  And the government

6     submits --

7               THE COURT:  If you are not going to show what swerves

8     and gas and all those coded language means, then tell me what

9     that -- why is that relevant?

10              MR. KIBBE:  A couple points, Your Honor.  One is that

11    this text shows that there is transactions going back and

12    forth, so that's one part of the relevance here.

13              THE COURT:  Transactions between whom?

14              MR. KIBBE:  Mr. Moore and Karen.

15              THE COURT:  Right.  But, I mean, she could be selling

16    antique stamps for all we know.

17              MR. KIBBE:  Right.  And so that is kind of the other

18    key point here is that we have charged, Your Honor, that

19    Mr. Moore and Mr. Frazer were conspiring to distribute

20    marijuana.  They were arrested on July 25th, each having

21    approximately $1,000 worth of marijuana.

22         The additional context here, which we will show in these

23    other text messages, is it's not just -- if we focus in on this

24    July 25th where Mr. Moore says, "I have got gas," there is half

25    a dozen text messages from Mr. Frazer saying "I have got gas"

1   on that same date leading up to just ten minutes before they
2   were arrested.

3          So the context, Your Honor, is that they are advertising
4   something, and the jury can infer and defense counsel can argue
5   that -- that they are selling antiques, but the context here is
6   they are telling different people, different customers, I have
7   got gas, I have got gas, I have got gas, I have got gas, I have
8   got gas, and then they are each arrested with $1,000 worth of
9   marijuana.

10         These text messages are relevant to their conduct, to
11  what they are doing that day, to what they have, and the jury
12  can weigh that evidence and determine if they are selling
13  antiques or if they are selling marijuana.

14         We won't say what does gas mean to our drug trafficking
15  expert, although, Your Honor, the drug trafficking expert was
16  noticed as an expert in marijuana transactions.

17         THE COURT:  Right.  But it's -- it's -- it's --
18  marijuana transactions -- well, that's a conclusory title for
19  what the general expertise is of that witness.  It is not what
20  the rule requires, which is the opinions that are going to be
21  offered and the basis for that.  That's the problem is it's a
22  -- it's a title as to a general area of expertise without any
23  of the underlying facts or opinions that are going to be
24  expressed on that unless you can show me in the disclosure that
25  there was more than that.

1          MR. KIBBE:  This is the expert disclosure, Your

2   Honor, and I can pass this up to you if that's easier for you

3   to read.

4          THE COURT:  I can see it.

5      So distribution of marijuana in the local area.  So he

6   can talk about, well, in this area, in Oak, they are selling

7   this, that, and the other thing.  Okay.  Fine.  That doesn't

8   have anything to do with those emails.

9      The methods used by drug traffickers in the distribution

10  of controlled substances, so the methods used.  Well, they sent

11  text messages, they sent Tweets, for all I know, smoke signals,

12  whatever.

13         MR. KIBBE:  And that, Your Honor, we would submit is

14  directly relevant to these text messages, the methods used to

15  contact customers.

16         THE COURT:  Right.  But that's like the methods used

17  by drug traffickers in the distribution of marijuana.  That

18  just says they send certain text messages.  Then the text

19  messages, themselves, have to be able to establish that what

20  they are selling is -- is marijuana.  And that's a different

21  thing than saying that even without defining gas and those

22  other terms in those text messages, the fact that something is

23  being bought and sold, bought and sold, and then they are

24  caught with this stuff right there, you can infer from that

25  that what they are referring to is marijuana because of the

1  frequency of the timing of when these were done and the fact

2  that they were caught with money and with scales and with

3  gloves and with marijuana and our expert says it's distribution

4  size, not personal use.  From that, we are saying this is

5  actually evidence of drug distribution even though none of

6  these terms have been defined or anything else.

7       That, I am going to allow.  But I am not going to allow

8  him to define those terms.

9       I understand what you are saying about the timing of

10  that, and, you know, it has some tendency to prove, so it's

11  relevant under 401.  It's not being offered in isolation

12  because it's connected up with what actually happened.  How

13  strong it is or how much weight it has, that's up to the jury.

14  And I suspect that, on cross-examination, there are -- it's

15  going to be brought out that none of these things refer to any

16  of these terms, and so how much help it gives you, not my --

17  not my issue.  That's the jury's issue.

18       But I will allow that in.  But he's not going to testify

19  to what gas or any of those other things mean.

20            MR. KIBBE:  Understood, Your Honor.

21            MR. LAWLOR:  Can I be heard before you rule, Your

22  Honor?

23            THE COURT:  Go ahead.

24            MR. LAWLOR:  I mean, Your Honor, so I question the

25  relevance without being able to identify these terms.  To be

1   honest, if you let the texts in and then have the expert say,

2   in some form or fashion, back door, that this is evidence of

3   distribution, I can't -- I am -- my hands are tied from

4   cross-examining without basically opening up the door, Well,

5   how does that show distribution?  Well, because gas means

6   marijuana.  So I can't really cross-examine him on these texts

7   without basically, you know, reversing the relief that I asked

8   for.

9        So, basically, the government is being rewarded --

10       THE COURT:  Hold on one second.  You are not planning

11  on asking him, Are these text messages evidence of distribution

12  of marijuana, are you?

13       MR. LAWLOR:  Well, it's sitting out there, though.

14       THE COURT:  Wait a minute, Mr. Lawlor.  Don't

15  interrupt me.  Are you going to ask him that question?  You are

16  going to put your guy on the stand, and he is going to say,

17  This is what they do and this is all kinds of stuff.  Now, you

18  may have questions about whether this is consistent with

19  distribution or not, but in terms of this exchange of -- are

20  you going to ask this expert to interpret what this exchange of

21  text messages says?

22       MR. AKE:  Your Honor, I would plan to bring out first

23  what the -- before we even get to the text messages, get into

24  the -- the prices associated with -- with user doses of

25  marijuana.  So there is going to be times where I am going to

1  ask, Is this price consistent -- because there is different

2  drugs involved -- Is this price consistent with the price of a

3  joint or, for instance, a, you know, an ounce of marijuana

4  versus an ounce of some other controlled substance or a price

5  of a pill, so that would be the extent of it, Your Honor.

6          THE COURT:  But are you then going to, in these

7  particular exhibits, say -- for example, would you show this

8  series of exhibits to the officer and then say --

9          MR. AKE:  I am not going to ask his opinion.  I am

10  just going to have him read through them, Your Honor, just to

11  get it into evidence because that's -- we just need some way to

12  get it into evidence and we don't have a witness.

13          THE COURT:  So he's not going to then try and say,

14  This is evidence of drug distribution.  He is going to say,

15  These are text messages and you have got the prices, and then

16  that's up to you in argument to argue that you connect the

17  timing --

18          MR. AKE:  Yes, Your Honor.

19          THE COURT: -- and the purposes.  You could say

20  something like what's the significance of this date, whatever,

21  if he knows that, and the date is the date they were arrested,

22  but that's it.

23          MR. AKE:  Yes, Your Honor.

24          THE COURT:  You don't get to go in there and try to

25  fill in all the blanks.  He doesn't get to define the terms.

1    And then what we have got, if you have got evidence of

2    exchanging of pictures with money and guns, they are on the

3    street together, they have got the same bag, this is the date

4    they were arrested, they were arrested with these drugs, and in

5    the three hours before, there are a series of text messages

6    between these various parties and one or more of the

7    coconspirators talking about the purchase or sale of something,

8    and the dollar amounts that they are talking about are

9    consistent with the amounts that stuff goes on the street.

10            MR. AKE:  Pretty much, Your Honor.

11            THE COURT:  All right.

12            MR. AKE:  Yes, Your Honor.

13            THE COURT:  I will allow that.

14            MR. LAWLOR:  Your Honor, can I be heard before you

15   rule?

16            THE COURT:  Go ahead.

17            MR. LAWLOR:  This is the second time the government

18   has made an argument and Your Honor has ruled without me even

19   being able to state the basis of my objection.

20            THE COURT:  Well, I already thought I knew the basis

21   of your objection.

22            MR. LAWLOR:  You did not because I am not being heard

23   on it.

24            THE COURT:  Then speak.

25            MR. LAWLOR:  Okay.  So, Your Honor, without the terms

1    being defined, number one, these are not relevant.  Number two,

2    to the degree they are relevant, under 403, the danger of

3    confusion substantially outweighs any relevance, which is

4    minimal at best.  Number three, these are statements made by

5    Mr. Moore.  They are, therefore, hearsay.  And under

6    801(d)(2)(E), the government has not yet proved, as it has

7    to -- one of the predicates for admission under 801(d)(2)(E) is

8    that the statement was made during the course of the

9    conspiracy.

10          What we have so far in evidence, Your Honor, is these

11   two, Mr. Moore and Mr. Frazer, being together at some point

12   later on the 25th.  I don't even think as to what occurred

13   during the chase and the arrest equates to a conspiracy, but

14   even to the degree that it does, those events have occurred

15   after these statements are made by Mr. Moore, so they are

16   hearsay.  That's my objection, Your Honor.

17          THE COURT:  Response.

18          MR. KIBBE:  Your Honor, the defendant, Mr. Frazer,

19   and Mr. Moore were walking around together with bags with

20   nearly identical contents.  When I say "nearly identical

21   contents," each had four bags of 28 grams, 28 grams, 28 grams,

22   24 grams, nearly the same image of marijuana.  Each had a gun.

23   Mr. Moore had all the money.  And the government is going to

24   argue that Mr. Moore was keeping the money from the sales that

25   came from those two bags that were less than 28.  That's the

1  foundational facts of the conspiracy for marijuana.

2          THE COURT:  So when does this conspiracy start?

3          MR. KIBBE:  It's charged June and July of 2019, Your

4  Honor.

5          THE COURT:  And it ends in?

6          MR. KIBBE:  July, July 25th.

7          THE COURT:  The text messages were sent when?

8          MR. KIBBE:  July 16th through the 25th.

9          THE COURT:  And the conspiracy ends?

10          MR. KIBBE:  July 25th.

11          THE COURT:  July 25th.  After the text messages were

12  sent?

13          MR. KIBBE:  Yes, when they were arrested.

14          THE COURT:  All right.  So, number one, objection,

15  relevant, overruled.  It has some tendency to prove

16  circumstantially that there are drugs sales.  We have back and

17  forth someone is asking for something, someone is saying they

18  have got something.  There is a price that's being offered.

19  The price that's being offered is, separately and apart, your

20  expert is going to say, that the quantity amounts of individual

21  is within that consistent with what drugs are selling for.

22      You have got, in that same chronological period of time,

23  they are seen walking together with the satchels after the

24  shooting, and culminating on the 25th, when they are both

25  arrested, which is after it but during the conspiracy period,

1  circumstantially infer from the fact that they are there with

2  the drug paraphernalia, with the money, with the firearms,

3  flight from law enforcement, all those things from which they

4  can circumstantially infer that that lead up in text messages

5  was part of selling something that was drugs.  That is a

6  inference that they can draw circumstantially.

7       Will they draw it?  Maybe.  Maybe not.  But it's

8  certainly relevant.

9       Is it excessively prejudicial?  No, not when it's put in

10  the context of all of those events in the sequence, which start

11  with the -- the -- them being seen beforehand, the carrying of

12  the bags, the going to apartments in -- and then coming back

13  from the apartments where what they were doing is not known.

14  Then you have got the text messages back and forth.  Then you

15  have got them on the street with the marijuana.  Those all fit

16  together.

17       Is that excessively prejudicial?  No.  It is prejudicial

18  in the sense that it is a connection from which a reasonable

19  fact finder could infer that these are all part of

20  communications, part of drug activity.  It is not excessively

21  prejudicial.

22       And then, finally, is it hearsay under 801(d)(2)(E)?

23  Well, if it's under 801(d)(2)(E), it's not hearsay by

24  definition.  And was it a statement of a coconspirator made

25  during the course of and in furtherance of a conspiracy?  It's

1 within the conspiracy date.  It's after the date in June and

2 it's before the 25th when they are arrested.  This is

3 established not simply by the statement itself but by the other

4 contexts.

5      So with that in mind, on the basis of the objection, I am

6 overruling it and I am letting it in.

7           MR. LAWLOR:  Your Honor, just for the record, the

8 date the conspiracy is charged is not the triggering event for

9 801(d)(2)(E).

10           THE COURT:  It's during the course of and in

11 furtherance of the conspiracy.

12           MR. LAWLOR:  But that's the charged conspiracy.

13 There is no evidence on this record that the conspiracy began

14 in June.  There is no evidence this conspiracy began any time

15 before they were confronted by the police on July 25th.  Just

16 because it's charged doesn't mean it's true.

17           THE COURT:  No.  These text messages that predated

18 the 25th is evidence that the conspiracy predated that.  They

19 are allowed to try to prove it circumstantially.

20           MR. LAWLOR:  Your Honor, how is texts between

21 Mr. Moore and a third party evidence that Mr. Moore and

22 Mr. Frazer were conspiring?

23           THE COURT:  It is evidence when it's put in the

24 context of all of the other connections between these two

25 individuals.

1        I have ruled, Mr. Lawlor.  I have ruled.  I have heard

2   your objections.  I have heard your objections several times.

3   I have overruled them.  That is the ruling of the Court.  Your

4   issue is preserved for purposes of further review.

5        What next?  We got a jury waiting to come in.

6             MR. KIBBE:  Your Honor, the defendant has passed us a

7   binder with proposed exhibits, including exhibits from the text

8   messages, and these relate to text messages where the defendant

9   says that he's trying to be a good father and he's trying to

10  get a job, and, Your Honor, the government submits that these

11  text messages are hearsay unless the defendant wants to take

12  the stand himself.

13             THE COURT:  So what are these -- what are you talking

14  about?  These are defense exhibits?

15             MR. KIBBE:  Yes, Your Honor.  May I, Mike?

16             MR. LAWLOR:  Of course.  Your Honor should have a

17  binder.

18             THE COURT:  Pardon me?

19             MR. LAWLOR:  You should have that binder.

20             THE COURT:  Oh, it's up here.

21             MR. LAWLOR:  And if you want me to put them on the

22  screen, Your Honor -- I don't have a PowerPoint, but I know

23  they are small.

24             THE COURT:  No.  I got it.

25        All right.  So you have got the Montgomery County traffic

1   violation.  There is no objection to that.  I think it's

2   already in.

3            MR. KIBBE:  Yes.  That's in, Your Honor.

4            THE COURT:  All right.  Exhibit 2 -- I want to know

5   the exhibit number of the one that you are --

6            MR. KIBBE:  Yes.  So this would be Exhibits 2 through

7   6, the rest of the binder, Your Honor, that we are objecting

8   to.

9            THE COURT:  So what is -- what is Exhibit 2?

10            MR. KIBBE:  Exhibit 2, I believe, Your Honor, is

11   Mr. Frazer on the right.  He's texting somebody else.  So

12   Mr. Frazer in the green text says, "I'm trying to be a great

13   father."  The person in blue says, "I am sure you are."  And

14   Mr. Frazer says, "Thanks."  And then on the next page, you can

15   see that Mr. Frazer texts a picture, which is then Exhibit 3,

16   and I presume that's a picture of Mr. Frazer and his daughter.

17            THE COURT:  So tell me what this is offered to show.

18            MR. LAWLOR:  So, Your Honor, you know, the government

19   has, in their opening statement, sort of made it out to be that

20   Mr., you know, Frazer is this sort of kingpin, large-scale drug

21   dealer, and these, in mass, these text messages show, you know,

22   that he's trying to get a job, that he's trying to spend time

23   with his child, which is sort of contrary to the premise that

24   the government is attempting to establish, you know, that he's

25   out on the streets selling drugs.

1          THE COURT:  Well, they are not trying to prove he's a

2    bad father and they are not trying to prove he's -- he doesn't

3    work.  I mean, the -- the defense -- the defendant, under

4    404(a)(2)(A), can introduce evidence of a pertinent character

5    trait of the defendant, and that is -- but it has to be a

6    pertinent character trait, and there is nothing about his

7    character for gainful employment or his character as a good

8    father that is at issue in this case.

9          Similarly, the manner in which his character can be

10   proved is governed by Rule 405(a), and it's limited to opinion

11   or reputation testimony, not specific instances of conduct.

12         So just simply the fact that he's -- that there is no

13   issue in this case as to how good a father he is or whether

14   he's gainfully employed or not.

15         MR. LAWLOR:  Your Honor, it's also -- you know, the

16   government opened on this theory, again, straddling the line

17   about the fact that Mr. Frazer has a prior conviction to

18   suggest that.  They sort of put his character at issue by

19   instead of saying his prior gun conviction will go to prove

20   that he was prohibited, but rather to say that he was this

21   criminal.

22         THE COURT:  We already have a limiting instruction in

23   the jury instructions.

24         MR. LAWLOR:  Nonetheless, the government is the party

25   -- out of -- so this is -- out of 10,000 texts, these are six,

1  and, you know, I submit, Your Honor, that the government, not

2  the defense, put Mr. Frazer's character at issue here.  So I

3  ought to be able to put something in to --

4          THE COURT:  Well, they are not putting his general

5  character at issue.  If every time they charged someone with

6  being a drug conspirator or a possession of a firearm by a

7  person with a felony conviction place their general character

8  at issue, then in every single case that we had of this, then

9  all kinds of evidence could be brought in regarding a, quote,

10 general character when there is no specific character trait

11 that they have put at issue or that the character trait that's

12 trying to be proved is not pertinent to the case.  So I don't

13 see that this can come in, Exhibit No. 2.

14      What's No. 3?  This is a picture of the picture that was

15 attached.  So three is the same.

16      What is Exhibit No. -- what's the second page of Exhibit

17 No. 3?

18          MR. KIBBE:  Your Honor, I believe that's the metadata

19 for that picture.

20          THE COURT:  Okay.  What's Exhibit 4?

21          MR. KIBBE:  I believe that's a calendar for a job --

22 a calendar entry for a job interview on July 18th for

23 Mr. Frazer.

24          THE COURT:  I don't see how that is admissible.  And

25 it's the same thing for 5, job.

1       What's 6?

2               MR. KIBBE:  6, Your Honor -- and Mike, if you'd

3    prefer to describe these, I don't mean to take this from you --

4    this is a text message exchange about a potential job.

5               THE COURT:  I see that.  And 6 is the last exhibit?

6               MR. KIBBE:  Yes, Your Honor.

7               THE COURT:  All right.  Has everybody said what they

8    want to say before I rule?

9               MR. KIBBE:  Nothing further from the government, Your

10   Honor.

11              MR. LAWLOR:  I don't have anything else to add, Your

12   Honor.

13              THE COURT:  All right.  The -- the government has

14   charged the defendant with conspiracy to possess with the

15   intent to distribute narcotics, possession with the intent to

16   distribute marijuana, use of a firearm or carrying a firearm in

17   connection with a drug trafficking offense, and possession of a

18   firearm by a prohibited person.  None of these charges,

19   themselves, place the defendant's character at issue.  Rather,

20   they are specific criminal offenses that are -- that charge the

21   defendant with discrete criminal activity that the government

22   has to prove.

23       The defendant is allowed, under Evidence Rule 404(a)(2),

24   to introduce evidence of a pertinent character trait of the

25   defendant, or, under certain circumstances, a victim.  The key

1  to that rule is it must be a pertinent character trait.  And,

2  so, the specific texts that we have here deal with being a good

3  father.  There is nothing about the case that the government

4  has put forward that in any event in any way calls into

5  question how good a father the defendant is.

6       The job interviews and offer issues have not been put at

7  issue in any way by the government.  And merely saying someone

8  may be a drug distributor or possess a firearm when they are

9  prohibited in no way calls into question whether or not they

10  seek gainful employment or whether they are a good parent.

11       Moreover, even if under Rule 404(a)(2)(A), the character

12  traits that are identified in these exhibits could be proved,

13  which I rule that they cannot, then they could -- the method of

14  proof would be governed by Rule 405(a).  405(a) limits the

15  method of proof of character to opinion or reputation

16  testimony, not specific instances of communications like this.

17  And 405(b) would only allow specific instances of conduct if

18  character is an essential element of a claim, defense, or

19  charge, which it's not.

20       So, for that reason, these are not admissible, and I am

21  not going to allow them to be introduced.  We will keep these

22  as exhibits.  The basis for the ruling and the purpose for

23  which it was being offered is part of the record, but that is

24  the ruling of the Court.

25       May we bring the jury in?

1          MR. KIBBE:  Yes, Your Honor.

2          THE COURT:  All right.  Bring them in, please.

3      (The jury panel enter the courtroom at 9:42 a.m.)

4          THE COURT:  All right.  Everybody have a seat.

5      Ladies and gentlemen, thank you very much.  I know that

6  you were here on time.  There were a couple of legal matters

7  that I am required to take up with the lawyers without you

8  being present.  We have just finished with those now and so we

9  can get started.  My apology for the fact that it took us a

10  little bit of time, but these things happen during the course

11  of a trial, and I appreciate your patience, as do the parties.

12          So, with that in mind, do we have a witness that we can

13  put on the stand?

14          MR. KIBBE:  Your Honor, the government calls

15  Detective Karen Carvajal.

16          THE COURT:  Come forward, please, and walk through

17  the double doors.  Come around here to the front.  And before

18  you step up into the witness stand, face our courtroom deputy

19  and she will administer the oath.

20          KAREN CARVAJAL, GOVERNMENT'S WITNESS, SWORN

21          THE DEPUTY CLERK:  Thank you.  Please be seated.

22      Please state your first and last name for the record and

23  please spell your first and last name.

24          THE WITNESS:  Karen, K-A-R-E-N; last name is

25  Carvajal, C-A-R-V-A-J-A-L.

1          THE COURT:  All right.  You have to do that again

2    louder and slower, please.

3          THE WITNESS:  Karen, K-A-R-E-N; last name is

4    Carvajal, C-A-R-J-A-V-A-L.

5          THE COURT:  Ma'am, the only people who are allowed to

6    be in the courtroom without a mask are people who are

7    vaccinated and only while they are speaking.  Does that meet

8    you?

9          THE WITNESS:  I'm sorry.  I couldn't hear you.

10          THE COURT:  Are you vaccinated, ma'am?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.  You can't be in the courtroom

13    without wearing a mask unless you are actually vaccinated and

14    actually doing the speaking so that you qualify under that

15    criteria.  Correct?

16          THE WITNESS:  Correct.

17          THE COURT:  I need you to listen carefully to the

18    questions.  If a question is not clear, let me know and I will

19    make sure it's clear before you answer it.  If it is clear,

20    answer it directly.  Don't guess.  Don't speculate.  Don't

21    volunteer.

22      If you are asked to look at an exhibit before you testify

23    about it, you may do so.  But if you are asked to look at

24    something to refresh your recollection, after having done so,

25    you must put it down and answer based upon your memory and not

1    the document unless the document has been admitted into

2    evidence.

3         Can you follow those instructions?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.  You may proceed.

6                        DIRECT EXAMINATION

7    BY MR. KIBBE:

8    Q.    Good morning.

9    A.    Good morning.

10   Q.    What is your title?

11   A.    I am a detective.

12   Q.    Detective Carvajal, who do you work for?

13   A.    Montgomery County Police.

14   Q.    And how long have you worked for the Montgomery County

15   Police?

16   A.    Since 1994.

17   Q.    What is your present assignment?

18   A.    I am a forensic -- digital forensic examiner with the

19   Electronic Crimes Unit, which is part of the crime lab of

20   Montgomery County Police.

21   Q.    And how long have you been a digital forensic examiner?

22   A.    Since 2017.

23   Q.    And, so, that's the job that you were doing in the summer

24   of 2019.  Is that correct?

25   A.    Correct.

1  Q.    Before you were a digital forensic examiner, what did you

2  do for the Montgomery County Police Department?

3  A.    I was assigned to the child abuse division from about

4  2001, and prior to that, I was a patrol officer.

5  Q.    What kind of work do you currently do as a digital

6  forensic examiner?

7  A.    I examine digital devices.

8  Q.    And what does that mean?

9  A.    Generally, what it means is we extract the data when a

10 submission requests -- something is requested by the lab --

11 from the lab.  We then will get whatever the evidence is.

12 Sometimes it's a cell phone, a computer, SD cards, thumb

13 drives.  And we extract the data and examine it and give it

14 back to the investigator in the format that they can read.

15 Q.    Do you see -- do you receive any type of training to do

16 this work?

17 A.    Yes.

18 Q.    And what kind of training did you receive?

19 A.    I have been through hundreds of hours of training in the

20 field of digital forensics: cell phone, computers, file

21 systems, extraction of data, imaging of computers, analysis.

22 Q.    And do you have any certifications to perform this sort

23 of work?

24 A.    Yes.

25 Q.    And could you please briefly describe those?

1    A.    I hold certifications through Cellebrite, which is a tool

2    that we use to extract and analyze mobile devices.  I also have

3    computer certifications through NWC -- 3C and ASIS.

4    Q.    Did you have an opportunity to review any evidence

5    associated with this case?

6    A.    Yes.

7    Q.    And what did you review?

8    A.    Two cell phones that were submitted.

9    Q.    And, generally speaking, what is the process when you

10   review the cell phones as part of this case?

11   A.    We receive -- generally, we receive a request into the

12   lab to examine a particular piece of evidence.  We -- once we

13   receive a request, we will have the evidence either sent or

14   brought to the lab.  Once it's there, the case is assigned.  We

15   -- assuming we have the search authority, we can then begin the

16   exam.

17         The exam consists of photographing the evidence.  In this

18   case, if it's a cell phone, removing the SIM card and analyzing

19   the SIM card and then analyzing the cell phone.

20   Q.    And what specific tools did you use in this case to

21   analyze the cell phones?

22   A.    Cellebrite and GrayKey.

23   Q.    And you mentioned Cellebrite earlier.  Can you just

24   review with us again what you can do with Cellebrite, what

25   Cellebrite shows you?

1  A.    Cellebrite can extract data from a device, a mobile

2  device.  It can also -- we use it to also use it to analyze

3  that data.

4  Q.    And when it's used to analyze data, what can you see when

5  you are using Cellebrite?

6  A.    When we have the extraction of the data from the device,

7  we then use a software, Cellebrite Physical Analyzer, and what

8  that helps us do is we -- we will load the file that contains

9  the data that was extracted from the device into Cellebrite

10 Physical Analyzer, and that is sort of a categorization of all

11 that data.  It takes the data, decodes it, and then puts it in

12 a format that we can read.  It organizes it into different

13 artifacts or categories of data to make it easier for the

14 person looking at it to be able to filter through data that --

15 that might be important to the case.

16 Q.    When you say "categories of data," what do you mean?

17 A.    Excuse me.  So, basically, you can filter data by types

18 of data: artifacts, call logs, contacts, images, videos, texts,

19 anything that -- any piece of data that can be put into a

20 particular category.

21 Q.    You mentioned text messages as one of the categories.

22       Can you then read the texts that were on the phone?

23 A.    Yes.

24 Q.    And you mentioned contacts.

25       Can you review the contacts that were on the phone?

Carvajal - Direct

```
 1   A.    Yes.

 2   Q.    Can you also view photos that were on the phone?

 3   A.    Yes.

 4   Q.    And do you have the ability to change any of the data

 5   that was on the phone?

 6   A.    No.

 7         MR. KIBBE:  Your Honor, may I approach the witness?

 8         THE COURT:  Yes.

 9   BY MR. KIBBE:

10   Q.    Detective Carvajal, I am showing you what has been

11   previously admitted as Government's Exhibit 12.

12         Do you recognize that?

13   A.    Yes.

14   Q.    What is it?

15   A.    It's an evidence bag containing a cell phone.

16   Q.    And do you recognize that cell phone?

17   A.    Yes.

18   Q.    You previously testified that you reviewed two cell

19   phones as part of this case.

20         Is that one of the cell phones you reviewed?

21   A.    Yes.

22   Q.    I am now showing you on the screen Government's Exhibit

23   13.

24         What is this?

25   A.    It's an extraction summary generated from Physical --
```

 1    Cellebrite Physical Analyzer.
 2    Q.    And directing your attention to the left side here.  I am
 3    going to blow it up.
 4              THE COURT:  Is this in evidence?
 5              MR. KIBBE:  The government would move to admit this
 6    into evidence.
 7              THE COURT:  Any objection?
 8              MR. LAWLOR:  Just based on the pretrial motion, Your
 9    Honor.
10              THE COURT:  All right.  Overruled.
11    BY MR. KIBBE:
12    Q.    What do we see here, Detective Carvajal?
13    A.    My name, my case number, and the evidence number.
14    Q.    So is it accurate that this is something -- that you
15    reviewed this -- that you generated this report?
16    A.    Yes.
17    Q.    Directing your attention to the left side of the screen
18    here.  Generally speaking, what kind of information is
19    included?
20    A.    It's just basic information about the device.  The Apple
21    I.D. is one of them, serial number, unique I.D., IMEI, ICCIDs.
22    Q.    And what is the Apple I.D. of this phone?  And I will
23    zoom in to make it easier to read.
24    A.    Darrylcfrazer@gmail.com.
25    Q.    I am going to zoom in on this bottom area here where it

Carvajal - Direct

1  says IMEI, IMSI, ICCID, and MSISDN.

2      Is there anything of significance in these categories of

3  information to you?

4  A.   There are -- the IMEI is a unique number to that device.

5  The MSISDN is typically the phone number that is associated

6  with the device.

7  Q.   And what is the phone number for this device?

8  A.   (240) 855-7123.

9  Q.   And is this report generated from the cell phone of --

10 from Exhibit 12 that you have in front of you?

11 A.   Yes.

12 Q.   I am now showing you what's been marked Exhibit 13.2.

13     What is this?

14 A.   It's an extraction report that is generated with

15 Cellebrite of a contact list.

16 Q.   And did this also come from the same phone that we have

17 been discussing?

18 A.   Yes.

19     MR. KIBBE:  Your Honor, the government moves Exhibit

20 13.2 into evidence.

21     THE COURT:  All right.  It's -- based upon the

22 pretrial rulings, it's admitted.

23 BY MR. KIBBE:

24 Q.   Detective Carvajal, directing your attention to the top

25 row here, what is this?

1  A.    It's a contact.

2  Q.    And what is the name of the contact?

3  A.    Mire Boy.

4  Q.    And what is the phone number of the contact?

5  A.    (202) 492-3062.

6  Q.    So is it accurate that this is a contact that was in that

7  phone for Mire Boy?

8  A.    Yes.

9        THE COURT:  What are the last four of that cell phone

10  number that's the contact of Mire Boy, please?

11  BY MR. KIBBE:

12  Q.    Can you please repeat the phone number.

13  A.    (202) 492-3062.

14        THE COURT:  Thank you.

15  BY MR. KIBBE:

16  Q.    I am now showing you what has been marked Government's

17  Exhibit 13.3, and I am pulling it up on the left side of your

18  screen.

19        What is this?

20  A.    It's an extraction report generated from the Cellebrite

21  report.

22  Q.    And is this from the same phone that we have been

23  discussing?

24  A.    Yes.

25        MR. KIBBE:  Your Honor, the government moves Exhibit

1   13.3 into evidence.

2            THE COURT:  All right.  So is this from the phone

3   ending 7123?

4            THE WITNESS:  I just would prefer to look at the

5   phone numbers on the extraction report.  Yes.

6            THE COURT:  All right.  Then, again, admitted for the

7   same reasons previously ruled on before court.

8   BY MR. KIBBE:

9   Q.    Detective Carvajal, to orient us, can you please explain

10  the difference between the green and the blue texts that we see

11  on this exhibit?

12  A.    Yes.  When you are seeing those chat bubbles, the report

13  in this chat bubble format, the owner of the phone will be on

14  the right and the person that they are communicating with will

15  be on the left.

16  Q.    So the owner of the phone is in green text.  Is that

17  correct?

18  A.    Correct.

19  Q.    And the person they are communicating with is in the blue

20  text.  Correct?

21  A.    Correct.

22  Q.    What does the owner of the phone say in the top message

23  on the first page?

24  A.    "Wuz up."

25  Q.    And what does the person in blue say in response?

```
 1    A.      "Who is this."
 2    Q.      Turning to page 2 of the exhibit, what does the person in
 3    green say at the top?
 4    A.      "Dis Darryl.  Wuz up."
 5    Q.      Turning to page 5 of this exhibit, what does the person
 6    in green say at the top?
 7    A.      "I got a new page though."
 8    Q.      And what does the person in green say next?
 9    A.      "My IG is Frazer 3878."
10    Q.      Turning to page 7 of this exhibit, what does the person
11    in green say at the top?
12    A.      "If I send a pic and you like what you see is you gonna
13    send me a pic too."
14    Q.      Finally, turning to page 10 of this exhibit, what does
15    the person in green text?
16    A.      What is what?  I'm sorry.
17    Q.      What does the person in green text?
18    A.      An attachment.
19    Q.      And what is the attachment of?
20    A.      An image.
21    Q.      And can you tell what that image is?  And I will blow it
22    up for you.
23    A.      It's a -- an image of a black male.  Excuse me.
24    Q.      On the right side of your screen, I am showing you what's
25    been marked Government's Exhibit 13.4.
```

1          What is this?

2    A.    It's the same image of a black male.

3    Q.    And this also came from the same phone that we have been

4    discussing?

5    A.    Yes.

6    Q.    And this is the image that was texted?

7    A.    Yes.

8              MR. KIBBE:  Your Honor, the government moves Exhibit

9    13.4 into evidence.

10             THE COURT:  Any objection?

11             MR. LAWLOR:  Same one, Your Honor.

12             THE COURT:  All right.  It's overruled.

13   BY MR. KIBBE:

14   Q.    Now showing you what's been marked Government's Exhibit

15   13.5.

16         What is this?

17   A.    An extraction report generated with Cellebrite of also

18   text messages.

19   Q.    And did this come from the same phone that we have been

20   discussing?

21   A.    Yes.

22             MR. KIBBE:  Your Honor, the government moves Exhibit

23   13.5 into evidence.

24             THE COURT:  All right.  Notwithstanding, I am going

25   to say, a continuing objection on your part, Mr. Lawlor, it's

1  admitted.

2  BY MR. KIBBE:

3  Q.    I am now showing you Exhibit 13.6.

4        What is this?

5  A.    An extraction report generated with Cellebrite also of

6  text messages.

7  Q.    And is this from the same phone?

8  A.    Yes.

9        MR. KIBBE:  Your Honor, the government moves Exhibit

10  13.6 into evidence.

11       THE COURT:  Admitted.

12  BY MR. KIBBE:

13  Q.    I am now showing you Exhibit 13.7.

14        What is this?

15  A.    An extraction report generated with Cellebrite, and it's

16  also messages.

17  Q.    And is it from the same phone?

18  A.    Yes.

19       MR. KIBBE:  Your Honor, the government moves 13.7

20  into evidence.

21       THE COURT:  Admitted.

22  BY MR. KIBBE:

23  Q.    I am now showing you 13.8.

24        What is this?

25  A.    An extraction report generated with Cellebrite of

1    messages.

2    Q.    And is it from the same phone?

3    A.    Yes.

4          MR. KIBBE:  Your Honor, the government moves 13.8

5    into evidence.

6          THE COURT:  Admitted.

7    BY MR. KIBBE:

8    Q.    I am now showing you 13.9.

9          What is this?

10   A.    An extraction report generated with Cellebrite also of

11   text messages.

12   Q.    And did it come from the same phone?

13   A.    Yes.

14         MR. KIBBE:  Your Honor, the government moves 13.9

15   into evidence.

16         THE COURT:  Admitted.

17         MR. LAWLOR:  Objection, Your Honor.  Can we approach?

18         THE COURT:  Come on up.

19         (The following took place at sidebar outside the presence

20   of the jury; Mr. Lawlor and Mr. Kibbe present.)

21         MR. LAWLOR:  So, Your Honor, 13.7, 8, 9, and 10 also

22   have coded language.  Some are looking for a dove, some are

23   looking for a 30, some are looking for a 20.  So my argument is

24   that those are, again, without an expert to really sort of

25   define what these terms are, they would have no relevance.

 1          THE COURT:  Well, so hold on one second there,

 2   Mr. Lawlor.  Is your drug expert going to talk about specific

 3   dollar amounts for certain individual use purchases that are

 4   consistent with the numerical, you know, 30, 20, whatever?  I

 5   don't know what the numbers say.  I can't read it.  It's too

 6   small.

 7          MR. LAWLOR:  On this range, it's, like, I think a 30

 8   and a 20.

 9          MR. KIBBE:  So the drug expert is going to testify

10   first generally about different drug prices and different

11   quantities.  And then, as Mr. Ake discussed earlier, Mr. Ake is

12   planning to ask the drug expert:  Is this consistent with, you

13   know, drug distribution, I guess consistent with these

14   quantities and these prices?  We will not be asking to define

15   specific slang terms.

16          THE COURT:  Well, in other words, if there is going

17   to be evidence, for example, a 20, that a 20 is -- is -- I

18   don't know, whatever -- whatever an ounce, a gram of marijuana

19   an individual use bag costs between $20 and $30, then that's

20   part of just simply the general information that was provided

21   in the disclosure, I will allow it.

22          But not to go in there and to identify, you know, the

23   terms of what these things are.  If he's already testified that

24   -- as to something -- for example, if there is a foundation

25   already laid as to what, like, 30 or 20 means in terms of

1   quantities of drugs purchased, then if the exhibit ties in with

2   that without having to define some ambiguous term, then is that

3   consistent with seems inappropriate question to ask but not to

4   define any of the underlying terms.  So your objection is

5   noted.

6                MR. LAWLOR:  Can I be heard a little further on this?

7                THE COURT:  Yeah.

8                MR. LAWLOR:  The problem is to say a 20 just as an

9   example, or a 30, you can buy an oxy pill, 30 milligrams, for

10  $30.  You can buy a certain amount, like a hit of heroin, for

11  $20.  You can buy one pill of MDMA for $30.  And you can buy

12  some particular quantity of marijuana, I don't know how much,

13  for $30.  So to me, letting this come in without defining the

14  terms but still letting it come in and letting the government

15  say, Well, this is demonstrative of drug distribution,

16  basically eviscerates the Court's ruling.

17       The government failed to give discovery in a timely

18  fashion.  The sanction was they couldn't define the terms, but

19  they are basically backdooring the same thing by saying, Well,

20  this is evidence of drug distribution.  You say it's

21  admissible, but, well, as to which conspiracy?  the marijuana?

22  heroin?  oxy?

23       So this is -- I don't think it's relevant under 401,

24  number one.  Under 403, there is a real danger of confusion

25  here.  And finally, Your Honor, this -- like I said, this

1  defeats the Rule 16 ruling that you made.  And, honestly, Your

2  Honor, because of that ruling, because of their discovery

3  violation, it deprives me of the right of confrontation because

4  he's going to say, Well, this is evidence of drug distribution.

5  I can't say, Well, how is it?  Because he's going to say, Oh,

6  dove is blank, and, you know, now I am stuck with that.

7          This is the argument I was making about Moore, and this

8  is the same argument I am making in addition to the Fourth

9  Amendment issue pretrial.  But any of these text messages that

10 have code in them should not come in.  How do I confront that

11 without, you know, opening the door or simply having the expert

12 say, Well, I know what the code is?

13         And so, Your Honor, you know, maybe I am repeating

14 myself, but I really feel like this is -- for all these

15 reasons, this just -- it shouldn't -- it should not be

16 permitted.

17         MR. KIBBE:  Your Honor, if I may?  This is the exact

18 issue that we talked about this morning for 45 minutes, and the

19 government will not be asking to define specific terms.  The

20 jury can infer or not based on --

21         THE COURT:  I think that -- I understand that and

22 that's the ruling that I made, and I don't have -- and I think

23 it's consistent with your being able to have a drug expert

24 testify in accordance with the disclosure as to a 20 -- I mean,

25 like Mr. Lawlor said, you can buy one oxy pill for $30.  You

 1   can buy X number of MDMA for $20, whatever, say all of that.

 2        But I think where I tend to agree with Mr. Lawlor is when

 3   you then go to these individual communications and say, Is this

 4   consistent with drug distribution?, that's the problem because

 5   we have that number which could be any number of things, and

 6   you have slang there that's not going to be defined, such as

 7   gas, and that, then, is -- is tantamount to defining what gas

 8   is by saying that the 30 means it's dealing with a drug

 9   transaction.

10        So I don't have a problem -- I have ruled that your drug

11   expert can set the basis for what certain terms mean in terms

12   of investigating drug offenses, like, a 20 could mean this, it

13   could mean that, it could mean the other thing, a 30 could

14   mean, this, that, or the other thing, and then introduce these

15   documents, and then argue to the jury that the expert told you

16   that a 20 means this and these are the exhibits that you see,

17   and you can circumstantially draw the inference that a 20 here,

18   in the context of everything else, is evidence of drug

19   distribution.

20        But I do agree that to then go to these individual

21   exhibits and ask the drug expert is this specific email

22   evidence of a drug -- consistent with a drug transaction is --

23   cuts out the essence of the limitation that I have ruled on the

24   basis that the disclosure did not contain the detail that gave

25   sufficient advanced notice to the defense to be prepared.

1          So that's the ruling.  All right?  Exhibits come in, the

2    testimony comes in, but going through each line of testimony

3    and asking if it's consistent with a drug transaction, I am not

4    going to allow it.

5                THE MR. KIBBE:  Yes, Your Honor.

6                THE COURT:  Okay?

7                MR. LAWLOR:  And I already repeated myself, but like

8    I said, I know you ruled, but my problem is, you know, the

9    government is still going to stand up in closing and say, Well,

10   you can infer that this is drug distribution, and I will have

11   been deprived of really confronting this expert because of the

12   untimely disclosure.  And they are going to still get up in

13   closing and say --

14               THE COURT:  Well, then, you can get up in closing and

15   say, All we know is this is 30, it could be any kind of things.

16   Or you can, if you want to, approach it with the expert if you

17   want to try and do that.

18         But I made my ruling and that's how we are going to

19   proceed.  All right?

20               MR. KIBBE:  Yes, Your Honor.

21         (End of sidebar discussion.)

22               MR. LAWLOR:  And Your Honor, can I just have a

23   continuing objection?

24               THE COURT:  Yes.

25               MR. LAWLOR:  On both grounds?

1        THE COURT:  Yes.

2   BY MR. KIBBE:

3   Q.    Detective Carvajal, returning to Exhibit 13.9, I may have

4   already asked you, but just to go over it again, what is this?

5   A.    It's an extraction report generated with Cellebrite from

6   messages.

7   Q.    And did this also come from the cell phone that was

8   identified in Exhibit 12 that we have been discussing?

9   A.    Yes.

10        MR. KIBBE:  Your Honor, if I have not already done

11  so, I'd like to move Exhibit 13.9 into evidence.

12        THE COURT:  It's admitted.

13  BY MR. KIBBE:

14  Q.    Detective Carvajal, I am now showing you Exhibit 13.10.

15        What is this?

16  A.    It's an extraction report generated with Cellebrite of

17  instant messages -- of messages.

18  Q.    And what does the person in blue text at the top of the

19  screen?

20  A.    An image.

21  Q.    And I am going to move this to the left side of the

22  screen, and on the right, I am going to show you Exhibit 13.11.

23        THE COURT:  What was that number, please?

24        MR. KIBBE:  13.11.

25  BY MR. KIBBE:

1   Q.    What is this, Exhibit 13.11?

2   A.    An image.

3   Q.    And did it come from the same phone that we have been

4   discussing?

5   A.    Yes.

6   Q.    Returning to 13.10 to zoom in on what was texted, is the

7   image that was texted on the first page of 13.10 the same image

8   in 13.11?

9   A.    Yes.

10  Q.    Returning to Exhibit 13.11 -- excuse me.  Returning to

11  Exhibit 13.10 --

12          THE COURT:  Are both of these offered into evidence?

13          MR. KIBBE:  Yes, Your Honor.

14          THE COURT:  Admitted.

15  BY MR. KIBBE:

16  Q.    -- and going to the third page of 13.10, what does the

17  person in blue text?

18  A.    An image.

19  Q.    And what is it an image of?

20  A.    It appears to be a prescription bottle, prescription pill

21  bottle.

22  Q.    On the right side of your screen, I am showing you

23  Exhibit 13.12.

24          What is this?

25  A.    An image of what appears to be a prescription pill

 1   bottle.

 2   Q.    And did it come from --

 3             THE COURT:  Ma'am, your voice is dropping off.  You

 4   need to keep your voice up, please.

 5   BY MR. KIBBE:

 6   Q.    What is 13.12?

 7   A.    An image.

 8   Q.    And did it come from the same phone that we have been

 9   discussing?

10   A.    Yes.

11             MR. KIBBE:  Your Honor, the government moves Exhibit

12   13.12 into evidence.

13             THE COURT:  Admitted.

14   BY MR. KIBBE:

15   Q.    Comparing the image on the third page of 13.10 with the

16   image in 13.12, are they the same image?

17   A.    Yes.

18   Q.    Staying on page -- or Exhibit 13.10 -- excuse me.  We

19   will go ahead and move on.

20         I am now showing you Exhibit 13.13.

21         What is this?

22   A.    An extraction report generated with -- by Cellebrite of

23   instant messages.

24   Q.    And is it from the same phone that we have been

25   discussing?

```
 1   A.    Yes.
 2              MR. KIBBE:  Your Honor, the government moves Exhibit
 3   13.13 into evidence.
 4              THE COURT:  Admitted.
 5   BY MR. KIBBE:
 6   Q.    I am now showing you Exhibit 13.14.
 7         What is this?
 8   A.    An extraction report generated with Cellebrite of instant
 9   messages.
10   Q.    And did it come from the same phone that we have been
11   discussing?
12   A.    Yes.
13              MR. KIBBE:  Your Honor, the government moves 13.14
14   into evidence.
15              THE COURT:  Admitted.
16   BY MR. KIBBE:
17   Q.    Showing you 13.15, Detective Carvajal.
18         What is this?
19   A.    An extraction report generated with Cellebrite of
20   messages.
21   Q.    And did it come from the same phone?
22   A.    Yes.
23              MR. KIBBE:  Your Honor, the government moves Exhibit
24   13.15 into evidence.
25              THE COURT:  Admitted.
```

```
 1    BY MR. KIBBE:
 2    Q.    I am now showing you Exhibit 13.16.
 3          What is this?
 4    A.    An extraction report generated with Cellebrite of
 5    messages.
 6    Q.    And did it come from the same phone?
 7    A.    Yes.
 8          MR. KIBBE:  Your Honor, the government moves 13.16
 9    into evidence.
10          THE COURT:  Admitted.
11    BY MR. KIBBE:
12    Q.    I am now showing you 13.17.
13          What is this?
14    A.    An extraction report generated with Cellebrite of
15    messages.
16    Q.    And did it come from the same phone?
17    A.    Yes.
18          MR. KIBBE:  Your Honor, the government moves 13.17
19    into evidence.
20          THE COURT:  Admitted.
21    BY MR. KIBBE:
22    Q.    I am now showing you 13.18.
23          What is this?
24    A.    An extraction report generated with Cellebrite of
25    messages.
```

1  Q.    Did it come from the same phone?

2  A.    Yes.

3              MR. LAWLOR:  Your Honor, can we approach?

4              THE COURT:  Come on up.

5         (The following took place at sidebar outside the presence

6  of the jury; Mr. Lawlor, Mr. Ake, and Mr. Kibbe present.)

7              MR. LAWLOR:  I don't want to be impolite or stepping

8  on someone's toes, but there are 61 of these, and I suggest if

9  the government is not going to have this witness read them,

10  that they just move them in en masse.

11              THE COURT:  Yeah.  I think that's probably right.  Do

12  you want to just --

13              MR. KIBBE:  Do you want me to do that?

14              THE COURT:  Yeah.  I think so.

15         The only thing I want to be careful of is I don't want

16  them shown to the jury -- for the jury to see them until they

17  are into evidence, and so I think that if you -- you have a

18  notebook of them, don't you?  They are in a notebook, aren't

19  they?

20              MR. AKE:  We can borrow one.

21              THE COURT:  I will give you mine.  You can take a

22  look at Exhibits X through Y, whatever time you want to take a

23  look at it, run through that, and then have it, when she's done

24  that, say, Are these all exhibits that were from the phone --

25              MR. LAWLOR:  I will stipulate that they are from the

```
 1  same phone.
 2          THE COURT:  Then, for this sequence, Mr. Kibbe, when
 3  does it end?
 4          MR. KIBBE:  13.60 or 61.
 5          THE COURT:  13.60 or 61.  So in terms of authenticity
 6  as to where they came from, that has been stipulated to.  The
 7  other objections are still there.
 8      I want to make sure, Mr. Ake, now that you are up here,
 9  that everybody understands the ruling I just made.  My concern
10  about the disclosures is that Rule 16(g) specifically says that
11  the summary of the expert must include the witness' opinions
12  and bases and reasons for those opinions.  That disclosure does
13  not do that with regard to the documents that Mr. Lawlor has
14  been objecting to.
15      And in going through and saying:  Is this email
16  consistent with text message or IM consistent with --
17          MR. AKE:  I will just have him read -- I will just
18  have him opine on the --
19          THE COURT:  I don't want any opinion on that.  He can
20  say that drugs -- that X number -- that oxycodone is sold in
21  pill format and it's a blue pill.
22          MR. AKE:  I will keep it clean like that, Your Honor.
23          THE COURT:  Because, otherwise, he can't
24  cross-examine, there is no confrontation, he had no specific
25  information on that, and couldn't give a counter-expert.
```

1          And I understand that the rule changed.  The rule changed

2    because I wrote to the Evidence Rules Advisory Committee and

3    said that the disclosures before this were garbage and they

4    needed to be increased, as did another judge, and they

5    considered it and they did it, and they did it to give this

6    kind of information so we wouldn't be here under these

7    circumstances.

8          So Mr. Lawlor's point is well taken.  You can lay a

9    foundation without reference to these text messages, but then

10   to go back in there does through the back door what the front

11   door didn't do, and that's what the rule requires.  And in my

12   court, that rule will be enforced.  All right?  All right.

13         (End of sidebar discussion.)

14   BY MR. KIBBE:

15   Q.   Detective Carvajal, we are going to move in a slightly

16   different fashion.  I am going to hand you a binder of the

17   exhibits.

18              MR. KIBBE:  Thank you, Your Honor.

19              THE COURT:  They are in the same shape they were.

20   BY MR. KIBBE:

21   Q.   So we last left off discussing 13.18 on the screen.  And

22   is it correct that you have had the opportunity to review all

23   these exhibits in advance?

24   A.   Yes.

25   Q.   And I'd like you to take a look at all of the exhibits

1  marked 13 now, take as much time as you need, and then I am

2  going to ask you where they came from and if you recognize

3  them.  So go ahead and take the time you need.

4  A.    Starting from 13.11?

5  Q.    Starting on 13.18.

6  A.    Oh, 13.18.  Through all of 13?

7  Q.    Yes.  Thank you, Detective.

8  A.    Okay.

9  Q.    Detective Carvajal, have you reviewed Exhibits 13.18

10 through 13.60?

11 A.    Correct.

12 Q.    Do those contain text messages and pictures?

13 A.    Yes.

14 Q.    And are they from the same phone that we have been

15 discussing?

16 A.    Yes.

17            MR. KIBBE:  Your Honor, the government moves to admit

18 Exhibits 13.18 through 13.60 with the exception of 13.27.

19            THE COURT:  All right.  Admitted.  Was that 13.61 or

20 13.60?

21            MR. KIBBE:  13.60, Your Honor, and without 13.27.

22            THE COURT:  Thank you.  13.26 is not yet in?

23            MR. KIBBE:  13.26, I move to admit, Your Honor, but

24 not 13.27.

25            THE COURT:  I misheard.  Thank you.

1          So Exhibits 13.18 through 13.60 but excluding 13.27 are

2     admitted.

3               MR. KIBBE:  Thank you, Your Honor.

4     BY MR. KIBBE:

5     Q.    Detective Carvajal, I am showing you what has been

6     admitted as 13.57.

7          What is this?

8     A.    An image.

9     Q.    And directing your attention to the second page of this

10    image, what are we looking at?

11    A.    It's a metadata about that image, about that file and

12    image.

13    Q.    Zooming in on the bottom of the screen, when was this

14    image created?

15    A.    The capture time is July 10, 2019, at 11:18 p.m.

16    Q.    Now showing you 13.58.

17         What is this?

18    A.    An image.

19    Q.    And directing your attention to the second page, are we

20    looking at the metadata again?

21    A.    Yes.

22    Q.    And at the bottom of the screen, when was this image

23    created?

24    A.    July -- the capture time was 7 -- July 20, 2019, at 10:32

25    p.m.

1    Q.    Now showing you Exhibit 13.59.

2          What is this?

3    A.    An image.

4    Q.    And directing your attention to the bottom of the second

5    page, when was this image created?

6    A.    It was taken July 20, 2019, at 10:32 p.m.

7    Q.    I am showing you Exhibit 13.60.

8          What is this?

9    A.    An image.

10   Q.    Directing your attention to the bottom of the second

11   page, when was this image taken?

12   A.    July 23rd, 2019, at 7:18 p.m.

13          MR. KIBBE:  Your Honor, may I approach the witness?

14          THE COURT:  Yes.

15   BY MR. KIBBE:

16   Q.    Detective Carvajal, I have just passed you what has been

17   marked as Government's Exhibit 20.

18          What is it?

19   A.    An evidence bag containing a cell phone.

20   Q.    And is this one of the cell phones that you reviewed in

21   this case?

22   A.    Yes.

23   Q.    On the left side of your screen, I am showing you what

24   has been marked Exhibit 21.28.

25          What is this?

A.    It's an extraction report generated with Cellebrite of

instant messages.

Q.    And did this report come from the phone that I just

showed you as Government's Exhibit 20?

A.    Yes.

Q.    And what is the phone number associated with this phone

in Government's Exhibit 20?

A.    1-202-492-3062.

Q.    On the right side of the screen, I am showing you what's

previously been admitted as Government's Exhibit 13.2.  And

zooming in on the top row, you previously testified that this

was a contact for Mire Boy, and the phone number was

(202) 492-3062.  Is that correct?

A.    Correct.

Q.    Apologies.  Let me pull that up again.

           THE COURT:  Did you move 13.2 in?

           MR. KIBBE:  13.2 has been moved in, Your Honor.

About to move 21.28 into evidence.

           THE COURT:  Admitted.

BY MR. KIBBE:

Q.    So on the left side of your screen, I am showing you

again 21.28.  On the right side of your screen, I am showing

you 13.2.  I am going to zoom in on the phone numbers.

      Can you compare the phone numbers for the owner of the

text thread in 21.28, the owner of the phone, with the contact

1   from Mire Boy in 13.2?  I'm sorry.  It's hard for me to get

2   them both at the same time.

3   A.    It's the same number.

4   Q.    Thank you.

5         Directing your attention back to Exhibit 21.28,

6   specifically the second page, you previously testified that the

7   person on the left side is a person that is the other person

8   part of the text messages.  Correct?

9   A.    Correct.

10  Q.    And in this text message in 21.28, what is the number of

11  that person?

12  A.    1-240-855-7123.

13  Q.    And is that the same number as the phone number for

14  Government's Exhibit 12?

15  A.    I'd like to refer back to the exhibit.  It is, but I just

16  would want to make sure.

17  Q.    So on the right side of the screen, I will show you

18  Government's Exhibit 13.  And directing your attention to the

19  bottom here, what is that number?

20  A.    (240) 855-7123.

21  Q.    And back to 21.28, what is the number here?

22  A.    1 (240) 855-7123.

23  Q.    So are they the same number?

24  A.    Yes.

25  Q.    Now directing your attention to the second page of 21.28.

```
 1          What does the person in blue text?
 2   A.    It's an attachment, an image.
 3   Q.    On the right side of your screen, I am showing you 21.29.
 4          What is this?
 5   A.    An image.
 6   Q.    And did it come from the same phone in Government's
 7   Exhibit 20?
 8   A.    Yes.
 9   Q.    Blowing up these images, is it the same image that was
10   texted in 21.28?
11   A.    Yes.
12          MR. KIBBE:  Your Honor, the government moves Exhibit
13   21.29 into evidence.
14          THE COURT:  Admitted.
15   BY MR. KIBBE:
16   Q.    On 21.28, what does the person in blue text at the bottom
17   of that page on page 2?
18   A.    An image.
19   Q.    On the right side of your screen, I am showing you
20   Exhibit 21.30.
21          What is Exhibit 21.30?
22   A.    An image.
23   Q.    Did it come from the same phone, Government's Exhibit 20?
24   A.    Yes.
25   Q.    Is it the same image that was texted in 21.28?
```

```
 1   A.    Yes.
 2   Q.    Now showing you 21.34.
 3         What is this?
 4   A.    An extraction report generated with Cellebrite of
 5   messages.
 6   Q.    And did it come from Government's Exhibit 20, that cell
 7   phone?
 8   A.    Yes.
 9         MR. KIBBE:  Your Honor, the government moves 21.34
10   into evidence.
11         THE COURT:  Admitted.
12         MR. KIBBE:  And if I didn't already do it, I'd like
13   to move 21.30 into evidence.
14         THE COURT:  It's admitted.
15   BY MR. KIBBE:
16   Q.    Detective Carvajal, I am showing you what's been marked
17   Government's Exhibit 21.39.
18         What is this?
19   A.    An extraction report generated with Cellebrite of
20   messages.
21   Q.    And did this also come from the phone identified in
22   Government's Exhibit 20?
23   A.    Yes.
24         MR. KIBBE:  Your Honor, I'd like to move 21.39 into
25   evidence.
```

 1                THE COURT:  Admitted.

 2                MR. KIBBE:  The Court's indulgence, Your Honor.

 3           Your Honor, I have no further questions.

 4                THE COURT:  Let's take a break, a 15-minute break,

 5     comfort break, come back in, and we will continue on with

 6     cross-examination then.

 7           Ma'am, please don't discuss your testimony with anyone

 8     during the break.

 9                THE WITNESS:  I'm sorry?

10                THE COURT:  Please don't discuss your testimony with

11     anyone during the break.

12                THE WITNESS:  Okay.

13           (The jury panel exit the courtroom at 10:40 a.m.)

14                THE COURT:  All right.  15-minute recess.  Be back at

15     just before 11:00.

16           (Recess taken from 10:41 a.m. until 11:01 a.m.)

17                THE DEPUTY CLERK:  This Honorable Court now resumes

18     in session.

19                THE COURT:  All right.  Can we bring the jury in?

20           (The jury panel enter the courtroom at 11:02 a.m.)

21                THE COURT:  Everybody have a seat, please.  And,

22     Detective, I remind you you are still under oath.

23                          CROSS-EXAMINATION

24     BY MR. LAWLOR:

25     Q.   Good morning, ma'am.  How are you?

1    A.    Good.  How are you?

2    Q.    Good.  Thank you.

3          So you are a detective with the Montgomery County Police

4    Department.  Is that right?

5    A.    Yes.

6    Q.    So, in a prior life, you went through the Police Academy,

7    and as opposed to doing phone things, you were a, you know,

8    boots-on-the-ground detective.  Right?

9    A.    Yes.

10   Q.    And so when did you start with the police department?

11   A.    1994.

12   Q.    Okay.  And so how long was it before you went into your

13   current position?

14   A.    I was there -- I was permanently transferred there in

15   2017.

16   Q.    Okay.  So from '94 to 2017, you went from patrol to

17   detective?

18   A.    Correct.

19   Q.    And then now you have been five years.

20         And what is the department that you work in?

21   A.    Montgomery County Police.

22   Q.    Do you work for the police department or for the county?

23   A.    The police department, but my ultimate employer is the

24   county.

25   Q.    Okay.  So you described the training that you had for

1    your current job.

2         Did that begin in 2017 when you were transferred to the

3    unit you are in now?

4    A.    No.

5    Q.    When did it begin?

6    A.    I don't have an exact date, but I'd already been taking

7    courses a couple of years before that.

8    Q.    With an eye on transferring to this unit?

9    A.    No.

10   Q.    Just out of interest or to further your sort of police

11   jobs, if you will?

12   A.    Yes.

13   Q.    Okay.  And if I could approach you with what I am going

14   to have marked as Defendant's Exhibit No. 8.

15        Could you identify that for the ladies and gentlemen of

16   the jury?

17   A.    Yes.  It's my C.V.

18   Q.    Okay.  Your resume, in other words?

19   A.    Yes.

20   Q.    Okay.  May I have it?

21        All right.  And this reflects, as you have indicated,

22   that you have been to, you know, dozens of trainings.  Right?

23   A.    Yes.

24   Q.    And as you indicated, you have thousands of hours of

25   training?

1  A.     Probably not thousands.  Maybe hundreds.

2  Q.     Okay.  Hundreds of hours of training spanning years and

3  dozens of different seminars that you have gone to.  Yes?

4  A.     Yes.

5  Q.     Okay.  And are you certified?

6  A.     Yes.

7  Q.     And what is your certification in?

8  A.     For cell phones, it's Cellebrite CCO and CCPA, Cellebrite

9  certified operator and Cellebrite certified physical analyst.

10 Q.     And who provides that certification?

11 A.     Cellebrite.

12 Q.     Okay.

13        MR. LAWLOR:  Your Honor, can I have Defendant's

14 Exhibit No. 8 admitted into evidence, please?

15        THE COURT:  Any objection?

16        MR. KIBBE:  No objection.

17        THE COURT:  It's admitted.

18 BY MR. LAWLOR:

19 Q.     Okay.  And, now, you did an analysis of -- of two phones

20 here.  Right?

21 A.     Correct.

22        MR. LAWLOR:  And the Court's indulgence, please.

23        THE COURT:  Yep.

24 BY MR. LAWLOR:

25 Q.     One of those was Exhibit No. 12.  Right?

1  A.    If I may --

2  Q.    Government's Exhibit No. 12.  Yeah.  Take your time,

3  please.

4  A.    Yes.

5  Q.    All right.  And what's the phone number for Government's

6  Exhibit No. 12?

7  A.    I'd have to refer.  I don't have it memorized.

8  Q.    No.  I understand.  Please.  Refer to any notes that you

9  have that you need to refer to.

10 A.    I believe that it was Exhibit 13.

11 Q.    Is the extraction report.

12 A.    It's (240) 855-7123.

13 Q.    Okay.  So I don't really want to get into the technical

14 aspects of Cellebrite, but, basically, this was an iPhone.

15 Right?

16 A.    Correct.

17 Q.    And I don't want to say plug it into something, but there

18 is a way to, for lack of a better term, plug the phone into

19 something and download all of its contents, number one, and

20 then it gets converted to a more readable format.  Is that

21 true?

22 A.    Mostly.

23 Q.    Okay.  And that's what you did with this phone.  Yes?

24 No. 12 and 13?

25 A.    So the extraction on this device was actually done using

Carvajal - Cross

1   GrayKey.

2   Q.    Okay.  So -- but aside from the program or software that

3   you used, you know, same question:  You download all of the

4   contents of the phone into a format that is more readable.

5   Yes?

6   A.    Correct.

7   Q.    Okay.  And so when you downloaded this phone, Exhibit No.

8   12, how many text messages -- well, let me back up.

9         Do you know the difference between MMS and SMS?

10  A.    Yes.

11  Q.    What's -- explain to the ladies and gentlemen of the jury

12  the difference between those two things.

13  A.    SMS is a standard text.  MMS contains -- is a multimedia,

14  so it generally contains some type of media.

15  Q.    Okay.  And is there a difference between SMS and

16  iMessage?

17  A.    Yes.

18  Q.    So this was an iPhone.  Yes?

19  A.    Yes.

20  Q.    And, so, if I have an iPhone and you have an iPhone and I

21  message you via the messaging app on my phone, it's not going

22  to show up under the SMS sort of header.  Correct?

23  A.    Well, it may, yes, because it's contained in the same

24  database as the SMS messages.  The only difference is the mode

25  in which the data is transferred.

Carvajal - Cross

1  Q.    Okay.  I mean, I guess regardless of that distinction,

2  how many text messages were downloaded from the phone that is

3  Exhibit No. 12?

4  A.    I don't have that information with me.

5  Q.    You don't have it -- it's not in your extraction report?

6  A.    I don't have the extraction report before the Court with

7  me.

8  Q.    Oh, okay.

9         MR. LAWLOR:  The Court's indulgence.

10        THE COURT:  Yep.

11     (Counsel conferring.)

12        MR. LAWLOR:  The Court's indulgence, please.

13        THE COURT:  Can I get counsel to approach?

14     (The following took place at sidebar outside the presence

15  of the jury; Mr. Lawlor, Mr. Ake, and Mr. Kibbe present.)

16        THE COURT:  Mr. Lawlor, when you were making

17  arguments earlier about the number, total number of text

18  messages being something around 10,000, was that a number that

19  you got from the extraction report, sir?

20        MR. LAWLOR:  Yes.

21        THE COURT:  All right.  So -- and that's what you

22  want to get from this witness?  Okay.  So he's entitled to get

23  it from the witness, and what I don't want to have to do is

24  have the witness re-called or go get this extraction report and

25  come back.

Carvajal - Cross

```
 1        But would it be possible, in the interest of time,
 2   Mr. Lawlor, to say something along the lines of, If I were to
 3   proffer to you that having read the extraction report, that,
 4   and having conferred with the government that there were over X
 5   number, would you agree with that, that would let you go in the
 6   direction you want to go without having to have that --
 7            MR. LAWLOR:  That's the only question I am asking.
 8   So there is nothing after that.
 9            THE COURT:  All right.  Can we try it that way and
10   see what happens?
11            MR. LAWLOR:  As long as the government is okay with
12   it, sure.
13            MR. AKE:  I am guessing that's probably accurate.  I
14   don't know offhand.
15            THE COURT:  Well, if she says no, then I am going to
16   require the extraction report be brought in.
17            MR. AKE:  If Your Honor could just give us a minute
18   to try to pull that up.
19            THE COURT:  Oh, I'm sorry.  If you got it --
20            MR. AKE:  I haven't looked it up.
21            THE COURT:  Oh, that's great.
22            MR. LAWLOR:  I will ask some other questions.
23        (End of sidebar discussion.)
24   BY MR. LAWLOR:
25   Q.    All right, ma'am.  I am going to ask you a couple
```

1    different questions while the government looks for that

2    information about the number of texts on the extraction report.

3         So when you have an iPhone, it typically will back up

4    into an iCloud.  Right?

5    A.    Not necessarily.

6    Q.    Okay.  Would you agree with me that on your iPhone, you

7    can set it and it is probably preset to back up the contents of

8    the phone to an iCloud?

9    A.    You may do that.

10   Q.    Okay.  And, first of all, what is an iCloud account?

11   A.    An iCloud account is the account that associates the user

12   of the device to Apple.

13   Q.    Okay.  And there is -- basically, the contents of the

14   phone backs up onto a storage device, the iCloud, only they are

15   maintained and operated by Apple.  Yes?

16   A.    If the user elects to do that.

17   Q.    If they elect to do that.  Okay.

18        So if I have messages on my phone and I delete them, they

19   may still remain on the iCloud.  Right?

20   A.    Possibly.

21   Q.    Okay.  And so my question is:  Did you have an

22   opportunity to review the contents of any iCloud associated

23   with this phone and phone number?

24   A.    No.

25   Q.    Okay.  Now let me show you what I am going to have marked

 1  only for identification as Defendant's Exhibit 9.

 2          THE COURT:  Yeah.

 3  BY MR. LAWLOR:

 4  Q.    Can I ask you to identify that, ma'am?

 5  A.    It's a summary report.

 6          THE COURT:  I'm sorry.  I couldn't hear that.

 7          THE WITNESS:  It's a summary report.

 8          THE COURT:  Thank you.

 9  BY MR. LAWLOR:

10  Q.    Of?

11  A.    Of an examination, the device examination.

12  Q.    This device, Exhibit No. 12, you -- in addition to

13  examining it, you made a report of your examination.  Is that

14  right?

15  A.    Yes.

16  Q.    Okay.  And do you do that every time you analyze a phone

17  and create a report?

18  A.    Yes.

19  Q.    And if I could retrieve that from you.

20  A.    Sorry.  It's stuck.

21  Q.    And then I want to refer you, if I could, to page No. --

22  well, the last page.  I don't know if they are Bates stamped.

23  But what is on the bottom of that last page?

24  A.    What do you mean "the bottom"?

25  Q.    Are there two signatures there?

1   A.      Yes.

2   Q.      And one of them is yours?

3   A.      Yes.

4   Q.      And then one of them is by a reviewer?

5   A.      Yes.

6   Q.      And who is the reviewer and what is their function?

7   A.      Detective Heverly, and he is just the person who does the

8   administrative and technical review.

9   Q.      Okay.  And what is an administrative and technical

10  review?

11  A.      It's just a person who checks the report for accuracy.

12  Q.      Okay.  So when you fill out a report stating various

13  things about an extraction, someone is going to come and look

14  over your shoulder basically to make sure you got it right?

15  A.      Not as I am doing it.

16  Q.      No.  No.  I don't mean literally look over your shoulder

17  at the time, but after you are done, you fill out a report, and

18  someone comes in after you from your unit to make sure that the

19  information in there is correct.  Right?

20  A.      Yes.

21  Q.      Okay.  So, ma'am, let me ask you this question:  In terms

22  of the text messages on Exhibit 12, if I told you that I looked

23  at the extraction report right here with Mr. Ake and he's

24  telling me that the number of text messages on it are 10,285,

25  would you agree with me that that's the number?

```
 1  A.    If that's what you guys are agreeing to and that's what
 2  you -- it says on the report.
 3  Q.    And Mr. Ake is going to acknowledge that.  He actually
 4  gave the thumbs up that that's correct.
 5        So 10,285 are the total number of messages on that phone.
 6  Right?
 7  A.    Okay.
 8              MR. LAWLOR:  The Court's indulgence, please.
 9              THE COURT:  All right.
10              MR. LAWLOR:  Thank you, ma'am.
11              THE COURT:  Nothing further.  Is that right?
12              MR. LAWLOR:  Yes, sir.
13              THE COURT:  Redirect?
14              MR. KIBBE:  Yes, Your Honor.
15                        REDIRECT EXAMINATION
16  BY MR. KIBBE:
17  Q.    Detective Carvajal, Mr. Lawlor just was asking you about
18  the total number of texts on the phone, and the number that you
19  agreed sounded reasonable, the thumbs up from Mr. Ake was
20  10,285 texts.
21        My question is:  Is that different 10,000 threads or is
22  that 10,000 individual text bubbles?
23  A.    Individual.
24  Q.    I'm sorry.  Please go ahead.
25  A.    Individual.
```

1  Q.    So those are just 10,000 individual texts back and forth?

2  A.    Entries.

3  Q.    Entries.

4        MR. KIBBE:  No further questions.

5        THE COURT:  Give me one second here.

6     All right.  May the witness be excused to return to her

7  duties?

8        MR. AKE:  Yes, Your Honor.

9        THE COURT:  And it's not expected that she's going to

10 be re-called.  Is that right?

11       MR. AKE:  Correct.

12       THE COURT:  Detective, you can return to your duties.

13 Please don't discuss your testimony in this case or any

14 information that you may have learned while you were in the

15 courtroom until after the jury has reached a verdict.  Thank

16 you.

17       THE WITNESS:  Should I leave this here?

18       THE COURT:  Just leave it right there.  That's fine.

19       THE WITNESS:  Thank you.

20       MR. AKE:  Your Honor, at this time, the government

21 would call Fern Jaramillo to the stand.

22       THE COURT:  Thank you.

23       MR. CRESPO:  Your Honor, may I --

24       THE COURT:  Yeah.  Please.

25     Sir, come forward.  Step up here if you would, please, to

1    the entrance to the witness box, face our courtroom deputy, and

2    raise your right hand.

3         FERNANDO JARAMILLO, GOVERNMENT'S WITNESS, SWORN

4              THE DEPUTY CLERK:  Thank you.  Please be seated.

5              THE WITNESS:  Thank you.

6              THE DEPUTY CLERK:  Please state your name for the

7    record and please spell your first and last name.

8              THE WITNESS:  Detective Fernando Jaramillo.  First

9    name is spelled F-E-R-N-A-N-D-O; last name is spelled

10   J-A-R-A-M-I-L-L-O.

11             THE COURT:  All right, Detective.  First of all, the

12   rule in this courtroom is that the only people who cannot wear

13   a mask are people who have, number one, been fully vaccinated,

14   and number two, are testifying.  Obviously, you are about to

15   testify.  Is the first criteria met with you, sir?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  The lawyers are going to ask you

18   questions.  I need you to listen carefully to each question.

19   If a question is not clear, tell me.  I will make sure it's

20   clear before you answer it.  If it is clear, answer that

21   question.  Don't volunteer.  Don't guess.  Don't speculate.

22   Make sure that your answer is based upon your personal

23   knowledge or your training and experience.

24             And if you are asked to look at a document or a

25   photograph or some other piece of information so that you can

1    answer questions about it, you can look at it for however long

2    you need to in order to testify accurately.

3            Do you understand those instructions, sir?

4                THE WITNESS:  I do.

5                THE COURT:  You may proceed.

6                MR. AKE:  Thank you, Your Honor.

7                         DIRECT EXAMINATION

8    BY MR. AKE:

9    Q.    Now, Detective Jaramillo, who do you work for?

10   A.    Montgomery County Police Department.

11   Q.    And do you also work for a different agency as a

12   deputized -- in a deputized status?

13   A.    I do.  I am a task force officer with the DEA, Drug

14   Enforcement Administration.

15   Q.    Okay.  So, essentially, you are a deputized federal

16   officer as well as a Montgomery County Police Department

17   officer?

18   A.    Correct.

19   Q.    And how long have you been working for Montgomery County?

20   A.    Almost 24 years.

21   Q.    And all of that as a police officer?

22   A.    Yes.

23   Q.    Okay.  Now, how long have you been working with the Drug

24   Enforcement Administration as a task force officer?

25   A.    Since approximately 2013.

Jarami - Direct

1  Q.    So nine years?

2  A.    Yes.

3  Q.    Okay.  And could you explain to the ladies and gentlemen

4  of the jury the type of work you have done specifically for the

5  DEA over the course of those past nine years?

6  A.    Yes.  So, within my police department, I am assigned to a

7  special investigations division, the major offender conspiracy

8  unit.  Within that unit, we do long-term drug investigations.

9  We target high-level organizations, high-level narcotics

10 traffickers.

11       So I am attached to HIDTA group within the DEA, High

12 Intensity Drug Trafficking Area, and I have been with -- and,

13 again, and in that task force, I work with other federal

14 agencies, other federal agents, and we do long-term drug

15 investigations into organizations and individuals trafficking

16 large amounts of narcotics.

17 Q.    Okay.  And when you go to work most days, are you going

18 to Montgomery County Police facilities or do you work primarily

19 in a federal facility?

20 A.    I am -- the office -- I am a task force, the federal --

21 Q.    So with the DEA task force office?

22 A.    Correct.  Yes.

23 Q.    Now, I would assume that you were doing narcotics

24 investigations before you were seconded over to the DEA.  Is

25 that correct?

1  A.    Correct.

2  Q.    And how long have you been doing narcotics investigations

3  with Montgomery County Police?

4  A.    So after the Police Academy, I was a patrol officer for a

5  couple years, and then I was assigned to a special

6  investigations assignment team, and within that team, we did

7  street-level crimes, which included street-level drug

8  enforcement.  I did that for approximately two or three years.

9        And then I was assigned to the special investigations

10 drug investigations unit where we did mid-level investigations.

11 I did that from 2005 to approximately 2011, and subsequently

12 was assigned to the HIDTA task force, the HIDTA DEA task force

13 full time in 2013.

14 Q.    Okay.  So, cumulatively, approximately how much time have

15 you spent in your career investigating narcotics crimes?

16 A.    Over 20 years.

17 Q.    Okay.  And could you briefly explain to the jury what

18 that level of specialization entails or what investigating

19 narcotics crimes involves that may not be common to other parts

20 of police work or law enforcement?

21 A.    So, a lot of the crimes that other detectives investigate

22 are crimes that already happened; whereas, what we do, we

23 investigate and we -- we target people who are committing that

24 crime, particularly selling narcotics, money laundering.  So

25 that's a little bit of a difference between the type of -- of

1  crimes different detectives do.

2  Q.    So, again, proactive investigations?

3  A.    Correct.

4  Q.    Now, what types of techniques do those investigations use

5  that may not be common to other investigations, like informants

6  and so forth?

7  A.    So, in a narcotics investigation, we use different

8  investigative techniques, something as simple as surveillance

9  and something the most elaborate, which would be a wiretap, a

10  Title III, so between those two, we use different investigative

11  techniques in order to accomplish what we need within that --

12  within that case.

13  Q.    Now, some of those involve using individuals or

14  undercover officers to make controlled buys, for instance?

15  A.    Yes.

16  Q.    And what's a controlled buy?

17  A.    A controlled buy is when we have either an undercover,

18  undercover agent or an informant working for -- for the -- for

19  the police, and they are tasked to purchase an amount of

20  narcotics from a known narcotics trafficker, narcotics dealer.

21       Prior to the purchase, we search the person to make sure

22  there is no contraband with them.  We want to make sure that

23  all the monies are accounted for.  We make sure that the money

24  that -- that we are going to spend, it's going to be already

25  determined how much the amount we are going to pay for the

1   drugs or narcotics that we are going to get.

2        We make sure that -- we gather additional evidence as

3   audio, hopefully video, and other -- other bits of evidence

4   that are going to corroborate our purchase.

5   Q.   And do you ever record the calls that lead up to some of

6   these transactions when you have got, say, a cooperator that's

7   making the buy for you?

8   A.   We do.  It's a controlled call.  We control -- we record

9   the telephone call.  We -- we make sure we capture the -- the

10  texts exchanged.  We make sure that everything leading up to

11  that transaction is -- it's all recorded, all pieces of

12  evidence leading up to the actual transaction.

13  Q.   Okay.  So, moving on.  To do all these things, have you

14  received specialized narcotics investigative training?

15  A.   I have.

16  Q.   Okay.  And what kind of classes have you taken or

17  training?

18  A.   I have taken numerous classes on how to pursue evidence,

19  how to capture evidence, how to conduct an electronic

20  surveillance, the use of -- of sources such as informants or

21  other open -- other open sources.

22  Q.   Okay.  And have you ever worked as an undercover --

23  A.   I have.

24  Q.   -- officer in narcotics investigations?

25  A.   I have.

1   Q.    About how long did you do that?

2   A.    Oh, I did that probably about eight years.  I was a

3   certified Homeland Security undercover operative.  I attended

4   numerous undercover schools where we covered different topics

5   on how to conduct undercover purchases in a safe manner and in

6   a manner for us to get as much evidence as we can.

7   Q.    Okay.  And when you were acting as an undercover, were

8   you operating primarily in the Maryland and surrounding area?

9   A.    Yeah.  The Washington metropolitan area.  Sometimes

10  different cases brought us to different parts, you know, out of

11  state depending on the case that we were working on, but mostly

12  in the Washington metropolitan area, yes.

13  Q.    So while working as an undercover, you have actually

14  participated in drug transactions.  Correct?

15  A.    Correct.

16  Q.    Okay.  And what types of drugs have those transactions

17  included, what range?

18  A.    Marijuana, cocaine, crack cocaine, heroin, meth, weapons.

19  Q.    And in addition to personal knowledge, how else have you

20  gained knowledge concerning the distribution of illicit

21  narcotics?  Like, have you learned about the structures of --

22  of drug trafficking organizations and how drugs may flow from

23  production --

24        MR. LAWLOR:  Your Honor, I am going to object to the

25  leading.

Jaramillo - Direct

1              THE COURT:  Come on up.

2         (The following took place at sidebar outside the presence

3    of the jury; Mr. Lawlor and Mr. Ake present.)

4              THE COURT:  So, under 611(c), leading questions are

5    ordinarily not allowed on direct except as necessary to develop

6    the testimony.  In going through the qualifications of someone,

7    typically, I am a little bit flexible on leading questions.

8              MR. LAWLOR:  I understand.

9              THE COURT:  Is there something about that one --

10             MR. LAWLOR:  You don't hear me making a ton of

11   objections here, Your Honor, but I think Mr. Ake is -- you

12   know, this is a leading question.  Let him say what his

13   qualifications are.  You know, if he doesn't have a C.V. or he

14   doesn't remember, then, you know, I don't think Mr. Ake should

15   be putting it in his mouth.

16             THE COURT:  Okay.  So I will sustain the objection.

17   Rephrase the question.  The way to do it is just to say, What,

18   if any, training or experience did you have with regard to drug

19   distribution structures or whatever else, and then he will

20   answer whatever it is.

21             MR. AKE:  Sure.  Thank you.

22         (End of sidebar discussion.)

23   BY MR. AKE:

24   Q.   So, Detective Jaramillo, could you tell me what kind of

25   training you have received that's specialized in this regard?

1    A.    Well, we always get updated training on the new trends

2    that we are seeing not just in our area but within the country.

3    We share information with different agencies, with different

4    offices within the DEA, within different police departments in

5    our area and in the country.

6          We also get -- gain a lot of information from debriefing

7    cooperators, debriefing defendants, debriefing witnesses who

8    have firsthand knowledge of -- of some of these organizations

9    and the current trends.

10   Q.    Okay.  And as a result of this training and debriefings,

11   with what aspects of illicit drug trafficking have you become

12   familiar, generally speaking, what kind of categories?

13   A.    Anywhere from, you know, distribution, low-level,

14   mid-level to wholesale distributions; personal use; smuggling;

15   money laundering; you know, attempts to hide proceeds from law

16   enforcement.

17   Q.    How about identification of drugs?

18   A.    Yes.

19   Q.    Okay.  And how -- generally, how have you learned to

20   identify drugs?

21   A.    Again, by conducting these purchases, these controlled

22   purchases; by actually handling some of these narcotics;

23   training, numerous training that -- that the police department

24   and the DEA puts on.

25   Q.    Okay.  And you have mentioned in passing that you have

1    debriefed defendants.

2         What do you mean by that?

3    A.    Sometimes when we do arrests of defendants, they like to

4    cooperate with the government, and they elect to tell us about

5    their drug trafficking activities, how they were doing it, how

6    they were attempting to avoid detection from law enforcement.

7    So they fill us in on -- on the newest trends or some of their

8    efforts to avoid detection from -- from law enforcement.

9    Q.    Okay.  And what type of information kind of changes over

10   time that this type of information is useful to you?

11   A.    The way they communicate; prices; lingo; source cities;

12   manner -- the way that they are selling.  Just the whole

13   structure of -- of -- of their business.

14   Q.    And how many times have you engaged in a debrief with

15   someone you have arrested?

16   A.    Oh, hundreds.

17   Q.    And Detective Jaramillo, have you testified in courts as

18   an expert witness on drug trafficking in the past?

19   A.    I have.

20   Q.    Now, where were those courts?

21   A.    Circuit court in Montgomery County and federal court here

22   in Greenbelt.

23   Q.    Do you recall how recently you have testified as a

24   witness here?

25   A.    I believe last one was late 2021 maybe.

Jaramillo - Direct

1  Q.    Okay.  So you have previously been recognized as an

2  expert by other members of this court?

3  A.    I have.

4  Q.    And have you ever been called on by other members of law

5  enforcement to render your opinion as to whether particular

6  evidence was indicative of narcotics trafficking?

7  A.    I have.

8  Q.    Okay.  And I think you have probably covered this, but

9  have you ever seized illegal drugs as part of your

10 investigations?

11 A.    I have.

12 Q.    Were you able to draw an understanding of appearance and

13 paraphernalia and so forth?

14 A.    I have.

15 Q.    Okay.  I just had a question.  You mentioned conducting

16 wiretaps.

17       How many wiretap cases have you participated in?

18 A.    Probably anywhere ten to 12.  I have been the actual case

19 agent, the affiant, about three or four.  I have assisted in

20 different roles in the other wiretap cases.

21 Q.    And when you are an agent on a wiretap case, what does

22 that entail in terms of your day-to-day duties when that

23 wiretap is going on?

24 A.    Besides putting together an affidavit to present to a

25 judge and get the authorization for the actual wiretap, it

1    involves actually listening to the telephone calls between the

2    -- the target and the other persons on the line, reviewing line

3    sheets, reviewing texts.  If we are authorized to capture

4    pictures, reviewing those pictures, and making sure that we are

5    actually recording and capturing pertinent information.

6    Q.    Okay.  Now, during those wiretaps, is it all audio calls,

7    or are there other ways of communicating as well?

8    A.    There are some audio calls, and there are also, of

9    course, texts.

10   Q.    Okay.  And when -- generally, what have you been able to

11   see with -- with -- with -- the use of text messages over time,

12   has that increased?

13   A.    Oh, yes.

14   Q.    Okay.

15          MR. AKE:  Your Honor, at this -- actually, one more

16   line of questions.

17   BY MR. AKE:

18   Q.    Are you familiar with firearms laws here in Maryland?

19   A.    I am.

20   Q.    And have you become familiar with the -- the use of

21   firearms within drug trafficking?

22   A.    I have.

23   Q.    And how have you learned about that?

24   A.    Again, from debriefs and arrests of individuals who are

25   trafficking narcotics and possession of firearms.

Jaramillo - Direct

```
 1   Q.    And in what proportions, generally speaking, roughly, not
 2   looking for anything exact here, but how often in drug
 3   trafficking cases that you have investigated have firearms been
 4   involved?
 5   A.    More often than not.
 6   Q.    Okay.
 7   A.    A large amount of our cases involve some type of firearm.
 8   Q.    And have you had occasion to speak with those you have
 9   arrested about their use of firearms?
10   A.    I have.
11   Q.    And what have you learned, generally, about the reasons
12   why?
13   A.    Generally, what I have learned is that they are -- they
14   are carrying firearms, they are using firearms within their
15   distribution of narcotics for a couple reasons: to protect
16   themselves from being robbed by rival drug dealers; to protect
17   their product, their narcotics and their -- and their proceeds.
18           MR. AKE:  Your Honor, at this point, I present
19   Detective Jaramillo as an expert in the area of drug
20   trafficking methods and indicators particularly here in
21   Maryland and the surrounding area.
22           THE COURT:  Do you want to voir dire on
23   qualifications, Mr. Lawlor?
24           MR. LAWLOR:  Your Honor, I have no objection to the
25   detective being accepted as an expert.  I do have questions,
```

1  but I will reserve them for cross.

2          THE COURT:  Thank you.

3      Pursuant to Federal Rule of Evidence 104(a) and Evidence

4  Rule 702, I am satisfied that the government has shown by a

5  preponderance of evidence that the witness has the knowledge,

6  training, experience, background, education, and skill to

7  testify in the form of an opinion or otherwise in the area of

8  drug trafficking and distribution particularly within the

9  Maryland, or, I should say, the metropolitan Washington area.

10 And you may proceed.

11         MR. AKE:  Thank you, Your Honor.

12 BY MR. AKE:

13 Q.    Detective Jaramillo, marijuana is quasi legal in

14 Maryland.   Right?

15 A.    Correct.

16 Q.    Could you explain to the jury what the status of

17 marijuana is and if it's any different than it was in 2019?

18 A.    Yeah.  I think marijuana is kind of transitioning -- the

19 possession of marijuana is transitioning.  There is many

20 jurisdictions now where you are allowed to possess a small

21 amount of marijuana.  There is places now where you can

22 purchase marijuana, dispensaries where you can buy marijuana,

23 places now in the area where you can grow a certain amount of

24 marijuana.  So it's slowly becoming more, I guess, accepted.

25 Q.    Okay.  So you talked about it being legal to -- to

1  possess some amounts.  Right?

2  A.    Correct.

3  Q.    Is it -- and we are just talking under Maryland law here.

4  What's the requirement for selling it, though, in order to be

5  legal under Maryland law?

6  A.    For you to sell it, you got to be a licensed seller,

7  dispensary, meet certain criteria within the state in order for

8  you to sell it.

9  Q.    Okay.  So if there are licensed sellers of marijuana --

10 and there were in 2019.  Correct?

11 A.    I believe so, yes.

12 Q.    All right.

13       -- why are people still buying or selling marijuana

14 illegally or buying it illegally?

15       MR. LAWLOR:  Objection, Your Honor.

16       THE COURT:  Sustained.

17 BY MR. AKE:

18 Q.    Let me put it this way:  Do you still experience those

19 who are selling it without licenses?

20 A.    Yes.

21 Q.    Okay.  And have you debriefed any defendants since

22 marijuana became somewhat licensed?

23 A.    Yes.

24 Q.    Or somewhat legal in the state?

25 A.    Yes.

1  Q.    That have sold marijuana?

2  A.    Yes.

3  Q.    And have they relayed to you why they continue to sell

4  marijuana?

5  A.    Yes.

6  Q.    And why is that?

7  A.    It's more popular.  It's lucrative.  A lot more would

8  rather buy from a place where it's not authorized by the

9  government because there are many loops that a person that

10 wants to buy from a dispensary has to go through; whereas, a

11 person who has -- or wants to purchase from a person who is not

12 authorized is just, you know, a quick exchange.

13 Q.    Okay.  And is it anymore unusual in your experience when

14 you encounter a marijuana dealer, versus someone that's selling

15 other drugs, for them to be carrying weapons?

16 A.    It's -- it goes hand-in-hand.  It's not -- it's not that

17 unusual.  No, it's not.

18 Q.    Okay.  And why is it no different?

19 A.    Well, they are still -- they are still making proceeds

20 from the sales, they are still making money from the sales of

21 those narcotics that include marijuana, and the reason why they

22 are carrying a weapon is to protect themselves from other

23 rivals or people wanting to rob them to take them for their

24 money, take their proceeds.

25 Q.    Okay.  Well, if -- if someone's robbed of money and their

1   property, can't they just call the police?

2   A.    They can; however, they usually -- they do not report to

3   the police that they were robbed of your illegal proceeds.

4   Q.    Or how about of drug -- illicit drugs?

5   A.    Correct.  Admit of selling drugs and being robbed, they

6   are not going to report that to the police.

7   Q.    Now, switching gears just slightly, can someone who has

8   been convicted of a serious crime or has otherwise lost their

9   civil rights, can they purchase a firearm in Maryland?

10              MR. LAWLOR:  Objection, Your Honor.

11              THE COURT:  Come on up, please.

12        (The following took place at sidebar outside the presence

13   of the jury; Mr. Lawlor and Mr. Ake present.)

14              MR. LAWLOR:  This is beyond his expertise.  We have

15   already stipulated to this.  I mean, this isn't his expertise.

16   He's not a gun licensing expert.  His qualifications were about

17   the connection between guns and drugs, not about whether or not

18   someone is a predicate for a 922 count.

19              MR. AKE:  This is just to get at --

20              THE COURT:  I'm sorry.

21              MR. AKE:  Your Honor, what I am trying to establish

22   is that not only is it unlawful to possess a weapon, but you

23   can't purchase a firearm legally from -- even from another

24   private party if that's also a --

25              THE COURT:  Well, the thing is, is that I -- I get it

1  if this was contested, but it has been stipulated that all of

2  the elements of the felon in possession have been met, so if

3  the mere possession is illegal and has been admitted that there

4  has been a violation, then I don't think we need that testimony

5  from this witness.

6       He is not an expert on gun laws.  I mean, the ATF people

7  usually come in here.  If it were an ATF agent, probably it

8  would be a different outcome, but I think I agree and I will

9  sustain the objection.

10          MR. AKE:  All right.

11      (End of sidebar discussion.)

12 BY MR. AKE:

13 Q.   So, Detective Jaramillo, I'd like to ask you about some

14 characteristics of different types of controlled substances.

15      We will start with marijuana, and I realize this may seem

16 super pedestrian, but what does marijuana present as its

17 physical appearance?

18 A.   It's green.  It's a -- you know, come in different,

19 sometimes different colors.  Just a bud.  It's derived from a

20 plant.

21 Q.   Are there many other controlled substances that look like

22 marijuana?

23 A.   No, not really.  I mean, marijuana is very specific to

24 its appearance.

25 Q.   Okay.  So can you think of other drugs, other than maybe

1  mushrooms, that are organic material looking?

2  A.    No, not really.

3  Q.    Okay.  Now, what would be a -- a user dose of marijuana

4  in terms of, like, weight or size?

5  A.    So I guess it would depend how much you are using, but

6  generally anywhere -- something underneath or below an ounce I

7  guess would be, you know, user amounts.

8  Q.    How is marijuana usually ingested?

9  A.    It's typically smoked.  It's typically, you know, rolled

10 up into, you know, some sort of smoking device or rolled up as

11 a marijuana cigarette or a blunt or -- but it's generally

12 smoked.

13 Q.    Okay.  And how much marijuana goes into one particular

14 cigarette or blunt, as you have said?

15 A.    You know, it depends how much you want, you know, you

16 want to consume, but, you know, generally, it's -- I would say

17 a typical user would smoke or clean up maybe a couple of buds

18 and roll them up or put them in a smoking device.

19 Q.    Okay.  So, say, compared to an ounce, how many joints or

20 cigarettes could you make from an ounce?

21 A.    Numerous.  I mean, an ounce, it's -- that's -- that would

22 be a really big, you know, marijuana cigarette, so you would be

23 able to have, you know, numerous marijuana cigarettes from a --

24 from an ounce.

25 Q.    Okay.  And what -- what would an ounce of marijuana go

1    for that's relative high quality back in 2019?

2    A.    Again, you have to understand there is different

3    qualities for marijuana, the potency and the effects, you know,

4    so something anywhere from $250 or $300.

5    Q.    And how much for, like, an individual dose or a

6    cigarette?

7    A.    Anywhere from 20 to $30.

8    Q.    Okay.  All right.  And are there certain things that you

9    find that indicate that somebody intends to consume marijuana

10   that they would have on hand?

11   A.    Yes.

12   Q.    And what are those things?

13   A.    Again, marijuana is smoked.  You would have to have, you

14   know, some sort of paraphernalia that would indicate that your

15   intent was to either roll it or put it in a bowl, put it in a

16   pipe, rolling cigarettes, and, of course, a lighter, some sort

17   of device for you to ingest the marijuana.

18   Q.    Okay.  And is that typically what people would call a

19   bong?

20   A.    A bong, a pipe, you know, something -- some instrument,

21   some form of paraphernalia that would be used to burn and

22   inhale the smoke from the marijuana.

23   Q.    Okay.  Conversely speaking, what types of things would

24   you expect to find on someone that's selling that might be

25   different?

1  A.    Somebody that would sell would have other paraphernalia,

2  such as a scale, additional baggies for distribution, but, you

3  know, packaging materials and a scale are the main things.

4  Q.    Okay.  Now, would -- do you find latex gloves would be

5  consistent with buying marijuana for the user?

6  A.    I guess if you wanted -- I mean, if you wanted to pick

7  your own marijuana from the stash that you are buying, but, you

8  know, I guess yes, if you didn't want to get your hands dirty

9  or, you know...

10 Q.    Is there a concern with marijuana as compared to other

11 drugs about contact highs or anything like that with marijuana?

12 A.    No, not really.  You can -- you know, if you are talking

13 about just, you know, touching it, no.

14 Q.    Okay.  Okay.  I am going to move on to -- are you

15 familiar -- did you become familiar, as a task force officer

16 with the DEA, about Percocet or oxycodone?

17 A.    Yes.

18 Q.    And, generally speaking, what's the origin of Percocet

19 and oxycodone in terms of manufacturing?

20 A.    They are manufactured by -- in an actual pharmaceutical

21 company, and, you know, they are sold at a pharmacy after you

22 obtain a prescription for them from your doctor.

23 Q.    Okay.  And as a result, physically, what do they look

24 like?

25 A.    It would -- it would be, you know, a -- a pill with some

1   sort of stamp that indicates the dosage and a number that would

2   indicate the type of pill that -- that it is.

3   Q.    Okay.  And what's typical -- generally speaking, how do

4   these pills move into an illicit market, then, if they are

5   manufactured by --

6   A.    So, selling in the illicit market, initially, it would

7   have to come from a person who obtained them in a legitimate

8   way from a pharmacy, and then they are transferred to someone

9   who is going to sell them to people who are not -- don't have

10  that prescription, and then they are sold -- they are sold

11  illegally.

12  Q.    And what's -- what's the -- the typical price that a -- a

13  user who is trying to buy illicitly could expect to pay for a

14  pill of Percocet or oxycodone?

15  A.    You know, it would depend on the amount of pills that you

16  would buy, but if you are buying the user size -- a user

17  amount, anywhere from 25 to $30 a pill.

18  Q.    Okay.  But if you are dealing in wholesale, what have you

19  seen prices be?

20  A.    Of course, if you go into wholesale, if you are buying

21  hundreds of thousands of pills, the price per pill is going to

22  drop.

23  Q.    Okay.  And now transitioning, what about MDMA or ecstasy,

24  are those also sold in pill form?

25  A.    Most of the time, yes.

Jarrah - Direct

1   Q.    And just generally speaking, what is MDMA or ecstasy?  Is

2   that the common name for MDMA?

3   A.    MDMA, ecstasy, yeah, it's an illegal substance.

4   Q.    Is it a stimulant?

5   A.    It is.

6   Q.    And does the -- the "MA" part stand for "methamphetamine"

7   in MDMA?

8   A.    Yes, sir.

9   Q.    And where do -- where does MDMA and ecstasy come from?

10  A.    They are usually manufactured illegally in illegal labs.

11  Q.    Sorry.  Can you clarify?  That was illegal labs?

12  A.    In illegal labs.  Correct.  Yeah.

13  Q.    So there is no, like, legal market for MDMA?

14  A.    Correct.

15  Q.    It's not prescribed by any doctors anywhere?

16  A.    Correct.

17  Q.    Okay.  But it's sold in pill form.  Right?

18  A.    Yes.  Most of the time, it's sold in pill form.  It can

19  also be sold in powder form, but it is mostly sold in a pill.

20  Q.    Okay.  And do those pills look like pills you would get

21  from your pharmacy?

22  A.    Typically not.

23  Q.    How are they different?

24  A.    Different colors, different stamps to market a certain

25  batch, and the stamps would be something specific, cartoon

1  character, a automobile emblem, something that would be

2  appealing to the person who is buying it.

3  Q.    And how much does a hit cost or a pill of ecstasy cost?

4  A.    Again, anywhere -- depending on how many you are buying,

5  but, you know, user end, if you are buying three to four,

6  anywhere from 25, 30, $35.

7  Q.    All right.  We will move on -- just one more -- go

8  through one more drug.

9        So cocaine, what does that look like as a physical

10  matter?

11  A.    Cocaine, typically, it's white, it's -- it initially

12  starts out sometimes, you know, in a brick form, and then it

13  gets broken down into a powder form.

14  Q.    Okay.  So when -- you are saying when drug traffickers

15  initially package it at its points of origin, they compress it

16  into a brick; is that what you are saying?

17  A.    Correct.  Yeah.  They will use a press just to compact

18  the -- the cocaine into a brick, a hard solid brick in order --

19  easier to transport, easier to smuggle, and typically sold in

20  -- in kilogram type of amounts.

21  Q.    And then by the time it gets used, what does it look

22  like?

23  A.    By the time it gets used, it's usually, you know, diluted

24  a little bit, and it's typically in a powder form.

25  Q.    And, so, a powder as -- as distinct from maybe like a

1   more salt or sugar crystal form?

2   A.    Yeah.  I would define powdery, you know, finer probably

3   than salt, sugar.

4   Q.    And how is cocaine ingested?

5   A.    Cocaine -- powder cocaine is usually snorted.

6   Q.    Okay.  Well, you said "powder cocaine."  Is there another

7   kind of cocaine?

8   A.    There is.

9   Q.    What is that?

10  A.    Crack cocaine.  It's -- it's cooked with -- with baking

11  soda and that's -- crack cocaine, after it's cooked, takes a

12  off-white appearance and becomes hard and you have to smoke

13  that.

14  Q.    Okay.  Now, when -- you mentioned using baking soda to

15  cook crack.

16        Does that dilute the -- the cocaine?  Does it end up

17  making it less potent?

18  A.    Again, you are cooking cocaine with baking soda and it

19  depends how strong of a batch you want to have, but, typically,

20  the reason why you are baking powder cocaine into crack cocaine

21  is in order for you to make more for profit selling the --

22  converting the powder cocaine into crack cocaine and getting

23  more, so you dilute it a little bit.

24  Q.    So would the price of an ounce of powder cocaine be

25  higher than an ounce of crack cocaine, or are they about the

1    same or --

2    A.    Sometimes they are about the same.  Then also, you know,

3    you come into, you know, availability of who has it and how

4    good the batch that you cooked is and how much you want to sell

5    that particular batch of crack cocaine for and how much you

6    want to make profit from that.

7    Q.    And at what level in the distribution chain of cocaine

8    does part of that cocaine total -- you know, the total amount

9    of cocaine coming to an area, at what level does some of it get

10   turned into crack?  Like, who is doing it?  the users?  the

11   distributors?

12   A.    No.  The street-level to maybe mid-level dealers.  You

13   know, your high-level, you know, distributors are not going to

14   cook, you know, kilogram or half kilogram of -- of powder

15   cocaine into crack cocaine.  That's usually done in order for

16   you to -- to stretch out the amount of cocaine that you

17   purchased, either an ounce or a half ounce, and to make more of

18   a profit from -- from the price that you paid for the powder

19   cocaine.

20   Q.    Okay.  So just to kind of wrap this up, how expensive,

21   looking particularly in 2019, if it's changed, would have been

22   an ounce of crack cocaine?

23   A.    Anywhere from 1300 -- 12, 1300, maybe sometimes even

24   $1400 for an ounce of crack cocaine.

25   Q.    And how much for powder cocaine?

1  A.    12 to 13.  Again, it would depend on the potency of it,

2  but that would be about the average price.

3  Q.    All right.  At this point, I want to transition with you

4  -- well, actually, let me ask you one question before I have

5  you look at anything here.

6        So -- so if you, in your training and experience, came

7  across a case where someone was arrested and had four ounces of

8  marijuana in a bag colocated with a handgun as well as a scale

9  and latex gloves but no pipes or lighters or wrapping papers,

10 what would you form as your opinion on what's going on there

11 with that person?

12           MR. LAWLOR:  Objection, Your Honor.

13           THE COURT:  Overruled.

14           MR. LAWLOR:  Can we approach?

15           THE COURT:  Come on up.

16      (The following took place at sidebar outside the presence

17 of the jury; Mr. Lawlor and Mr. Ake present.)

18           MR. LAWLOR:  Your Honor, I know that the Federal

19 Rules of Evidence permit the witness to give an opinion on the

20 ultimate issue, but here, in this case, I submit to the Court

21 that it would not be helpful to the finder of fact.  And all

22 the facts are laid out for them in this case, and I don't think

23 really -- many of the facts certainly get into the -- the

24 messages, but in terms of, you know, the bag --

25           THE COURT:  We are not going to get into messages.

1   He is not going to be looking at the messages and giving

2   opinions on those.  Right?

3           MR. AKE:  No.

4           THE COURT:  Pardon?  Hold on.  One at a time.  What

5   was your answer?

6           MR. AKE:  So, Your Honor, just based on that

7   hypothetical, given what he's already laid out as a foundation,

8   yeah, I am going to have him express his opinion before the

9   text messages so I don't do it after the text messages and mix

10  the issues.

11          THE COURT:  All right.  So I will allow -- I am going

12  to overrule the objection and allow him to do that.  He has

13  testified as to his knowledge between how drugs are used

14  individually as opposed to how they are sold.  He's had

15  arrests.  He's talked to people.  He can express an opinion as

16  to whether or not this is more consistent with distribution or

17  personal use, and that's it, he's answered it once, and then we

18  move on.

19          So overruled.

20          (End of sidebar discussion.)

21  BY MR. AKE:

22  Q.    So just going back to that set of circumstances, what

23  would you -- what would your opinion be on what's going on

24  there?

25  A.    Again, the first thing that I would look at is the --

1   what sticks out at me is the fact that there was no smoking

2   devices.  If you consume marijuana if you are a smoker, you are

3   going to have some sort of paraphernalia that indicates that's

4   what you are doing.  There is no pipes, there is no rolling

5   papers, there is no bongs or other things that show that you

6   are consuming.

7        The other thing that sticks out at me is the fact that

8   you have a scale.  Typically, you have a scale in order for you

9   to properly distribute the amount that you are selling or the

10  person is buying.  That's -- that would indicate to me that you

11  are -- you are distributing.

12       The four ounces -- you know, if you are -- if you are a

13  heavy smoker, you are not going to have four ounces with you

14  just regularly.  You know, you have an ounce at home that you,

15  you know, smoke during the week, but, typically, you are not

16  going to walk around or drive around with -- with four ounces

17  in you and a scale.

18  Q.    Okay.  Thank you.

19       At this point, I am just going to ask you to help me put

20  some things in evidence, so I am going to show you some text

21  messages and basically just going to ask you to help me read

22  those into evidence.

23  A.    Sure.

24  Q.    Thanks.  So I am going to start actually by bringing up

25  one picture.

1          THE COURT:  Could we approach real quick just for one
2    second?
3          (The following took place at sidebar outside the presence
4    of the jury; Mr. Lawlor and Mr. Ake present.)
5          THE COURT:  So, just for clarification, my ruling
6    this morning before the jury came in was made pursuant to
7    Federal Rule of Evidence 103, so it was a definitive pretrial
8    ruling on the record, and, therefore, preserves your objection.
9    But in an abundance of caution, Mike, you want a continuing
10   objection to all of these?
11         MR. LAWLOR:  I thought I asked for one.
12         THE COURT:  Yeah.  I think it may be there, but I
13   just want to make it real clear.
14         MR. LAWLOR:  I want it clear I do want a continuing
15   objection.
16         THE COURT:  So rather than just objecting to every
17   time he's going to put them in, it's a continuing objection to
18   all of that subject to the ruling I have already made.
19         MR. LAWLOR:  For both reasons, just the pretrial
20   issue and the in trial issue, so for all the reasons of --
21         THE COURT:  Right.  I understand.
22         MR. LAWLOR:  Actually, while we are up here, Your
23   Honor, I know you would like to go a little longer.  I am not
24   asking for a lunch break, but if we are about to get into the
25   text messages, can we take ten minutes?  You can't leave a

1  grown man sitting here for two hours.

2          THE COURT:  Has it been two hours?

3          MR. LAWLOR:  No, it hasn't been.  It's only been one

4  hour, but you will keep us here for two hours, at which point I

5  will fall out of my chair.

6          THE COURT:  Let me ask a question:  How much longer

7  do you think it's going to take to get these messages in before

8  we can take a lunch break because it's 12 now?

9          MR. AKE:  You maybe just want to do 15 minutes or so

10 and then take a break for lunch, or do you want to wait until

11 1:00?

12         THE COURT:  How long is it going to take?

13         MR. AKE:  It's going to take well over an hour.

14         THE COURT:  Then why don't we take a lunch break now

15 and let him do that.

16     Now, you are going to want a break before cross probably?

17         MR. LAWLOR:  Probably.  I can't see sitting here for

18 two hours.  Maybe I will get a rubber band and fly upstairs --

19         THE COURT:  Keep objecting and I will keep you here.

20 Just kidding.

21     (End of sidebar discussion.)

22         THE COURT:  All right.  Ladies and gentlemen, I think

23 that the next section of examination might take a bit of time,

24 so -- and then we still have to have cross-examination.  So if

25 I am looking at the schedule, I think 12:00, it lines up pretty

1  well with the lunch hour, so let's take our lunch break now.

2  All right?  We will have a lunch break, come back at five

3  minutes after one, so we will start promptly at five minutes

4  after one, and then, again, we won't go longer than 5:00 today,

5  which has been our custom.  All right?  Thanks very much,

6  everybody.

7        (The jury panel exit the courtroom at 12:03 p.m.)

8        THE COURT:  Okay.  One-hour recess for lunch.

9        Detective, please don't discuss your testimony with

10  anyone because you are still on cross-examination and haven't

11  been crossed.  So you can talk about scheduling, you can talk

12  about getting lunch, but not about what you have testified

13  about.

14        THE WITNESS:  Yes, sir.

15        (Recess taken from 12:04 p.m. until 1:1 5 p.m.)

16        THE DEPUTY CLERK:  This Honorable Court now resumes

17  in session.

18        THE COURT:  Okay, everyone.  Have a seat, please, and

19  be comfortable.  I hope you got a chance to get some lunch.

20        Can we bring the jury in?

21        MR. AKE:  Yes, Your Honor.

22        THE COURT:  Okay.  Let's bring them in.

23        Mike, what time is your flight tomorrow?

24        MR. LAWLOR:  Eight-ish.

25        THE COURT:  P.m.?

```
 1              MR. LAWLOR:  Yes.  I will have to check.
 2              THE COURT:  Out of where?
 3              MR. LAWLOR:  BWI.
 4              THE COURT:  Okay.
 5         (The jury panel enter the courtroom at 1:16 p.m.)
 6              THE COURT:  Have a seat, everybody.
 7         Thank you very much, ladies and gentlemen.  We are back
 8  at it, and, Detective, you are still under oath.
 9         Mr. Ake, whenever you are ready, sir.
10              MR. AKE:  Thank you, Your Honor.
11  BY MR. AKE:
12  Q.    Detective Jaramillo, before I get to the text messages, I
13  have one more question I forgot to ask you.  What is legal --
14  sorry.  Maryland's criminal threshold for marijuana is at what
15  level of weight?
16  A.    You can have up to ten grams.
17  Q.    Without it being a criminal offense?
18  A.    Yes.
19              THE COURT:  You can have up to how many grams?
20              THE WITNESS:  Ten grams.
21  BY MR. AKE:
22  Q.    And below that is just a civil offense.  Is that right?
23  A.    Correct.
24  Q.    Or a civil citation?
25  A.    Civil citation.
```

1    Q.    Thank you.

2          So I want to show you what's previously been admitted as

3    Government's Exhibit 5. -- actually, I think it was 5.2 and

4    what's been admitted as Government's Exhibit 13.55.  And on

5    13.55, I am just going to show you -- go to the last page here,

6    and what is the timestamp on that particular text message?

7    A.    It says 7:34 p.m.

8    Q.    And what date?

9    A.    The date is July 25th, 2019.

10   Q.    And what's the date and time on Exhibit 5.2?

11   A.    July 25th, 2019.

12   Q.    And that's expressed in Zulu time, correct, the time on

13   there?

14   A.    23:48.  Correct.

15   Q.    And what time would that be in Eastern Time?

16   A.    11:48.

17   Q.    That's Zulu time.  Right?

18   A.    Say it again.

19   Q.    Never mind.  We have been through that already so I will

20   withdraw the question.

21         So going back -- I am going to bring up 13.55, the

22   exhibit that we had on the right there, and start from the

23   beginning.

24         Going to the top, who is the text between?

25   A.    Frazer38 and Debonair Jones.

1    Q.    And Frazer38 is the owner?

2    A.    I'm sorry?

3    Q.    Frazer38 is noted as the owner?

4    A.    Correct.

5    Q.    Okay.  Sir, could you start reading, and if you could

6    just note, like, who is speaking?  It says at the top of each

7    bubble there.

8    A.    Sure.  It starts with Debonair Jones, "Aye."

9          The response from Frazer38, "Yea."

10         MR. LAWLOR:  Your Honor, can we approach?

11         THE COURT:  Come on up.

12         (The following took place at sidebar outside the presence

13   of the jury; Mr. Lawlor, Mr. Ake, and Mr. Kibbe present.)

14         MR. LAWLOR:  I'm sorry.  I could be missing

15   something, but the phone number at the top of that exhibit

16   doesn't appear to be the same phone number as Exhibit 12.

17         THE COURT:  It's not.

18         MR. LAWLOR:  So is there a foundation for this then?

19         THE COURT:  Well, that's a good question.  The

20   numbers -- Adam, you can perhaps shed some light on this.  What

21   -- my concern is this.

22         MR. AKE:  I see where it's --

23         THE COURT:  It's Detective Jaramillo said that it was

24   -- you had Mr. Frazer's ended in 7123 and that yours ended in

25   3062.

1          MR. AKE:  So this would have been from one of the

2     apps on the phone.

3          THE COURT:  Well, I don't really have a foundation

4     for that.

5          MR. AKE:  We would have to re-call Detective

6     Carvajal, Your Honor, so --

7          THE COURT:  It's fine, I mean, but we don't have any

8     foundation for that I don't think.  I mean, I am pretty sure we

9     don't have a foundation for that --

10          MR. LAWLOR:  I agree.

11          THE COURT:  -- if that's from one of the apps.

12          MR. LAWLOR:  Normally, I would trust the government,

13     but I just --

14          THE COURT:  Can you do it conditionally?

15          MR. LAWLOR:  Well, no.  I just don't know what she's

16     going to say.  I haven't seen this in the report, so I am just

17     not confident that she's going to be able to --

18          THE COURT:  So that's the thing, Adam, is how do we

19     know that --

20          MR. LAWLOR:  I know I have seen an app from a cell

21     phone from a different phone number.

22          MR. AKE:  Well, this was also the case where the

23     pictures -- some of the pictures that were attached to those

24     attachments also had that same number at the top, the 119

25     number, the number that begins in 119.

1          THE COURT:  Can you show me --

2          MR. AKE:  Sure.  So, for instance --

3          THE COURT:  What's the exhibit number?

4          MR. AKE:  One of them --

5          THE COURT:  Just give me any one of them.

6          MR. AKE:  So, for instance, 21 -- so this one, it

7    shows up as that number, and I have seen that on other -- I saw

8    that on some of the attachments.

9          THE COURT:  So which -- what exhibit are you looking

10   at?

11         MR. AKE:  I am trying to find my -- I saw that

12   earlier, too.

13         MR. KIBBE:  What was the question?

14         MR. AKE:  There is no foundation for ascribing that

15   to Frazer.

16         MR. KIBBE:  I think we have evidence that that was

17   his Instagram account, Frazer, that he used, and that's part of

18   exhibit -- I can go get the number.

19         THE COURT:  Yeah.  If it's in there already, then

20   it's in there.

21         MR. LAWLOR:  That's the phone number of his Instagram

22   phone, but that doesn't necessarily correspond with Instagram.

23         THE COURT:  What's the exhibit that the jury was just

24   looking at?

25         MR. AKE:  13.55, Your Honor.

1          THE COURT:  13.55?

2          MR. AKE:  Yes, Your Honor.

3          THE COURT:  Okay.  And so what we are looking at

4    here, what Mike is talking about is Frazer38 -- and this

5    obviously comes from the extraction report -- to Debonair

6    Jones.  So what the jury just looked at was 13.55.  And,

7    Patrick, what are you saying connects that up with -- if you

8    take a look at the top left-hand corner, this is coming out of

9    the extraction report and Frazer38 is owner.  But where -- that

10   did not -- I don't recall any testimony from the detective that

11   linked -- put this number with Mr. Frazer's.

12         MR. KIBBE:  There is two ways to ascribe it to

13   Mr. Frazer.  The first, Your Honor, is it's on the left side,

14   it's the green text, and you have already received testimony

15   that the green text is the owner of the phone.  On the right

16   side, excuse me, the green text, is the owner of the phone, and

17   it says owner of the phone on there.  And that -- we had

18   testimony that that came from Mr. Frazer's phone.

19         THE COURT:  In this particular exhibit?

20         MR. KIBBE:  Just generally speaking.  One of the

21   first foundational questions I asked --

22         THE COURT:  Right.  Right.  Right.  But you offered

23   in 13 -- but 13.55 is already in evidence.  Right?

24         MR. AKE:  Yes.

25         THE COURT:  So this is already in evidence?

1              MR. KIBBE:  Yes.

2              THE COURT:  And we have -- the testimony that put

3     this in evidence was from the detective.  The detective said,

4     This is what got -- was taken out of the extraction report.  In

5     fact, you were going exhibit by exhibit through that to say,

6     Where did you get it?, and then we speeded it up by having her

7     look at that, and she testified that all those were the

8     extractions from it.

9              MR. KIBBE:  Mm-hmm.

10             THE COURT:  And that's what links up this with the

11    other?

12             MR. KIBBE:  Yes.  That's from Frazer's phone.  And in

13    addition, we had testimony that the green text on the right

14    side for all of these text messages --

15             THE COURT:  We know that this came out of

16    Mr. Frazer's phone because that was established.  And that's

17    true.  We went through the exhibit, you went through each one,

18    and then we took a recess or paused, she looked at all of them,

19    and from all of those, they were offered in.  So this is

20    already in evidence.

21             MR. KIBBE:  Yes.

22             THE COURT:  And then we have the testimony that the

23    green part is from the owner of the phone and the blue part is

24    from the other person?

25             MR. KIBBE:  Yes.

1          THE COURT:  I think that does it, Mike.  You only had

2     to do it by preponderance of evidence.  Thank you.  Sorry for

3     that, but this was important.

4          (End of sidebar discussion.)

5          THE COURT:  I think you may need to repeat the

6     question, Mr. Ake.

7          MR. AKE:  Yes, Your Honor.

8     BY MR. AKE:

9     Q.    So, Detective Jaramillo, can you go ahead and start

10    reading in the text messages there?

11    A.    Debonair Jones, "Aye."

12          And in response from Frazer38, "Yea."

13          And that's followed up by another text that reads, "Got

14    good gas."

15    Q.    Okay.  Could you keep going?

16    A.    Response from Debonair Jones, "I need the other thing.

17    We talked about in a hit you when I touch down and put my bread

18    together."

19          A response from Frazer38, "Aite."

20          And a response with "WYA," where you at, I would assume

21    that's what that means.

22          THE COURT:  Keep going.

23          THE WITNESS:  Response from Frazer38, "In da oak."

24          "I'm trying do that" was a response from Debonair Jones.

25    BY MR. AKE:

Sar-am 1 - Direct

1    Q.    And just for the record, what was the time of that last

2    response from Debonair?

3    A.    The last response was at 11:30 p.m. -- or, I'm sorry,

4    11:29 p.m. to be exact.

5    Q.    Okay.  Continue with Frazer's response.

6    A.    Frazer38 responded, "Tomorrow."

7          A subsequent text, "Be ready in the a.m."

8    Q.    And then we got a text from Debonair at 6:01 -- 6:01 p.m.

9    on July 25th, 2019.

10   A.    "Where you at.  You got gas."

11         Response from Frazer38 is "Yea."

12         And another one reads, "Good gas."

13   Q.    And that last text message was at what time?

14   A.    7:34.

15   Q.    Thanks.  I am going to go back and start more at the

16   beginning of these text messages.  I am going to start with

17   13.5 that's already been admitted as a government's exhibit.

18         Can you tell me who the counterparty with this text

19   message thread is?

20   A.    It reads Amber.  It's (301) 383-3649.

21   Q.    What's the name?

22   A.    Amber.

23   Q.    Okay.  Go ahead and start reading with the outgoing text.

24   A.    "Whatever you wanna do."

25   Q.    And what's the response?

1    A.    The response is, "Go grab food and chill."

2          A response, "Aite cool."

3          "You don't be drinking and shit" is the follow-up text.

4    Q.    And what's Amber's response?

5    A.    She says, "I'm more of a smoker."

6          And another one reads, "I drink depending on what it is."

7    Q.    Okay.  I will show you text -- Government's Exhibit 13.6.

8          Who is this text with?  Just the name.

9    A.    Wood.

10   Q.    And what's the date of this text exchange?

11   A.    June 6th, 2019.

12   Q.    Okay.  And the first text from Wood, what's that say?

13   A.    "Spark me up."

14   Q.    What's Frazer's response?

15   A.    "As soon as I grab something.  I got something for you."

16   Q.    Showing you Government's Exhibit 13.7 previously

17   admitted.

18         Who is this thread with?  Just the name.

19   A.    Jonny Boy.

20   Q.    And what's the date of the text exchange here?

21   A.    It reads, "Black can you come to my house please?"

22         "I just left.  I'll be back around in a hour."

23              THE COURT:  You asked about the date.

24              THE WITNESS:  The date is June 16th, 2019.

25   BY MR. AKE:

Saran-1 - Direct

```
1    Q.    And I am going to go back -- so, apparently, the -- what

2    was on my computer got cut off in the full, so going back to

3    Government's Exhibit 13.5, it got cut off at page 3.  I think

4    the text that you read earlier was, "I drink depending on what

5    it is."

6          Could you continue reading 13.5?

7    A.    "So what you drink."

8          "I don't really smoke like that anymore."  That's a

9    follow-up text.

10   Q.    I think that's it.  Thank you.

11         And then showing you Government's Exhibit 13 -- we are

12   back at 13.7.

13         This text is with whom?  It would help if I show you.

14   A.    Jonny Boy.

15   Q.    Okay.  All right.  So what's the date that this

16   conversation begins?

17   A.    June 16th, 2019.

18   Q.    Okay.  Could you start reading with the opening text from

19   Jonny Boy?

20   A.    "Black can you come to my house please"?

21         The response is, "I just left.  I will be back around in

22   a hour."

23   Q.    Can you continue with Jonny Boy's response?

24   A.    "A 30 hook me up bro please if you can."

25   Q.    And what's the response?
```

1   A.    The response is, "Imma make it worth your while."

2         And the response, "Okay."

3         That's followed up on, "Okay.  I got you."

4         And a response, "Okay."

5         "And it reads, "Wassup up Black."

6         "Okay thanks bro" is the next one.

7         Followed up by, "Black you far from here."

8         "Am here Black."

9         "Aite here I come."

10        And the next one is, "Yo Black.  Thanks bro.  No nobody

11   do that."

12        "You good.  I got you.  Just tuck with me a J."

13   Q.    And showing you what's been previously marked and

14   admitted as Government's Exhibit 13.8.  Who is the counterparty

15   in this text thread?

16   A.    Jonny Boy.

17   Q.    Okay.  And just when does this thread start?

18   A.    It starts on June 19th, 2019.

19   Q.    Okay.  And can you go ahead and start reading that?

20   A.    It starts with, "Am here Black."

21        And it's followed up by the same response, "Am here

22   Black.

23        "Black bro it me J.  Where ya at."

24        "I need a 20."

25        "If you good just let me know cause I had to put it

1    together for you."

2         "But it's no biggie."

3         The response says, "Am here Black."

4         And that's -- the reply says, "I'm bout to be right

5    there."

6    Q.    Showing you what's been previously marked and admitted as

7    Government's Exhibit 13.9.

8         Who is the counterparty in this text?

9    A.    Jean.

10   Q.    And what's the date on this thread?

11   A.    June 21st, 2019.

12   Q.    Okay.  And Jean starts off with what?

13   A.    "Sup this Jean."

14        The response is, "Wuz up."

15        Then Jean asked, "Dub, are you around."

16        And the response is, "Yea."

17        "Where ya at?"

18        It's replied by, "I'm by the Z pool."

19        "Okay I'm like 15 minutes away" is the reply.

20        It's followed up by "What you want."

21        "Call me RN," meaning call me right now.

22        "Aye man."

23   Q.    I am showing you what's previously been marked and

24   admitted as Government's Exhibit 13.10.

25        Who is the counterparty in this text?

1   A.      Bush.

2   Q.      And what's the date of this text?

3   A.      June 21st, 2019.

4   Q.      Okay.  I am showing you what's been previously admitted

5   as 13.11.

6           Just describe what you see there.

7   A.      It appears to be two pills.

8   Q.      Okay.  Going back to 13.10, I just ask that you read

9   Frazer's text there.

10  A.      It says, "I can't see the joint.  You gotta send me a

11  better pic.  Or just tell me what the numbers on the pill say."

12  Q.      The response?

13  A.      "Bruh it's too small.  You can meet me.  I can show you.

14  Trust me.  I know what I'm talking about."

15          And it's followed up by, "Come to the circle."

16  Q.      Okay.  And there is another picture there.

17          I am going to show you what's previously been marked and

18  admitted as Government's Exhibit 13.12.

19          Could you read the label there?

20  A.      It's -- it reads, "Oxycodone HCl 5 milligrams."

21  Q.      Does it say Silver Spring above that?

22  A.      It says, "Colgate Way, Silver Spring."

23  Q.      All right.  Going back to 13.10, back to page 3.

24          What's that say there?

25  A.      "11459 Lockwood apartment," abbreviation for apartment.

1    Q.    So if you could just keep that number in mind real quick,

2    the 11459, I am going to show you Government's Exhibit 2.1.

3          What's the name of the street at the top there?

4    A.    Lockwood Drive.

5    Q.    And what is that building number at the top?

6    A.    11459.

7    Q.    Thank you.

8          Going back to Government's Exhibit 13.10, scrolling down

9    through page 4, can you read that, please?

10   A.    "Call me."

11         Followed up by, "Fool."

12         And, again, another text that reads, "Fool."

13         "80 fool for 400."

14         "How many 5s."

15         "They just want the 5s."

16         "80 5s."

17   Q.    Okay.  And showing you Government's Exhibit 13.13.

18         Who is the counterparty in this text exchange?

19   A.    Jonny Boy.

20   Q.    And the date of this thread beginning?

21   A.    June 22nd, 2019.

22   Q.    Okay.  Could you read what Jonny Boy starts with?

23   A.    "Black can you came to my house."

24         And that's followed up by, "A 40.  It's for my boy if you

25   can."

```
 1            Another one reads, "Black I know I told you for today."
 2            It's followed up by, "Give me two more hour men am nat
 3   letting you dawn."
 4   Q.    Keep going.
 5   A.    "Am here Black."
 6   Q.    And showing you Government's Exhibit 13.14.
 7            Who is this text exchange with?
 8   A.    Jean.
 9   Q.    And what's the date of the exchange?
10   A.    June 25th, 2019.
11   Q.    Okay.  How does Jean start that?
12   A.    "Do you have a peace [sic] of cake just got $15 let?"
13   Q.    And what's Frazer's response?
14   A.    "Yea."
15   Q.    Okay.  Can you read Frazer's next text there?
16   A.    Abbreviation for where you at.
17            And the response is, "Home."
18            "You gonna come."
19            "Where you at?"
20            Followed up by, "Where you picked up from earlier."
21            "Please be around.  Coming.  My phone almost dead."
22            And the response is, "How long."
23            "Sorry man.  My phone went off and I have to go give the
24   C at back.  I still got the 15 if you wanna."
25            "Yea" is the response.
```

Sarah-1 - Direct

1    Q.    Showing you Government's Exhibit 13.15.

2          Is there a name associated with the counterparty in this

3    one?

4    A.    Not on this one.

5    Q.    Okay.  Could you read from the unidentified

6    correspondence how he starts or she?

7    A.    "Yo."

8          And the response is, "Wuz up."

9          It's followed up by, "Wassup.  What you doing?"

10         And the response is, "Shit out here.  Got some Grade A

11   shit."

12         A response is, "That's a bet.  I'm bout to come fuck with

13   you."

14         It's followed up by, "Where you at."

15         And the person responds, "Gburg."

16         It's followed up by, "Aite."

17         And, "How long you bout to be."

18         The next one reads, "Tomorrow."

19         And it's followed up with, "Later today."

20         And the response is, "Okay.  I'm out here."

21   Q.    Okay.  Showing you Government's Exhibit 13.16.

22         Who is the counterparty in this text?

23   A.    Monica.

24   Q.    Okay.  And when does this text thread begin?

25   A.    June 25th, 2019.

 1   Q.    Okay.  And how does Monica start this?

 2   A.    "Hey."

 3         And it's followed up with, "Are you coming over here

 4   today."

 5         And Frazer's response, "I don't think so."

 6         "Why."

 7         And the response for that is, "Nah cuz I was trying to

 8   see if you know anybody that's good."

 9         The reply is, "I'm waiting on my man to come drop some

10   off to me."

11         The response is, "Oh okay."

12         And it's followed up by, "Hey so did your friend came

13   through or not."

14         The response is, "Yea."

15         "Yea my folks came through but I'm out White Oak."

16         And the response is, "So are you coming here."

17         And it's followed up by, "I know I sound like a weed head

18   but I'm not a weed head.  To be honest I sleep when I smoke

19   I'm not going to lie to you ever since my accident."

20   Q.    Okay.

21   A.    "If I can get a ride I come through right quick" is the

22   response.

23   Q.    Okay.  Showing you Government's Exhibit what's been

24   admitted as 13.17.

25         Is the counterparty identified by name?

Saran - Direct

```
 1   A.    No name on there.

 2   Q.    Okay.  And when is the first text in this thread?

 3   A.    It starts on June 28th, 2019.

 4   Q.    Okay.  And how does it start?

 5   A.    With a question, "You good??"

 6         And the response is, "Yea."

 7         And then the follow up with, "Can you meet me RIGG BIW."

 8         Followed up with "Now."

 9         "I'm at the same place by the dumpster" is the follow-up

10   text.

11         "What was tryna do."

12         And the response is "20."

13         And the other one is "I'm here."

14         Followed up by "Ready."

15         And "I'm right here."

16         "Have your 20."

17         With a question mark.

18         And a follow-up text that reads, "Are you good??"

19         "Can I get a 20."

20   Q.    Okay.  Showing you what's been previously marked and

21   admitted as Government's Exhibit 13.18.

22         Who is this text thread with?

23   A.    Monica.

24   Q.    And what's the first date on this thread?

25   A.    The date is June 28th, 2019.
```

1  Q.   Go ahead and read.

2  A.   "Hey there Darryl."

3       And it's followed up by "You okay."

4       "I got too much on mine.  You know anyone that's good."

5       And the response is "Yea.  What you wanted."

6       "25."

7  Q.   Okay.  And showing you Government's Exhibit that's been

8  admitted as 13.19.

9       Who is the counterparty in this thread?

10 A.   Jonny Boy.

11 Q.   Okay.  And what's the first date on this thread?

12 A.   June 28th, 2019.

13 Q.   Go ahead and start off?

14 A.   "Wassup Black.  Where ya at bro."

15      And the response is, "Where my $ at," where is my money

16 at?

17      And the response is, Damn you don't mess with me anymore.

18      Followed up with, "Come on man I ain't tripping off that

19 $40.  Just pay me it whenever you can."

20      And it's followed up by, "Don't let that ruin our

21 friendship."

22 Q.   Okay.

23 A.   And the response by Jonny Boy is, "Black I am paying you

24 men I don't know with me but on this Friday no bullshit I will

25 have your money."  I didn't play with no one money, men.  "I

1    know I fuck up with you."

2        And the response is, "You good bruh."

3        "Black wassup men."

4        It's followed up by, My boy asking wassup if you coming.

5    I told him when you say you coming you coming.

6        "Or you want to let it pass" is the next text.

7        And the response is, "Nah I'm coming."

8    Q.    Now I am going to show you what's been marked and

9    admitted as Government's Exhibit 20 [sic].

10       Who is the counterparty in this text by name?

11   A.    Swindle.

12   Q.    And what's the date of the first thread there?

13   A.    July 2nd, 2019.

14   Q.    Okay.  Go ahead and start off.

15   A.    "King."

16       Followed up by, "Def good seeing you AHK swear MO."

17       The following response is, "Respect."

18       "You already know" is the subsequent text.

19       "Wuz up fool."

20   Q.    And just to clear up, "Wuz up fool" is on July 4th.

21   Correct?

22   A.    Correct.

23       "Sup bro" is the response.

24       "What you doin?"

25       The response is, "Shit I can't call it."

1          And the other text, the response is, "Chu doin today!"

2          And the response is, "We suppose to be having a cookout

3    today."

4          "Where at?"

5          "My pops having one too."

6          And the response is, "Around White Oak."

7    Q.    And just for the record, it appears there is a picture,

8    then, on the next thread.  Correct?

9    A.    Correct.

10   Q.    All right.  Okay.  Continuing past, looking at page 6 of

11   this exhibit.

12   A.    "Time it start?"

13         And then the next one reads, "I fuck around pull up."

14         "At five."

15         "Light bet.  You ever holla at your folks with da gas?"

16         A response, "I'm try and pull up to your father's joint."

17         It's followed up by, "Nope I'm bout holla at him now."

18         The response is, "Bet.  It's in Bowie too."

19         "Aite."

20         "Yoyo."

21   Q.    And then "Yoyo" is on what date?

22   A.    The 5th.

23   Q.    Okay.

24   A.    Response is, "Wuz up fool."

25         It says, "I'm waiting on my lil man to get back to me on

1    the numbers."

2          The response is, "Ain't shit bra.  Light bet."

3          A text that says, "You no [sic] niggas dat be fucking

4    with da white?"

5          The response is, "Yea."

6          "Wass they numbers?"

7          "150 for a jacket."

8          "300 for a quack."

9          What about an OZ?

10          "It should be either 13 or 14."

11          The response is, "See if they do 11 or 12.  I come back

12    fast AF."

13          "Aight let me holla at him right quick" is the response.

14          They reply with, "Assaluma alikum.  Text me aight.  I'm

15    on the train."

16          And the response is, "Okay."

17    Q.   And just to be clear, on that last -- so from the "let me

18    holla at him right quick," that's on July 5th, and what date is

19    the "assaluma alikum" response?

20    A.   July 9th.

21    Q.   Okay.  Keep going.

22    A.   It's followed up with, "Okay."

23          And then follow-up text says, "My cousin said he can do

24    the OZ for 13."

25          "And if you keep fucking with him he'll drop the price."

1        Followed up with, "The shit drop."

2        "When be asking" --

3  Q.    Sorry.  Let me make sure I get that all on there.  Go

4  ahead.

5  A.    "When be asking the smokers what it be hitting on the

6  lowest rating I ever got was an eight out of ten."

7        "But I never got a 10 neither."

8        "Light bet.  Ima hit you when I need."

9  Q.    Sorry.

10 A.    "Good look."

11       "Yea I had to tell him that you Serria Leon."

12       It's followed up with, "I'm supposed to be" --

13 Q.    Let me make that bigger.

14 A.    Followed up with, "I'm supposed to be getting a half P on

15 the pressure.  I'm just waiting on my man to holla at."

16 Q.    Okay.  It looks like he continued the thought there.

17 A.    The other one reads, "Me."  Continuation from the

18 previous text.

19       Then it reads, "So if that come through Imma holla at

20 you."

21       And the response is, "Bet dat."

22 Q.    Okay.  And then -- so that's the last text on July 9th.

23       The next -- what's the next date on there?

24 A.    July 12th.

25 Q.    Go ahead and read that.

1   A.     "Aye I got some Face Off and Guerrilla Glue."

2          And the response is, "Wass da numbers?"

3          "$250 a OZ and I'm not seeing nothing back."

4          "I'm just giving you the number I got."

5          "I'll give you two please for $450."

6          "OZ."

7          "Got good gas."

8   Q.     Okay.  And then continuing, what's the date on the next

9   set there?

10  A.     July 16th, 2019.

11  Q.     Okay.  And the outgoing text is what?

12  A.     "You don't know nobody that be fucking with dem perks."

13         "Good gas on deck."

14  Q.     So that's a different date, though, right?  What's the

15  "good gas on deck" date?

16  A.     That is July 23rd, 2019.

17         And the reply is, "What flavor?"

18         And the reply on the 24th of July, "Nd is the percs

19  real?"

20         The response is, "The percs gone and they were real."

21         Followed up by, "I got some shit called King Louie and

22  WiFi."

23  Q.     And just showing you what's been previously marked and

24  admitted as Government's Exhibit 19.1, what does that bag say

25  on it right there?

1   A.     Louie.

2   Q.     All right.  Going back, now I am going to show you what's

3   been marked and previously admitted as Government's Exhibit

4   13.21.

5         Who is the counterparty in this text thread?

6   A.     Jean.

7   Q.     And what date does this begin on?

8   A.     This is July 2nd, 2019.

9   Q.     Okay.  How does Jean begin?

10  A.     "I said I'm coming, I'm driving.  Let be quick."

11        The response was, "What you tryna do."

12        It again was followed up with the same -- I'm sorry,

13  "What you wanna do."

14  Q.     Could you speak into the microphone a little more

15  closely?

16  A.     It's followed up by a text, "What you wanna do."

17        The response is, "I said pug me two dub for 30."

18        And followed up by, "I'm here."

19        A response says, "Okay.  I'm coming."

20        And it's followed -- the response is, "You sure it's

21  raining."

22        And a response is, "I need you to come to me."

23        "Is raining."

24        Followed up by the text that reads, "1507 November CIR."

25        "Put it in your GPS."

1    And subsequently, "You got me."

2    "Aye."

3  Q.   And next I am showing you what's been marked and

4  previously admitted as Government's Exhibit 13.22.

5    Who is the counterparty in this text thread?

6  A.   Amber.

7  Q.   And what date does this begin on?

8  A.   The date of June 10th, 2019.

9  Q.   How does it begin?

10  A.   "GM" -- good morning -- "sweetie."

11  Q.   And then on June 12th, next text?

12  A.   "I'm saying though should I delete your number out my

13  phone."

14    And the response is, "Probably think shit never thought

15  you'd hear from me again."

16    And the response is, "I'm happy you did call me."

17    The response is, "I just don't want no games at all."

18    And "Where the pack at."

19    "Well come to you."

20    "Can we come get some pack."

21  Q.   And then there is a picture.  Correct?

22  A.   Yeah.  "Like my new hair color?," and a picture.

23    The response is, "Yea."

24    And followed up by, "What's the address."

25    He replies, "I'm bout to send it."

1      "Okay boo."

2      "How much is 3.5."

3      "There a lot of boys on the road.  I'll just come

4   Friday."

5      "I'm sorry."

6      "It's cool."

7   Q.    Okay.  All right.  Showing you what's been marked and

8   previously admitted as Government's Exhibit 13.23.

9      Who is the counterparty in this text?

10  A.    Jonny Boy.

11  Q.    And date of the first text?

12  A.    "How long you think you going to be from now."

13          THE COURT:  The question was the date.

14          THE WITNESS:  July 2nd, 2019.

15  BY MR. AKE:

16  Q.    Go ahead and start reading.

17  A.    "How long you think you going be from now."

18      "Black can you do me a 15 if you can bro please."

19      The response is, "Yea but you gotta wait until I go back

20  up that way."

21      The response is, "Okay."

22      And followed up by, "I'm at the door."

23  Q.    Okay.  Showing you what's been marked and previously

24  admitted as Government's Exhibit 13.24.

25      Who is the counterparty in that text?

1  A.    African Mike.

2  Q.    And the first text appears to be a screenshot.  Is that

3  right?

4  A.    Correct.

5  Q.    I am going to show you Government's Exhibit 13.25.

6        Could you read that, please?

7  A.    It starts off with, "3701 Hull Street."

8        "You got it bruh."

9        The other party says, "Yea I got it."

10        The reply is, "Okay.  What you got on deck they asking me

11  right now."

12        "So that way there [sic] bread can be straight by the

13  time I get there."

14        "Dracos 9 ar 15 a mac 11."

15        The other one reads, How many 9."

16        And the response is, "5.  2 dracos, 1 mac, 2 ar 15."

17        "The mini joints or regular."

18  Q.    And going back to Exhibit 13.24, starting with the text

19  on July 9th outgoing.

20  A.    "Aye what kinda Mac is it 10 or 11."

21        The response is, "Ama hit you right back."

22        The response is, "11609 Lockwood Drive."

23        "Man I was tryna go fool."

24        The response is, "You can."

25        "Y'all coming back."

1                "Followed up with, "I can get her a ride back."

2                The response is, "Texter and see what's up.  Let her know

3        the move-in on with it because I'm bout to head back to VA

4        anyway."

5                The response is, "Do I have to take her to VA."

6                The reply is, "Naw she stay in the city on F Street."

7                "Hit her bruh.  Do your thing.  Trust me."

8                Followed up by, "Easy does it."

9                The other response is, "I just did.  She ain't pick up."

10               "So she probably got another mission for the night."

11               Followed up by, "Aye you gonna bring her back out this

12       joint."

13               "She said she bout to holla at you."

14       Q.    So that was a text on July 14th.  Correct?

15       A.    Correct.

16       Q.    Okay.  And then the next text is what date?

17       A.    July 16th.

18       Q.    Okay.  And that next text just contains an attachment.

19       Correct?

20       A.    Correct.

21       Q.    And just -- what does that attachment appear to be a

22       picture of?

23       A.    It appears to be a shotgun, firearm.

24       Q.    And I am going to pull up Government's Exhibit 13.25 --

25       excuse me.  Let's go with 13.26.

1          And although sideways, does that appear to be the same

2    picture?

3    A.    Yeah.

4    Q.    And you described it as a shotgun previously?

5    A.    Yeah.  Appears to be a shotgun.

6    Q.    So going back to 13.24 back down to page 7.  Okay.  The

7    next text after the attachment, start reading -- what's

8    Frazer's response?

9    A.    "I want something I can walk around with."

10         And followed up text reads, "We already got the big

11   shit."

12         The reply is, "I got you."

13         And the response is, "And Mireboy needs one."

14         And the response is, "Bet."

15   Q.    Showing you Government's Exhibit -- oops, sorry.  Let's

16   go with 13.28.

17         Who is the counterparty on this text thread?

18   A.    Kadija.

19   Q.    Okay.  And what's the date of the first text message on

20   this thread?

21   A.    July 9th, 2019.

22   Q.    Okay.  And the outgoing text begins with what?

23   A.    "What the move for tonight."

24   Q.    What's the response?

25   A.    The response is, "I'm going out."

1          And the reply is, "You always going out."

2          The response is, "My folks B day today."

3          "It's the summertime."

4    Q.    I will make that a little easier to read.

5    A.    The reply is, "You need to gather like two of your

6    friends one day and come out here and chill with us."

7          Followed up with, "It's gonna be a good time."

8          The response is, "I can definitely go out as much as I

9    want."

10         "I'm.  Whole single women out here."

11         "W got pressure, molly, coke, dope, percs, and etc."

12         The response is, "N my friends are bood up."

13         Followed up by, "Well that's gonna be for another day."

14         The response is, "Aite."

15   Q.    Okay.  Next text.  Showing you Government's Exhibit

16   13.29.

17         Who is the counterparty in this?

18   A.    Monica.

19   Q.    And what's the date on the first text in this thread?

20   A.    July 11th, 2019.

21   Q.    Okay.  Can you read reading from Monica?

22   A.    "Hey Darryl if you're coming back to vanna please let me

23   get a dub."

24         The response is, "Okay."

25         "Make that $30."

Sarani - Direct

```
 1   Q.    That's it for that one.
 2         Can I get you to speak into the microphone a little bit
 3   more.  Thank you.
 4         I am going to show you Government's Exhibit 13.30.
 5         Who is the counterparty with this one?
 6   A.    Wood.
 7   Q.    And first text begins what day?
 8   A.    July 12th, 2019.
 9   Q.    And Wood begins with what?
10   A.    "Can you get some pills any kind."
11         "E pill boot trying send in joint."
12         "My man got the boot on deck."
13         "I'm tryna get some percs from my cousin."
14         She got em.
15   Q.    "She get em"?
16   A.    I'm sorry.  Yes.  "She get em."
17   Q.    And what's the next text from Frazer?
18   A.    It's July the 12th.
19   Q.    What's it say there?
20   A.    "Subscribe."
21   Q.    And Wood's response?
22   A.    "See cus bra Uncle Earl got the way."
23         "Like ASAP."
24   Q.    Looks like an empty text there?
25   A.    Correct.
```

```
 1           "How much molly should I grab."

 2           "Uhh at least five grams."

 3           "To send in if it's torch."

 4           "Aite Imma holla at him after jumah."

 5           All right.

 6    Q.    Okay.  All right.  Showing you Government's Exhibit

 7    13.31.

 8           Who is the counterparty on this text?

 9    A.    Laurin.

10    Q.    And when does the first text on this thread start?

11    A.    July 12, 2019.

12    Q.    Go ahead and read Frazer's outbound text.

13    A.    "Aite aye can I get $100 till the first."

14           "I promise I'll give it back.  That's my word."

15           "Trust me."

16           "I'm tryna re-up."

17           "Followed up by, "So now you don't see my texts."

18           The reply is, "I ain't get no calls from you."

19           "See you quick to jump to conclusions."

20    Q.    Okay.  Now showing you Government's Exhibit 13.32.

21           Who is the counterparty on this text?

22    A.    Ross.

23    Q.    And what's the date of these texts?

24    A.    June 28th, 2019.

25    Q.    Okay.  Go ahead and read.
```

Sarabia - Direct

1   A.    "My fault bruh.  What it do."

2         "Yo where ya at got a KD on you."

3   Q.    All right.  Showing you Government's Exhibit 13.33.

4         Who is this text with?

5   A.    Fat Phil.

6   Q.    And what's the date on this thread, or the opening?

7   A.    The date is June 16th, and it reads, "A this fat Phil son

8   hit me."

9   Q.    And the response is what date?

10  A.    July 12th, 2019.  It says, "Got good gas."

11        The response is, "Bet."

12        "Yup."

13  Q.    Okay.  Next I am showing you Government's Exhibit 13.34.

14        Who is the counterparty with this text?

15  A.    Jean.

16  Q.    What's the opening date on the thread?

17  A.    July 12th, 2019.

18  Q.    Okay.  How does it start?

19  A.    "Where you at?"

20        The response, "At the same spot."

21        Abbreviation for where you at.

22        "I got weed too."

23        The response is, "Okay.  Just got in the complex."

24        "You called?"

25        "Still there?"

1          The response is, "Yea."

2          The reply with, "Okay."

3          Answer with, "You coming."

4          Where you at abbreviation.

5          "I'm bout to leave."

6          "Aye."

7          The response is, "Oh sorry.

8          Followed up by, "You there."

9          Reply is, "I'm gone man."

10         And the response is, "Coming now."

11         Response is, "I left."

12         Followed up by, "You coming?"

13         "Yeah two minutes away."

14         The response is, "Okay."

15         Replies with, "I'm pulling up now."

16         Reply is, "Yo."

17         Followed up by, "Okay."

18         Response is, "Coming in the building to."

19    Q.   All right.  Showing you Government's Exhibit 13.36.

20         Who is the counterparty in this text?

21    A.   Jody.

22    Q.   When is the opening date on the thread here?

23    A.   July 11th, 2019.

24    Q.   Go ahead and read it, please.

25    A.   "I'm tryna see you tonight."

1       The response is, "For what."

2       "You smoke tree."

3       "So we can chill baby girl."

4       "Hello."

5       The response is, "I smoke but I'm not smoking right now.

6  I got a drug test soon."

7       The response is, "Aite respect."

8       "I don't smoke at all."

9       "Cause I'm on urines."  I assume he means urinalysis.

10  Q.    Showing you text 13.37.

11        Who is that text exchange with?

12  A.    Lena.

13  Q.    When does this thread begin?

14  A.    July 11th, 2019.

15  Q.    Go ahead and read that.

16  A.    "Whatever we do Shannie ain't gotta know."

17        "That's my word."

18        The reply is, "Bye you being real disrespectful."

19        The response is, "I just told you I ain't tryna

20  disrespect you."

21        "And I Alain first tryna disrespects you."

22        "I'm just expressing my true feelings."

23        Followed up by, "But if you ain't fucking with me...

24  respect."

25        "You on some bamma shit."

```
 1          "Dog you playing games."
 2          "OX for $250."
 3   Q.    And 13.38, I am showing you what's been previously marked
 4   and admitted.
 5          Can you tell me who the counterparty on this is?
 6   A.    Kadija.
 7   Q.    And when is the date that this conversation begins?
 8   A.    July 14th, 2019.
 9   Q.    And start at the outgoing texts.
10   A.    "What's going on at blowfish's."
11          "Nothing FR."
12          The response is, "Nobody looking for tree out there."
13          Abbreviation for I don't know, "IDK."
14          "How much yea."
15          Response says, "Whatever they want."
16          Reply is, "I'm talking bout me."
17          The reply is, "Oh okay.  I got you."
18          The reply is, "You can do me a dub?"
19          Followed up by, "Somebody else was tryna cop."
20          "Fuck that shit GN," meaning good night.
21   Q.    And that was -- that last text was on what day?
22   A.    July 14th.
23   Q.    Okay.  And continue with the response the same night.
24   A.    "Dog I was driving."
25          The response is, "It's cool."
```

Sarani - Direct

1         Followed up by, "Pick up right quick."

2         Followed up by, "?"

3         And "14009 Castle Boulevard.

4         Followed up by, "Hello."

5         And "I'm going back out White Oak."

6         "Respect."

7              MR. LAWLOR:  May we approach, Your Honor?

8              THE COURT:  Yes.

9         (The following took place at sidebar outside the presence

10   of the jury; Mr. Ake and Mr. Lawlor present.)

11             MR. LAWLOR:  I told you 90 minutes is my limit.

12             THE COURT:  Do you need a break?  How much longer do

13   you got?

14             MR. AKE:  We are about two-thirds of the way through.

15             THE COURT:  All right.

16             MR. AKE:  We can take the afternoon break now.

17             THE COURT:  We will take a 15-minute break now.

18   Okay.

19        (End of sidebar discussion.)

20             THE COURT:  Ladies and gentlemen, how about a

21   15-minute break?  I know it's -- it takes a while sometimes to

22   concentrate carefully, and you need a little break to do it and

23   I do as well.  And there might even be coffee back in my office

24   that I might take some of and you have some in your room if you

25   want some, too.

Jaramillo - Direct

```
 1          So let's take a 15-minute break and come on back.
 2          (The jury panel exit the courtroom at 2:22 p.m.)
 3              THE COURT:  All right.  15-minute break.  Just --
 4      after this witness, how much -- is that it?
 5              MR. AKE:  That's it.  That's the last witness, Your
 6      Honor.
 7              THE COURT:  Okay.  All right.  Then let's keep going.
 8          (Recess taken from 2:23 p.m. until 2:36 p.m.)
 9          (The jury panel enter the courtroom at 2:38 p.m.)
10              THE COURT:  Everybody have a seat, please.
11          Detective, you are still under oath.
12              THE WITNESS:  Yes, sir.
13      BY MR. AKE:
14      Q.   Detective Jaramillo, I am continuing with Government's
15      Exhibit 13.39.
16          Who is the counterparty of this text message?
17      A.   Monica.
18      Q.   And what's the date of the text exchange beginning?
19      A.   July 14th, 2019.
20      Q.   Okay.  Can you start with Monica's first text?
21      A.   "Hey there."
22          Reply is, "Wuz up."
23          She replied, "Shaddai try to cop me too."
24          The response is, "Aye I'm tryna see if I can catch a ride
25      out there."
```

1          "Hey Darryl are you coming around here today.  If you all

2    can I get a dub or $40" is the response.

3          Followed up by, correction [sic] are.

4          Reply, "Yea I got you."

5    Q.    Next I am going to show you Government's Exhibit 13.40.

6          Who is the counterparty in this text?

7    A.    Lil E.

8    Q.    And when does this thread begin?

9    A.    July 13th, 2019.

10   Q.    And what's the outgoing text begins with?

11   A.    It's an email account:  Darrylcfrazer@gmail.com.

12   Q.    That appears to be the same thing?

13   A.    Yeah.  "Darrylcfrazer@gmail.com."

14         The reply is, "Aye you got em cuz."

15         Followed up by, "2 folders."

16         Response, "I'm bout check right now."

17         Followed up by, "Aye you don't know anybody that fuck

18   with percs."

19         The response is, "You got some??"

20         Reply is "YE."

21         The reply is, "What kind my men do."

22         Response is, "Perc 5s."

23         Response is, "How much."

24   Q.    And then the first text on page 5 of that exhibit appears

25   to carry an attachment.

1          I am going to show you Government's Exhibit 13.41.

2          Does that appear to be that attachment?

3   A.    Yes.

4   Q.    Okay.  And what is this attachment that we are looking

5   at?

6   A.    It looks to be a screenshot.

7   Q.    From what website?

8   A.    Drugs.com.

9   Q.    And could you read the body of that message there?

10  A.    "Pill with imprint K 18 is white, round, and has been

11  identified as Oxycodone Hydrochloride 5 milligram.  It is

12  supplied by KVK Tech. Inc.

13         "Oxycodone is used in the treatment of chronic pain; pain

14  and belongs to the drug class narcotic analgesics.  FDA has not

15  classified the drug for risk during pregnancy.  Oxycodone 5

16  milligram is classified as a Schedule II controlled substance

17  under the Controlled Substance Act."

18  Q.    And showing you, then, Government's Exhibit 13.42.

19         Does that just appear to be the lower part of the same

20  screenshot?

21  A.    Correct.

22  Q.    Okay.  And back to 13.40, jumping back down to page 6

23  after the two attachments, continue reading here.

24  A.    "How much per pill.

25         Followed up by, "??"

Saran - Direct

1          Response is, "$5," five dollars.

2    Q.    And then there is attachment except it's not a picture.

3    Correct?

4    A.    Correct.

5    Q.    I am going to show you 13.44 which was previously --

6    excuse me; sorry -- 13.43, which was previously admitted as the

7    attachment to that.

8          What does that appear to be?

9    A.    I guess a screenshot of a contact list.

10   Q.    Just a contact information?

11   A.    Correct.

12   Q.    Who is the person?

13   A.    Bush.

14   Q.    Okay.  Now I am showing you Government's Exhibit 13.44.

15         Who is the counterparty on that text?

16   A.    Freak.

17   Q.    And what date does this text thread begin?

18   A.    July 16th, 2019.

19   Q.    Okay.  What does the outbound text begin with?

20   A.    It says, "Got some P5."

21   Q.    Okay.  What's the response from Freak?

22   A.    The response is, "Bet.  I let you know if I need some."

23         "Ite."

24   Q.    Okay.  Next I will show you Government's Exhibit 13.45.

25         Who is the text thread with?

1    A.    Dre.

2    Q.    And there is just one text -- actually, no, there are

3    more texts.  When does the text thread begin?

4    A.    July 16th, 2019.

5    Q.    And the first outbound text?

6    A.    It reads, "I got some P5."

7    Q.    What's the text above the attachment there?

8    A.    It reads, "These the ones I got."

9    Q.    Okay.  And just for time's sake, does that attachment

10   appear to be the same one that was just sent on that previous

11   text?

12   A.    Correct.

13   Q.    And on page 3, what's the next text?

14   A.    It reads, "Good looking fool."

15   Q.    Now I am showing you text message 13.48.

16         Who is the counterparty with this text?

17   A.    Kani.

18   Q.    What's the first date?

19   A.    The date is June 19th, 2019.

20   Q.    Okay.  Of the opening text.

21         And then what's the next text date?

22   A.    July 16th.

23   Q.    Could you start with July 16th?

24   A.    July 16th reads, "Aye you don't know anybody that fuck

25   with dem percs."

1          The response is, "Been sleep all day cuz I was telling
2    Unc I need get up with you earlier."
3          Followed up by, "But my folks asking bout em now.  Let me
4    know which joints."
5          "Yea did he holla at you bout what I was telling him."
6          Followed up by, "Dem joints sold out."
7          And "I had 50 of dem and they sold out in like 15
8    minutes."
9          The reply is, "That's it and stamp yeah.  I need push up
10   on you so I can hear more and we wrap."
11   Q.    I am going to next show you Government's Exhibit 13.49.
12         Who is this text thread with?
13   A.    Jill.
14   Q.    And when does it begin?
15   A.    It begins July 21st.
16   Q.    And the first text from Jill?
17   A.    "I can do that 30 again if you can do the two dubs
18   again."
19         Followed up by, "I'm thinking I might as well, in case
20   the chick or anyone else end up wanting something on top mine."
21   Q.    Okay.  And showing you 13 -- Government's Exhibit 13.50.
22         Who is this text with?
23   A.    Tonio.
24   Q.    What's the date on this text?
25   A.    July 23rd, 2019.

1  Q.    Okay.  What's that open with?

2  A.    It starts with, "Where you at?"

3        And the reply is, "I'm at my PO joint."

4        "Good gas."

5  Q.    Okay.  So that was -- the "good gas" text is on what

6  date?

7  A.    That text is July 23rd, 2019.

8  Q.    Okay.  And showing you what's been previously marked and

9  entered as Government's Exhibit 13 -- oops -- 13.51.

10        Who is this text with?

11  A.    Jonny Boy.

12  Q.    Okay.  And what's the date on this thread?

13  A.    July 23rd, 2019.

14  Q.    And Jonny Boy starts with what?

15  A.    "Came on Black."

16        And the response is, "Coming now."

17        The reply is, "Yo Black am living bro."

18        "I being 10 minutes here.  Wassup."

19        And the reply is, "I'm right here but if you wanna leave,

20  go ahead."

21        Followed up with, "I got some tree."

22        And the response is, "Black you think you can give me a

23  20 in to tomorrow please if you can bro."

24  Q.    Showing you Government's Exhibit 13.52.

25        Who is this text with?

1   A.      Allusine.

2   Q.      Okay.  And what's the date on the first outgoing text

3   there?

4   A.      It is July 24th, 2019.

5   Q.      Go ahead and read the first outbound text.

6   A.      "I got good gas."

7           The reply is, "I'm good and nigga how many phones you

8   got?  All these random numbers."

9           The response is, "I just gave you my number yesterday."

10          And then the reply is, "Oh shit.  My fault big home.  I

11  was thinking it was this wild nigga."

12          Followed up with, "Ima hit you tomorrow."

13          And "I forgot to lock you in."

14  Q.      And then I will show you Government's Exhibit 13.53.

15          Is the counterparty identified here?

16  A.      They are not.

17  Q.      And what's the date on this?

18  A.      July 24th, 2019.

19  Q.      What's the outbound message?

20  A.      "Aye I got good gas."

21          And the reply is, "Who is this."

22          Response is, "Frazerboy."

23          The response is, "Where ya at big bro???"

24  Q.      Going to the next text message, 13.54.

25          Who is the counterparty?

1   A.    Laurin.

2   Q.    What's the date on the thread here?

3   A.    July 24th, 2019.

4   Q.    Okay.  Go ahead and start with the first outbound text.

5   A.    "Aye you sleep."

6         The response is, "Hey what's up?"

7         The response is, "701 Edgewood Street."

8         And then reply is, "On my way...."

9         And the response is, "Okay."

10        The response from that is, "You forgot the tree."

11        Followed up by, "And you left your charger in my car."

12  Q.    Okay.  All right.  Next I am going to show you what's

13  been previously marked as Government's Exhibit 13.56.

14        Who is the counterparty on this text?

15  A.    Slug.

16  Q.    And when is the first text in this thread?

17  A.    It was July 18th, 2019.

18  Q.    Could you read the first outgoing text?

19  A.    "Aye do they piss you for alcohol in that council plus

20  joint."

21        And the response is, "Yeah like one or two times."

22        Followed up by, "And I've been going since February."

23        The response is, "Oh okay."

24  Q.    And that was on July 18th.

25        The next text is on what date?

1  A.    This is July 25th, 2019.

2  Q.    At what time?

3  A.    It says, "Got good gasoline."

4  Q.    And at what time is that?

5  A.    7:38.

6  Q.    All right.  Now I am going to move on to some texts, just

7  a few texts that were extracted from Defendant Moore's phone.

8  These were previously admitted.  Just two more.  All right.

9        So the first one I am going to show you is marked and

10 previously admitted as Government's Exhibit 21.34.

11       And is the -- so this is with -- out of Moore's phone,

12 but is the counterparty identified?

13 A.    They are not.

14 Q.    Start with the first inbound text.  Sorry.  What date was

15 the first inbound text?

16 A.    This is July 19th, 2019.

17 Q.    Okay.  Go ahead and read the first inbound text message

18 -- text.

19 A.    "Where you at."

20       The response is, "Who is this."

21       Reply by "Karen."

22       Followed up by, "Lil Kay."

23       The response is, Okay.

24 Q.    Are you sure on that?

25 A.    "Oak."

1    Q.    "Oak?"

2    A.    "Oak."

3    Q.    Keep reading.

4    A.    The response is, "Yea."

5          "Da oak."

6          The response is, "Need pressure."

7          Followed up by, "All these fuck niggas act like they not

8    Gucci."

9          Reply by, "What you got?"

10         "Brah ova here."

11         And the response, "$100."

12         Followed up by, "I'm in the 30s where you seen me the

13   other day with Fred.  Where you at.  Meet me by the pool."

14         Reply by, "You good sis?"

15   Q.    And just for the record, the next text is starting on

16   7/20/2019.

17         Could you go ahead and continue reading with the inbound?

18   A.    "Yea I was trynna see you man.  You was MIA.  You okay?"

19         The response is, "Yea I'm good sis.  Tryna get a couple

20   dollars."

21         Reply is, "Yea I was trynna see you man.  You was MIA.

22   You okay?"

23         Response is, "Yea.  You good?"

24         The reply is, "That was the phone.  I didn't know why TF

25   it sent the message from last night again."

```
 1          Followed up with, "But good morning."

 2          Replied, "Good morning."

 3          Response is, Where you at, or, I'm sorry, "What you

 4  doing," correction.

 5          And followed up by, "Ayee."

 6          "Need more."

 7          And, "Tell em hit my phone now."

 8          "Aight" is the response.

 9          "$160."

10          "Hunnit bouta call you."

11          "Gas out here."

12  Q.   And the "gas out here," what's the date on that text?

13  A.   July 21st, 2019.

14  Q.   Okay.  And then the next one?

15  A.   "Gas on deck."

16  Q.   On what date?

17  A.   July 24th, 2019.

18  Q.   And the response?

19  A.   The response is July 25th, 2019, and it reads, "Yoyo."

20          And the response is, "Call me."

21          Followed up by, "Bring me some swerves on da gas and I

22  got you."

23  Q.   And those texts are what time?

24  A.   12:30 on July 25th, 2019.

25  Q.   And one last text, Government's Exhibit 21.39.
```

1        This is between Mr. Moore, and who is the counterparty?

2   A.    T Mac.

3   Q.    And when does this thread begin?

4   A.    July 22nd, 2019.

5   Q.    Okay.  Could you read through it, please?

6   A.    "Can you come over around seven or eight."

7        The response is, "8:00 it is.  If you play I'm never

8   fucking with you again."

9        The response is, "Never mind.  Let's just keep it as is.

10  I'm not going to play with your time."

11       And the response is abbreviation for shaking my head,

12  "SMH."

13       Followed up by, the response was, "Man you talking about

14  you never fucking with me anymore."

15       Followed up with, "I rather us just stay cool.  No

16  smoke."

17  Q.    And that last inbound text was July 22nd.  Correct?

18  A.    Correct.

19  Q.    And then one last outbound text on July 25th, what's that

20  say?

21  A.    "Gas on deck."

22  Q.    At what time?

23  A.    That is 12:36.

24       MR. AKE:  The Court's indulgence one minute.

25       Your Honor, I will pass the witness.

```
 1                THE COURT:  All right.  Cross-examination.

 2                MR. LAWLOR:  Yes, Your Honor.

 3                          CROSS-EXAMINATION

 4     BY MR. LAWLOR:

 5     Q.    Good afternoon, Detective.

 6     A.    Good afternoon.

 7     Q.    How are you?

 8     A.    I am doing well.  And yourself?

 9     Q.    Good.  Thank you.

10           So I want to start with your training.  You said you have

11     been accepted as an expert in other courts.

12           How many times has that been?

13     A.    Federal court or state court?

14     Q.    Either.

15     A.    Numerous times.  Over ten times.

16     Q.    Okay.  Now, you indicated that you have been a police

17     officer for how long?

18     A.    Almost 24 years.

19     Q.    And how long in Montgomery County?

20     A.    All of them.

21     Q.    Well, all right.  So you are still employed by Montgomery

22     County, but you have been on this task force for some time.

23     Right?

24     A.    Yes, sir.  Yes.

25     Q.    And how long has that been?
```

Jaramillo - Cross

1    A.    Almost ten years.

2    Q.    All right.  And, I mean, the task force is still doing

3    police work.  It's just a unit that sort of focuses on drugs.

4    Yes?

5    A.    Yes.  It's a DEA task force, yes, sir.

6    Q.    So DEA agents and local law enforcement come together, so

7    it's still policing, but you are just focused on drug

8    trafficking.  Right?

9    A.    Correct.

10   Q.    Okay.  Now, in order to become an expert, have you been

11   accredited by anybody?

12   A.    By an agency or by a organization?  What do you mean by

13   --

14   Q.    An agency or an organization.  Has anyone accredited you

15   to say that you have the requisite training and knowledge to be

16   considered competent at being expert in giving opinions about

17   drug trafficking?

18   A.    Just by the Court.

19   Q.    Just by the Court.  Okay.

20         And did you write a report about your findings in this

21   case?

22   A.    I did not.

23   Q.    You did not.  Okay.

24         So the things that you have told the ladies and gentlemen

25   of the jury, they haven't been subject to review by anybody

1    else.  Right?

2    A.    By the government.

3    Q.    Well, aside from the government, who you are testifying

4    for, did anyone else consider your opinions and determine them

5    to be correct or not correct?

6    A.    No.

7    Q.    Now, I want to show you this document which is going to

8    be identified as Defendant's No. 10, I believe.

9          Could I have you take a look at that and tell the ladies

10   and gentlemen of the jury what that document is?

11   A.    My C.V.

12   Q.    Okay.  Now, do you list any of the trainings that you

13   have got -- received over the years on that C.V.?

14   A.    Not -- not each individual one, no.

15   Q.    Okay.  Now, you have received training as a police

16   officer.  Yes?

17   A.    Yes, sir.

18   Q.    Have you received training specifically in the field of

19   your expertise?

20   A.    Yes, sir.

21   Q.    You have?

22   A.    Yes, sir.

23   Q.    To become an expert or for the purposes of your policing?

24   A.    I think they both go hand in hand.

25   Q.    All right.  Fair enough.

```
 1           Now, you are, as you indicated, still employed by the
 2   Montgomery County Police Department.  Right?
 3   A.    Correct.
 4   Q.    And your testimony here, I would imagine one of the three
 5   gentlemen seated at the prosecution's table reached out to you
 6   and asked you to be a witness in this case.  Yes?
 7   A.    Correct.
 8   Q.    And you met with them and you reviewed the evidence and
 9   you told them, you know, what your opinion was.  Yes?
10   A.    Correct.
11   Q.    All right.  Have you ever testified on behalf of the
12   defense?
13   A.    No.
14   Q.    Okay.  I mean, you are a police officer.  Right?
15   A.    Correct.
16   Q.    Okay.  Do you know the people that were involved in this
17   investigation?
18   A.    Not specifically, no.
19   Q.    All right.  Now, you mentioned some of the things --
20   well, let me ask you this:  You said where you are now, you are
21   not doing street-level stuff.  Right?  You are doing longer,
22   broader investigations.  Correct?
23   A.    Correct.
24   Q.    And it's proactive.  Yes?
25   A.    Correct.
```

1   Q.    And do you have more than one of these going on at any
2   individual time?
3   A.    Yes, sir.
4   Q.    Okay.  So how many are going on at any given time?
5   A.    Anywhere from two to three.
6   Q.    Okay.  Do any of them that you are doing now involve
7   marijuana?
8   A.    Actually, they do.  Yes, sir.
9   Q.    Okay.  How many of the two or three involve marijuana?
10  A.    The one that I just received some information on does
11  involve marijuana.
12  Q.    Okay.  And how much marijuana are we talking about?
13  A.    We are talking about hundreds of pounds of marijuana.
14  Q.    Hundreds of pounds.  Okay.
15        So a smidge more than four ounces.  Yes?
16  A.    Correct.
17  Q.    So in reviewing the information about this case, can you
18  tell the ladies and gentlemen of the jury, in terms of the
19  investigative techniques that were employed, do you know
20  whether or not a Title III warrant was ever obtained?
21  A.    For this investigation?
22  Q.    Yes.
23  A.    I don't believe so, no.
24  Q.    Okay.  And you said -- you testified on direct about the
25  things that you do during the course of your investigation.

1    Yes?  Right?

2          During the course of an investigation, you employ certain

3    techniques.  Yes?

4    A.    Correct.

5    Q.    In the hope of gaining enough information to make an

6    arrest.  Yes?

7    A.    Correct.

8    Q.    And then bringing the case to court for prosecution.

9    Yes?

10   A.    Correct.

11   Q.    All right.  And so one of those things is a Title III.

12   Yes?

13         Another thing that you employ is the use of search

14   warrants.  Right?

15   A.    Correct.

16   Q.    Do you know whether or not any search warrants were

17   utilized in this case?

18   A.    I believe the search warrants were utilized to analyze

19   the contents from the telephones.

20   Q.    Okay.  So we have two search warrants for the phones.

21         Any other search warrants for a car, for a house, for

22   anything like that?

23   A.    I don't -- from the facts that I am aware of, I don't

24   believe there was any indication or that any of the homes or

25   cars were involved in this particular portion of the

1  investigation.

2  Q.    Okay.  Well, you said search warrants were employed to

3  search the phones.

4        You wouldn't expect to find drugs in the phone.  Right?

5  A.    Correct.  Not drugs, but you would expect to find

6  communications related to the trafficking of drugs.

7  Q.    Okay.  Understood.

8        But not actual drugs themselves.  Right?

9  A.    I don't know how you could find drugs on your phone.

10  Q.    Exactly my point.  Thank you.

11        Did the investigation in this case utilize informants?

12  A.    I don't believe so.

13  Q.    Okay.  Were any controlled buys effectuated during the

14  course of this investigation?

15  A.    Not that I know of.

16  Q.    So not using a confidential informant and not using an

17  undercover police officer.  Right?

18  A.    Correct.

19  Q.    Okay.  You mentioned audio and video, you utilize audio

20  and video during the course of your investigation.

21        Was any of that employed during the course of this

22  investigation?

23  A.    I am not sure.  I am not completely sure whether there

24  was any body camera footage utilized in the arrest.

25  Q.    Other than body camera footage?

Jaramillo - Cross

1  A.    I don't know whether any other audio and video was
2  utilized.
3  Q.    And what about controlled -- any controlled calls?  You
4  mentioned controlled calls.  Were any controlled calls made
5  during the course of this investigation?
6  A.    I don't believe so, no.
7  Q.    All right.  So, now, you talked about sort of some of the
8  instrumentalities of drug trafficking.  Right?
9  A.    Yes, sir.
10 Q.    And part of your opinion that the amount of marijuana
11 here was not for personal use, you said part of it was that
12 there were no lighters or bongs or rolling papers.  Right?
13 Correct?
14 A.    Correct.
15 Q.    And, conversely, it did look like dealing or sale of
16 drugs because of the involvement of the scale.  Right?
17 A.    Yes, sir.
18 Q.    Okay.  Would you agree that if you were going to buy, not
19 sell, but buy a quantity of marijuana, say four ounces, you
20 might want to weigh that as you are purchasing to make sure you
21 are getting what you are paying for?
22 A.    No, sir.  That's not very common at all.
23 Q.    Not common.
24       So the people who are buying the drugs are content to get
25 ripped off?  The only smart people are the dealers?  Is that

Jaramillo - Cross

1    what you are telling me?

2    A.    No.   That's not what I am telling you at all.   I wouldn't

3    -- I wouldn't put it that way at all.

4    Q.    Okay.   You are telling me if I am going to buy four

5    ounces of weed, I -- I would necessarily not bring a scale to

6    that purchase?

7    A.    It works the other way, sir.   So if I am selling you an

8    amount of narcotics, I am going to weigh it in front of you.

9    That way, you know the amount that I am weighing that I am

10   giving you, the one that you are purchasing for.

11   Q.    I see.   I see.

12         So there is not a set of circumstances where the person

13   buying the drugs would ever want to weigh it to make sure that

14   they were getting what they wanted?

15   A.    No.   That's not very common at all.

16   Q.    Okay.   Not very common.   All right.

17         Now, you also said there is no -- there were no, you

18   know, rolling papers or lighters.   Let me walk you through a

19   scenario and see if this is possible.

20         I go to my neighborhood marijuana dealer or dispensary

21   and I purchase four ounces of marijuana utilizing the scale

22   that I brought to make sure I am not getting ripped off.   Could

23   I then go to a place like 7-Eleven and get rolling papers and a

24   lighter and spark up?

25   A.    I guess eventually after you purchased the marijuana, you

1   would -- you would have to either go home or buy -- go

2   somewhere to buy it, yeah.

3   Q.   There you go.  All right.

4        I might have that stuff in my house.  Right?  As Mr. Ake

5   indicated or you indicated, I could have a pipe.  Right?  And

6   you can buy a pipe anywhere.  They have head shops everywhere

7   in the DMV.  Right?

8   A.   Correct.

9   Q.   There is nothing illegal about owning a pipe.  Right?

10  A.   Correct.

11  Q.   And a bong isn't something I am really going to carry

12  around in my backpack.  Right?

13  A.   Right.  Generally, yes.

14  Q.   I am willing to bet some or all of these ladies and

15  gentlemen of the jury know what a bong is, but just in case,

16  tell them what a bong is.

17  A.   A bong is a smoking device, more elaborate smoking device

18  where you would put a small amount of marijuana in one end and

19  you create a vacuum by sucking on it and creating smoke that

20  you hence would inhale.

21  Q.   All right.  And that could be kind of big, and I would

22  guess be more often to be found in a college dorm room than in

23  a home of an adult who might smoke marijuana.  Yes?

24  A.   It's all a matter of preference.

25  Q.   All right.  There you go.  To each his own.

Jaramillo - Cross

```
 1        Now, in terms of instrumentalities, though, you mentioned
 2  baggies.  Right?  Baggies?
 3  A.    Yes, sir.
 4  Q.    Were there any baggies, smaller baggies in the satchel
 5  that Mr. Frazer was carrying?
 6            MR. AKE:  Objection, Your Honor.  May we approach?
 7            THE COURT:  Come on up.
 8        (The following took place at sidebar outside the presence
 9  of the jury; Mr. Lawlor and Mr. Ake present.)
10            MR. AKE:  I kind of let this go for a little while,
11  but the detective actually didn't participate in this
12  investigation at all, so I think you need to lay a foundation
13  first whether or not he knows these things.
14            MR. LAWLOR:  I will ask him.  He is the one who gave
15  an opinion, and he also said these are instrumentalities of
16  trafficking, none of which are present in this case.
17            THE COURT:  Right.  But I think you have had the
18  opportunity to ask in general.  Now you are going into the
19  specifics.  And so if you are asking him to give testimony
20  about whether -- what was found in this case, you should start
21  with asking him whether he is aware, participated in or aware
22  what was found in this case.
23            MR. LAWLOR:  If he is giving expert opinion about the
24  facts of this case, he's not qualified --
25            THE COURT:  No.  No.  No.  That's not true.  He is
```

1  giving expert opinion about facts, and it's up to the

2  government to prove those facts, but not necessarily through

3  him.

4       So I am going to sustain the objection.  If you want to

5  rephrase by giving him an opportunity to clarify, then you may

6  go ahead.

7            MR. LAWLOR:  All right.

8       (End of sidebar discussion.)

9  BY MR. LAWLOR:

10 Q.    So, Detective, in fairness, you were not involved in this

11 investigation.  Right?

12 A.    Correct.

13 Q.    After Mr. Frazer was arrested, as I indicated, the

14 government reached out to you and asked you to be a witness in

15 this case.  Right?

16 A.    Correct.

17 Q.    And they asked you, I assume, to review all of the things

18 that were seized from Mr. Frazer on July 25th.  Is that right?

19 A.    Correct.

20 Q.    In order to formulate your opinion, you had to know what

21 was and was not in his satchel.  Yes?

22 A.    Correct.

23 Q.    So you mentioned the scale.  I believe you mentioned the

24 amount of weed, about 100 grams.  Right?  Correct?

25 A.    Correct.

1    Q.    And some latex gloves.  Yes?

2    A.    Yes.

3    Q.    Now, are the latex gloves, in your expert opinion,

4    indicative of trafficking marijuana?

5    A.    Not necessarily, no.

6    Q.    All right.  You said a scale is and you also said that

7    baggies are.  Right?

8    A.    Correct.

9    Q.    No baggies here.  Correct?

10   A.    No baggies.

11   Q.    Cash?

12   A.    I believe he had some cash on him.

13   Q.    Mr. Frazer?

14   A.    I don't -- I don't recall whether he had cash or not.

15   Q.    But that is an indication of trafficking, yes, being in

16   possession of large quantities of cash.  Correct?

17   A.    After you conduct your sales, yes.

18   Q.    Okay.  Would things like ledgers and tally sheets, might

19   those be present?

20   A.    Yes.

21   Q.    Okay.  Now, you indicated that people carry guns to

22   protect their stash.  Right?

23   A.    And their proceeds, yes, sir.

24   Q.    Pardon me?

25   A.    And their proceeds, yes, sir.

1    Q.    All right.  And their proceeds.

2          So we are talking about 100 grams of marijuana here.

3    Right?  Yes?

4    A.    Yes, sir.

5    Q.    And you agree, right, the purposes -- purpose of

6    purchasing marijuana in all likelihood is to smoke it.  Right?

7    A.    Correct.

8    Q.    And as you indicated, while it's still illegal, the

9    federal government still determines that it's illegal, it's

10   legal in a lot of parts of the country.  Right?

11   A.    Correct.

12   Q.    Including in Maryland and in the District of Columbia.

13   Correct?

14   A.    Correct.

15   Q.    So there is a lot of places you might have to get a

16   medical I.D. card or, you know, give somebody my license, but I

17   could kind of walk into a neighborhood dispensary and buy some

18   weed.  Right?

19   A.    Sure.

20   Q.    And so if I have -- let's say I didn't go into a

21   dispensary but I bought four ounces of weed for my personal

22   enjoyment.  When I roll one joint, how much weed do I put in

23   that one joint?

24   A.    It's just a matter of preference how much you want to

25   smoke.

1    Q.    Okay.  But in your expert opinion -- and one of the

2    things I thought I read was that you are familiar sort of with

3    the dosage of marijuana that are used by people who utilize it.

4    Is that part of your expertise?

5    A.    Sure.  Yes, sir.

6    Q.    All right.  So could we agree that I might be able to put

7    -- I mean, a gram is about the size of a sugar cube.  Right?

8    A.    Sure.

9    Q.    All right.  So in one joint, I might put two or three

10   grams of weed in it.  Right?

11   A.    Correct.

12   Q.    And let's say I am a purveyor of the enjoyment of

13   marijuana; instead of lawyering all day, I like to get high all

14   day.  People do that.  Right?

15   A.    Yes, sir.

16   Q.    All right.  So I might, say, roll three or four joints in

17   a given day.  Yes?

18   A.    Correct.

19   Q.    All right.  So if I put two grams in each joint and roll

20   four joints a day, that's eight grams of marijuana that I am

21   using daily.  Yes?

22   A.    Yes.

23   Q.    And you agreed with me that -- you know, I don't want to

24   use the pejorative pothead, but there are people out there who

25   smoke every day.  Right?

Jaramillo - Cross

1   A.    Correct.

2   Q.    I mean, you know, this isn't a back alley drug.  Right?

3   A.    Correct.

4   Q.    I mean, you got friends who smoke it?

5   A.    I know people who smoke it.

6   Q.    I do, too.  And I bet Judge Grimm even knows people who

7   like to get high.  You know, it's not in the back alley

8   anymore.

9         So I smoke my eight grams a day, and let's say I have a

10  girlfriend and she smokes, too.  So, now, maybe she's not as

11  big as I am, she's not quite the stoner that I am, she only

12  uses four grams a day.  My eight, her four is 12.  Right?

13  Agreed?

14  A.    Yes, sir.

15  Q.    All right.  So, in that instance, she and I might blow

16  through 100 grams of weed in a little under ten days.  Fair?

17  A.    Sure.

18  Q.    Okay.  And, I mean, you said, right, I mean, people buy

19  an ounce.  Right?  I mean, if I am a regular middle-class

20  lawyer in my house with my two cats and my dog, my wife, my

21  three kids, assume I like to get high, I might have an ounce of

22  weed hidden away where the kids won't find it.  Right?

23  A.    Sure.

24  Q.    So from one ounce to four ounces, you know, it's not a

25  tremendous leap; would you agree?

1    A.    Not huge, but I guess that's not something out of the

2    ordinary, right.  If you are smoking an ounce a week --

3    Q.    Well, we just established, did we not, that some people

4    get high every day?

5    A.    Right.

6    Q.    All day every day.  Right?

7    A.    Sure.

8    Q.    I mean, you look at me, you see a guy who is pretty well

9    put together, and say, Well, that guy doesn't smoke ten or 12

10   grams of weed a day, but there are some people out there like,

11   I don't know, Darryl Frazer who might smoke with his lady

12   friend ten or 12 grams of weed every day.  Right?

13   A.    Sure.

14   Q.    Okay.  Now, you said that weed dealers like to keep guns

15   to keep ahold of the stash and their profits.  Right?

16   A.    Correct.

17   Q.    All right.  So, you said you can get an ounce of weed for

18   about 250.  Right?

19   A.    Correct.

20   Q.    Four ounces is about a stack.  Right?

21   A.    Correct.

22   Q.    All right.  How much is four ounces of, say, heroin

23   worth?

24   A.    Heroin?

25   Q.    Yeah.

1   A.    Almost --

2   Q.    Why don't I cut this short and make you not do a lot of

3   math in your head.  Four ounces of heroin is worth a lot more

4   than four ounces of weed.  Right?

5   A.    Oh, yes.  Yes, sir.

6   Q.    And you can't go into the neighborhood dispensary and buy

7   heroin.  Right?

8   A.    Correct.

9   Q.    Okay.  So, first of all, in the Lockwood area of Silver

10  Spring, Maryland, do you know there to be a lot of gangs or

11  stickup boys running around robbing and shooting the local weed

12  dealers?

13  A.    Yes, sir.

14  Q.    You do?

15  A.    Yes, sir.

16  Q.    Okay.  So one of the reasons I might have a gun is to,

17  you know, not let anyone lay claim to my four ounces of weed,

18  but another reason I might have it is if I or one of my friends

19  just got shot and I might be scared for my safety.  Right?

20  That could happen, couldn't it?

21  A.    Shot because of --

22  Q.    I don't know.  Maybe somebody didn't like how long his

23  dreads were.  I don't know.  But let's just say me or one of my

24  friends were shot or shot at, I might carry a gun.  Aside from

25  the fact that someone is coming to rob me of my $1,000 worth of

1  marijuana, I could also have a gun because I feel unsafe.

2  Correct?

3  A.    Sure.  I guess you'd have to figure out the reason why

4  you were shot or you were shot at before.

5  Q.    Right.  Okay.  But you would agree with me, in this day

6  and age, it is a dangerous and violent world that we live in,

7  isn't it?

8  A.    Yes, sir.

9  Q.    Independent of the sale of marijuana, these are dangerous

10  times, are they not?

11  A.    Yes, sir.

12  Q.    Okay.

13        MR. LAWLOR:  Can I have the Court's indulgence,

14  please?

15        THE COURT:  Yes.

16        (Pause.)

17        MR. LAWLOR:  All right, sir.  Those are all the

18  questions I have.  Thank you for your time today.

19        THE WITNESS:  Thank you.

20        THE COURT:  Redirect?

21        MR. AKE:  Just briefly, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MR. AKE:

24  Q.    A couple things, Detective Jaramillo.  Are you aware of

25  any organization that accredits or certifies anyone as an

1   expert in illegal drug trafficking?

2   A.    No, I am not.

3   Q.    Is that the type of knowledge that ages poorly?  In terms

4   of trying to keep up with trends, it would be difficult to

5   say -- you know, snap the chalk line and say you are an expert

6   and you are forever an expert?

7   A.    Correct.

8   Q.    And -- sorry.  So, I shouldn't be asking quite as leading

9   a question.  But what -- what makes it difficult to -- or why

10  do you need to stay current on drug trends?

11  A.    Because the trends, prices, methods, the way different

12  narcotics are trafficked, it's evolving.  It always changes.

13  What it was back in 2019 is not the same as what it is in 2022.

14  And it's -- you know, the way people looked at marijuana in

15  2019 to how it is looked at now in 2023 is completely

16  different.  Everything is evolving.  Just like our society

17  evolves, drug trends evolve, our culture evolves.

18  Q.    Okay.  So if you got a degree in drug trafficking from

19  1975, would that still have much pertinence today?

20  A.    That would be very outdated, yes, sir.

21  Q.    All right.  Now, I think we got at -- you didn't have any

22  direct involvement with this investigation.  Correct?

23  A.    Correct.

24  Q.    Okay.  And with regard to violence, have you seen many

25  cases of violence where there was -- someone was shot for no --

Jarrandi 1 - Redirect

```
 1   no reason that you can determine, like, they didn't -- they
 2   weren't the target of a robbery or anything like that, it was
 3   just random violence?  I know it happens, but have you seen
 4   that happen?
 5   A.    It happens, but, technically, there is an underlying
 6   reason.
 7   Q.    And, typically, what are the reasons in the areas that
 8   Mr. Lawlor was talking about?
 9            MR. LAWLOR:  Objection, Your Honor.
10            THE COURT:  Well, you haven't established that he
11   even knows.
12            MR. AKE:  Correct.
13            THE COURT:  Sustained.
14   BY MR. AKE:
15   Q.    Do you know -- do you keep an eye on violent trends
16   around these areas?
17   A.    I do.  I am familiar with White Oak area.  I am familiar
18   with Lockwood Drive.  I am familiar with New Hampshire Avenue.
19   When I was a patrol officer, that was my beat.  When I worked
20   in special assignment team, that's one of the areas I would
21   work.  And that area has always had some dispute between young
22   people over territory, over gangs from one side of Lockwood
23   Drive to the other side of New Hampshire Avenue, and more often
24   than not, it goes back to the area of distribution of drugs and
25   just your regular territory of that particular -- that
```

Cunanan - Redirect

1   particular spot.

2   Q.    Okay.  And, finally, I just want to -- Mr. Lawlor was

3   alluding to the idea that there might be some personal use

4   involved.  Just showing again -- if you could read page 3 of

5   the bottom texts of Government's Exhibit 13.5, I'd appreciate

6   it.

7   A.    "I don't really smoke like that anymore."

8   Q.    And then there was one more text on that on page 4.

9   A.    "I been smoking these last couple of days but I'm not

10  bout to stop again because once I start my electrician job, I'm

11  liable to get passed whenever and I'm not tryna to lose that

12  once I get it."

13              MR. AKE:  Nothing further.

14              MR. LAWLOR:  Your Honor, briefly recross?

15              THE COURT:  All right.

16                    RECROSS-EXAMINATION

17  BY MR. LAWLOR:

18  Q.    Sir, Mr. Ake just showed you -- I am having trouble

19  speaking today -- Government's Exhibit 13.5.

20              MR. LAWLOR:  Can I have the Court's indulgence for a

21  moment?

22              THE COURT:  Yes.

23        (Pause.)

24  BY MR. LAWLOR:

25  Q.    So, sir, this is, is it not, a text between Amber and

Jan'am'll Foley Recross

```
 1   Mr. Frazer.  Right?
 2   A.    Correct.
 3   Q.    And it starts out, "Whatever you wanna do."  Right?
 4   A.    Correct.
 5   Q.    And "Go grab food and chill," yes, is next?
 6   A.    Correct.
 7   Q.    And then, "Aite cool."
 8         "You don't be drinking and shit."  Right?
 9   A.    Correct.
10   Q.    "I drink depending on what it is."
11         "So what you drink" is next, yes, for Mr. Frazer?
12   A.    Yes.
13   Q.    "I really don't smoke like that anymore."  Is that what
14   he says?
15   A.    Correct.
16   Q.    Okay.  And then Amber says, "Patron."
17         "Wine."
18         "I been smoking these last couple of days but I'm bout to
19   stop again."  Right?  Is that what it says?
20   A.    Correct.
21   Q.    So does this sound like a young man and a young lady
22   about to make plans for the evening?
23   A.    They are trying to make plans, correct.
24   Q.    Okay.  It seems like a lady and a dude trying to make
25   plans for the night.  Yes?
```

```
 1   A.     Yes, sir.

 2             MR. LAWLOR:  Okay.  Thank you.

 3             THE COURT:  All right.  Any further questions of the

 4   witness?

 5             MR. AKE:  No, Your Honor.  Thank you.

 6             THE COURT:  Mr. Lawlor, during the examination, you

 7   marked Defense Exhibit 10 for identification.  You did not move

 8   its admission.

 9         Did you wish to do so?

10             MR. LAWLOR:  I do.

11             THE COURT:  Any objection?

12             MR. AKE:  No, Your Honor.

13             THE COURT:  It's in.

14         May the witness be excused?

15             MR. AKE:  Yes, Your Honor.

16             THE COURT:  All right, sir.  You can return to your

17   duties.  Thank you very much.

18             THE WITNESS:  Thank you, Your Honor.

19             THE COURT:  Please don't discuss your testimony with

20   anyone or any information you may have learned during your

21   testimony until the case is over.  All right?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Thank you.

24             MR. AKE:  At this time, the government rests its

25   case.
```

1          THE COURT:  Counsel, could you approach, please.

2          (The following took place at sidebar outside the presence

3    of the jury; Mr. Lawlor, Mr. Ake, Mr. Crespo, and Mr. Kibbe

4    present.)

5          THE COURT:  All right.  So the government has rested.

6    Mike, you are going to want to do a motion and they are going

7    to want to respond.  We got to do that outside the presence of

8    the jury.  Do you know, Mike, are you planning on putting on

9    any evidence?

10         MR. LAWLOR:  No, Your Honor.

11         THE COURT:  So this -- this will end the case.  We do

12   want to finalize the jury instructions, just the stuff that we

13   did based on last night to make sure Is are dotted and Ts are

14   crossed.  We did -- we want to make sure that's all righteous

15   before we actually stand up there and do it in front of the

16   jury.  And we have got your additional instructions that you

17   want included that we have to discuss.

18         So my thought is we excuse the jury now but tell them to

19   come back tomorrow, say, around 9:30 or quarter to ten just to

20   make sure that we have enough time.  I have a 5:30 phone call

21   that might take 30 minutes, but other than that, I can stay

22   this evening.  I'd like to try to wrap all this up so that

23   tomorrow I instruct, right, and then you guys do closing and we

24   give it to the jury.

25         So if they get here at 9:30, we give them the menus, they

1   order the stuff, I instruct, then we close, that way, I would

2   excuse them now and tell them to come back, say, by 9:30.

3        Does that make sense to everybody?

4              MR. AKE:  Yes.

5              MR. LAWLOR:  Yes.

6              THE COURT:  So that gives us enough time to do it,

7   everybody to do it, for them to go out and start to deliberate.

8   You don't have to get cut too close on the airport.  Your

9   colleague will be here in the event that if something is

10  needed, you are okay?  You are not leaving tomorrow afternoon.

11  Right?

12             MR. AKE:  I am actually on the same flight as he is.

13             THE COURT:  Well, then, you are --

14             MR. LAWLOR:  We are not on vacation.

15             THE COURT:  After all this discussion, I never

16  realized you guys liked to have such a good time.

17        But in any event, that way, you are okay on your

18  schedule.  Right?  And then if -- if you have enough co-counsel

19  so that if something comes up after that, we just take it on

20  Friday.  Does that work for everybody?

21             MR. AKE:  Yes, Your Honor.

22             THE COURT:  Okay.  Great.

23        (End of sidebar discussion.)

24             THE COURT:  Ladies and gentlemen of the jury, this

25  concludes the government's case.  At this point in a trial, I,

1   as a judge, am required to talk about legal matters with the

2   lawyers that have to be done without you being here.  So what

3   I'd like to do is excuse you now today, again, an hour and a

4   half before 5:00.  I am not very good on estimating time.  I

5   know it breaks your heart.  I'd like you to be back here

6   tomorrow morning by 9:30.  Give you a little bit more time.

7        Why?  Because tomorrow morning, we will start off with me

8   instructing you on the law, and I will have a little podium out

9   there and you will each have a copy of it.  When I do it, you

10  will each be able to follow along with me.  All right?

11       After that, the very fine lawyers in this case will sum

12  up their case for you, they will give you their closing

13  statements, and say, This is what we think has been proved or

14  not proved in this case, and then the case will go to you to

15  deliberate.

16       When you get here at 9:30, our wonderful courtroom

17  deputy, who is taking good care of you, is going to give you a

18  menu to order lunch because when you deliberate, lunch is on

19  us.  Okay?  So you will pick what it is and then we will have

20  to guesstimate when it should be delivered.  So if you really

21  can't eat soup unless it's piping hot, you might have to use

22  the microwave because we don't know exactly when they are going

23  to deliver it, but we order your lunch.

24       And then we will bring you back in here, I will instruct

25  you on the law, closing argument, and then the case goes to

1  you.  Okay?  And after that, it's in your hands.

2      So, with that in mind, thank you again for your time and

3  attention, for being here on time.  Tomorrow, be here by 9:30.

4  And let us know how things are going, if there is any issue,

5  but keep an eye on the weather.

6      We will see you tomorrow morning, and thank you for your

7  time and attention, ladies and gentlemen.

8      (The jury panel exit the courtroom at 3:34 p.m.)

9      THE COURT:  All right.  How about a 15-minute break

10  so that you can come back here, and then what I want to do is

11  any motion for judgment of acquittal, followed by us finalizing

12  jury instructions, taking up the three jury instructions that

13  the defense asked for, and hopefully wrapping it by then.

14  Okay?

15      MR. LAWLOR:  Your Honor, after the Rule 29 motion,

16  can Mr. Frazer be excused to go back with the marshals?

17      THE COURT:  Yes.  Is that -- if that's all right with

18  Mr. Frazer, yes.  I don't want him missing chow.  I don't want

19  him to miss dinner.  And if we -- because if that's all I do,

20  you know, he has a right to be here when we are talking about

21  the jury instructions.

22      MR. LAWLOR:  Surprisingly, he got a little bored

23  yesterday so -- during the jury instructions.

24      THE COURT:  He handled it well.  Yes, Mr. Frazer, if

25  you have discussed that with your attorney and that's what you

1  want to do, once the motion has been concluded, then yes, of

2  course, you can go back with the marshals so that you don't

3  have to sit through this while we go through the fine print of

4  the jury instructions.

5      All right.  15-minute break.  We will see you back here

6  by ten minutes of.  All right?

7      (Recess taken from 3:36 p.m. until 3:50 p.m.)

8          THE COURT:  All right.  Have a seat.

9      Mr. Lawlor, do you have a motion under Rule 29?

10          MR. LAWLOR:  My co-counsel does, Your Honor.

11          THE COURT:  All right.  Then I am happy to hear it.

12          MR. DEMETRIOU:  Thank you, Your Honor.  Thank you,

13  Your Honor.

14      On behalf of Mr. Darryl Frazer, we make a motion for a

15  judgment of acquittal pursuant to Federal Rule of Criminal

16  Procedure 29 --

17          THE COURT:  For all charges, even the ones you have

18  admitted?

19          MR. DEMETRIOU:  I was just about to say as to Counts

20  One through Three of the second superseding indictment.  As to

21  --

22          THE COURT:  So hold on one second.  One is the

23  conspiracy?

24          MR. DEMETRIOU:  Yes.

25          THE COURT:  Okay.  Two is the --

1          MR. DEMETRIOU:  Possession with intent to distribute.

2          THE COURT: -- the possession with the intent to

3  distribute marijuana?

4          MR. DEMETRIOU:  Yes.

5          THE COURT:  The marijuana he was found with when he

6  was seized?

7          MR. DEMETRIOU:  Yes.

8          THE COURT:  And third is the possession of a firearm

9  in furtherance of a drug trafficking offense?

10          MR. DEMETRIOU:  Mainly the offense charged in Count

11  Two of the second superseding indictment.

12          MR. AKE:  Your Honor, may I just jump in real quick?

13  I talked to Mr. Lawlor before, but the government partially

14  concedes on Count One, that we have not presented sufficient

15  evidence on the heroin allegation to allow a rational trier of

16  fact to find guilt beyond a reasonable doubt on that particular

17  element or object of the conspiracy.  So --

18          THE COURT:  Well, I mean, so here is the thing on the

19  -- for Count One.  I am going to let you make your argument.

20  But the jury has got to agree that the -- they got to agree

21  that there was a conspiracy with all the definitions of

22  conspiracy.  And to cut to the chase, while I am not going to

23  give the Ninth Circuit's instruction on buyer/seller, I am

24  going to include the language in the definition of existence of

25  an agreement, the language out of the Maryland cases that you

1  all cited that talk about mere buyer/seller relationship alone

2  is not enough, so that that issue is there and you can argue

3  that to the jury.

4       But in addition, they have got to all agree beyond a

5  reasonable doubt as to the drugs that are involved in the

6  conspiracy since the indictment charges several types of drugs.

7       So heroin is out so we don't have to argue about that.

8  When we argue about No. 1, we can talk about whatever is left

9  on the list.  All right.

10      So you want to get rid of the drug trafficking --

11 possession of firearm in furtherance of a drug trafficking

12 offense, namely, the drug trafficking offense of possession

13 with the intent to distribute marijuana, and the conspiracy

14 count.  Right?

15           MR. DEMETRIOU:  Yes.

16      And so, obviously, as the Court well knows, in evaluating

17 the Rule 29 motion, the government does get the benefit of all

18 reasonable inferences drawn from the facts.

19           THE COURT:  Yes.

20           MR. DEMETRIOU:  And, so, in light of that, as to

21 Counts Two and Three, in light of the expert testimony

22 presented by the last witness, we will submit on those.  We do

23 think that the testimony was shaky, but, obviously, the Court

24 knows that you don't assess the credibility of the witnesses at

25 a Rule 29 motion, so we will submit on those.

1          And we will also submit in terms of the marijuana

2    allegation for Count One.  But we do contend that the motion

3    should be granted as to the MDMA, cocaine, and the oxycodone

4    allegations in Count One.  You know, as the Court knows, part

5    of what the government has to prove to show the drug conspiracy

6    is that there was the agreement that is charged in the --

7          THE COURT:  Yes.  Yes.  Obviously, it's very

8    important.

9          MR. DEMETRIOU:  Right, between Mr. Moore, Mr. Frazer,

10   and others.  I don't think that the jury has heard any evidence

11   that Mr. Moore and Mr. Frazer joined together to have any

12   involvement with those drugs, the non-marijuana drugs that are

13   still at issue in this case.  There are no text messages

14   between Mr. Moore and Mr. Frazer about those -- those kind of,

15   you know, drugs.

16         Obviously, understanding the ruling of the Court in a

17   different context earlier today on the 801(d)(2)(E) issue, the

18   Court did determine that part of the circumstances of the

19   arrest when both Mr. Moore and Mr. Frazer had similar

20   quantities of marijuana in their bags, they had the guns, they

21   were arrested at the same place, you know, the Court did find

22   that that could be indicia that would support a finding of the

23   marijuana conspiracy.  We don't have anything like that for the

24   non-marijuana drugs.

25         THE COURT:  And this sort of ties a little bit into

1   the separate conspiracies.

2          MR. DEMETRIOU:  Right.

3          THE COURT:  I hear you on that, and I am leaning

4   towards that instruction, but I understand the argument and I

5   don't disagree that there is -- that the jury, on the evidence

6   here, could find that there is no conspiracy as to those

7   particular controlled substances between the two of them.  But

8   I want to hear from everybody before I go any farther on that.

9          MR. DEMETRIOU:  I think the Court, you know, well

10  understands the argument.  It really is just that simple, that

11  we -- we haven't heard any evidence of a connection, of an

12  agreement, a meeting of the minds between Mr. Moore and

13  Mr. Frazer and others regarding those non-marijuana drugs that

14  are still at issue in the case.

15         We have certainly heard evidence that, viewed in the

16  light most favorable to the government, could suggest that

17  maybe Mr. Frazer was involved in the sale of perhaps Percocets,

18  oxycodone, Molly with other people, but I don't believe that

19  there is any evidence before the jury that would connect that

20  to the conspiracy that's charged involving Mr. Moore.

21         THE COURT:  Okay.  All right.  Thank you very much.

22         MR. DEMETRIOU:  Thank you.

23         THE COURT:  Well spoken.

24         MR. AKE:  So, Your Honor, the conspiracy charge is

25  not tethered to Mr. Moore any more than it's charged to the

1    unnamed coconspirators, so the government --

2           THE COURT:  Well, you can't say it's not tethered

3    anymore because you asserted that he was in it.  You are just

4    saying it doesn't exclusively --

5           MR. AKE:  And the Court is well aware that the

6    conspiracy instruction clearly says that different members of

7    the conspiracy will potentially agree to different aspects of

8    objects, and that they don't necessarily --

9           THE COURT:  I agree with that.  So what is the

10   evidence -- look, you have got a whole lot of text messages

11   that have come in all from Mr. Frazer's phones that have been

12   brought in.  They make reference, at least the notes that I

13   took, we have seen an oxy pill; we have seen percs; we have

14   seen white; we have seen King Louie, and we have got King Louie

15   on the marijuana bag; Molly; coke; dope; perc; percs; Molly;

16   weed; ox; percs; percs 5S; K18 with pictures.

17          Now, if you look at the Urban Dictionary, which the jury

18   can't do and was not put in evidence, gas is frequently used

19   for purposes of gasoline or very good marijuana, as in all my

20   cars, ashtrays have gas, but that's not before the jury.

21          So the question then becomes if you have references in

22   Mr. Frazer's emails to at least coke, which I guess is cocaine,

23   perc, which is Percocets, which is OxyContin, right?

24          MR. AKE:  Yes, sir.

25          THE COURT:  And weed and marijuana, that those are

1   mentioned, but that's Mr. Frazer offering it for sale, and,

2   presumably, the purchasers are not the coconspirators, or are

3   you saying they are?

4           MR. AKE:  Well, certainly many of the marijuana

5   customers are not coconspirators.  They appear to be

6   user/buyers.  So the government is not arguing that.

7           But the exchange with Swindle, which is the basis for the

8   cocaine count, they are discussing distribution level

9   quantities so that the -- and it seems to be an ongoing

10  relationship because it's not just one particular exchange but

11  it's over a long period of time that there is different

12  discussion of drugs.  So the government would contend that --

13          THE COURT:  Refresh my recollection, Mr. Ake.  I have

14  to admit in the -- in the excitement of all the text messages

15  being read, I might have missed the actual connections of

16  Swindle.

17          What's the quantities there that indicate the drug?

18          MR. AKE:  So he asks for the prices on the white and

19  then --

20          THE COURT:  "White" being "cocaine"?

21          MR. AKE:  "White" being "cocaine."  And there was

22  testimony -- because, eventually, we get to ounce quantities,

23  and the response back is 1300, which was --

24          THE COURT:  Oh, 1300, yeah.  And then can you get it

25  down to 11 or 12?

1          MR. AKE:  Yeah.  And if you keep messing with my

2     cousin, you know, he'll drop the price.

3          THE COURT:  I understand what you are saying.

4          MR. AKE:  This, essentially, it's looks more like he

5     is middling the deal, but that would be then acting as a bridge

6     in a conspiracy that he is trying to set up for his cousin to

7     sell to Swindle.  Your Honor, I think it may not support guilt

8     beyond a reasonable doubt, but I certainly --

9          THE COURT:  No.  No.  No.  I understand.  I

10    understand.  I want to be candid about that.  That's fine.  I

11    appreciate that candor.  All right.  Go ahead and finish your

12    argument.

13         MR. AKE:  So that's essentially the one on the white.

14        The percs, there are several discussions of large numbers

15    of pills for sale.

16         THE COURT:  50.

17         MR. AKE:  Again, seen 80 for $400 at five each,

18    right, so --

19         THE COURT:  But he's saying I have it, right?  He

20    actually got it from a cousin or something.

21         MR. LAWLOR:  Your Honor, can I answer up for a

22    minute?

23         THE COURT:  You just did.

24         MR. LAWLOR:  I don't know why we would be talking

25    about percs because that's not in the indictment, is it?

1             THE COURT:  The oxycodone.

2             MR. LAWLOR:  Percs is short for Percocet.

3             MR. AKE:  That's the brand name.  It's like Ibuprofen

4    versus Advil.

5             MR. LAWLOR:  I don't think there was any testimony

6    about that, though, Your Honor.

7             THE COURT:  I thought that in the questioning of the

8    agent, there was discussion of Percocet, oxycodone.

9             MR. AKE:  I believe that's how I phrased the question

10   in talking about Percocet/OxyContin.

11            THE COURT:  It wasn't how the question was phrased.

12            MR. AKE:  That's how I have it in my script.

13            THE COURT:  Well, I remember that.  Look, I didn't

14   know that Percocet was oxycodone, so the only way I could know

15   that is by virtue of the questions that you asked.

16            MR. AKE:  It's just the brand name for -- or the --

17   the original brand name.

18            THE COURT:  Right.  And that was the way the question

19   was asked of the witness and the witness answered the question,

20   so it's not a huge amount, but it is, I think, in the record.

21            MR. AKE:  And there is additional discussions of him

22   selling out on the quantities that were -- that he had

23   available.

24            THE COURT:  Also, wasn't one of the -- the perc 5S,

25   the little phrase that said what it was, didn't that say

1   oxycodone on it, too?

2          MR. AKE:  Oh, that definitely -- that's the generic

3   terms.  That was --

4          THE COURT:  No.  No.  No.  In the picture, the

5   picture of the little -- I thought that that --

6          MR. AKE:  That one also said -- yes, the P15 or the

7   P18, I believe that picture actually had both terms in it.

8          THE COURT:  Let's just make sure about that because I

9   agree that Mr. Lawlor raises a point that we want to make sure

10  that we, to the extent that we can recall the evidence, that we

11  have got it there.

12         MR. AKE:  Yeah.  That one is a combination of

13  Acetaminophen, but I believe that -- we will have to just go

14  back and make sure I asked the question about

15  Percocet/oxycodone.

16         THE COURT:  I had it -- I have it -- my recollection

17  is that you did because I have in the characteristics of

18  controlled substances, my notes from the expert, the detective,

19  was oxy/Percocet, and then price for Percocet/oxy, user amount,

20  25 to $30 a pill.  So there is -- it's not a lot, but it's in

21  there, so --

22         MR. AKE:  Yes, Your Honor.  And in that case, Your

23  Honor, given the quantities he's obtaining for sale, certainly

24  the government would argue that there is enough there to infer

25  that he's got an ongoing supplier.  And he also talks about his

1  cousin securing pills for him, so the existence of a

2  relationship with more than one person on that.

3       Finally, Your Honor, and the MDMA is the weakest, you

4  know.  Just candidly, there is references to Molly, E pill.

5       THE COURT:  Yeah.  I am going to sustain the

6  objection as to Molly.  I think I have to because I know that

7  it's referred to as Molly by virtue of my job, but we didn't --

8  I mean, had I ruled differently on his testifying to the slang,

9  you'd have asked him about all that and he would have said

10 Molly is MDMA, but -- and the jury may be familiar with it

11 because it's referred to frequently in use, but it's not

12 evidence, so I am going to have to -- I am going to grant it as

13 to Molly.

14      We agree it's out as to heroin.  Right?

15      MR. AKE:  Yes, Your Honor.

16      THE COURT:  And then the issue is whether it is in as

17 to --

18      MR. AKE: -- cocaine and Percocet and oxycodone.

19      THE COURT:  Percocet -- well, cocaine.  Marijuana is

20 obviously in there --

21      MR. AKE:  Yes, Your Honor.

22      THE COURT: -- because there has been a lot said about

23 weed, and so it's oxy -- Percocet is not named in the

24 indictment.

25      MR. AKE:  Correct.

1          THE COURT:  It's oxycodone.  Right?

2          MR. AKE:  Right.

3          THE COURT:  Well, there is enough of that there, it

4   seems to me.

5          MR. AKE:  And the bottle -- the bottle also said

6   oxycodone.

7          THE COURT:  And there is a bottle that had a picture

8   of hydrocodone.  That's right.  That's true.  So that's enough

9   to have at least that to make the argument and then to

10  determine whether that's sufficient under Rule 29.

11     Anything else on Count One from the government?

12         MR. AKE:  No, Your Honor.

13         THE COURT:  Okay.

14         MR. AKE:  We can live with the three substances being

15  listed.

16         THE COURT:  Okay.  All right.  Well, I haven't quite

17  ruled on that, but I understand it.  We have at least taken

18  care of two of those substances.

19     And then what about -- what about the possession with the

20  intent to distribute marijuana, is that -- are you saying that

21  that is not -- there is not enough evidence to go to the jury

22  on possession with the intent to distribute marijuana?

23         MR. LAWLOR:  That's our position.  Yeah.

24         THE COURT:  Okay.  All right.  So why don't you

25  address that.

1        MR. AKE:  Your Honor, we have elicited expert

2   testimony specifically to that point given the distribution

3   quantities.

4        THE COURT:  And you are talking about the contents of

5   the pouches and the --

6        MR. AKE:  Correct, the absence of any indicia of

7   personal use and the distribution level quantities as well as

8   the --

9        THE COURT:  I understand that.

10        MR. AKE:  Yes, Your Honor.

11        THE COURT:  And then, of course, if that counts out,

12   then, by definition, the possession -- use of a firearm in

13   furtherance of a drug trafficking offense.  Right?

14        MR. AKE:  Yes, Your Honor.

15        THE COURT:  Anything further?

16        MR. LAWLOR:  No, Your Honor.

17        THE COURT:  Okay.  So let me sort of put my cards on

18   the table.

19        I think the conspiracy charge, it's up to the jury to

20   decide whether or not it has been proved beyond a reasonable

21   doubt.  There is little evidence to connect Mr. Moore to the

22   conspiracy other than marijuana in the first count other than

23   his presence with Mr. Frazer and the references to him in some

24   of the text messages.  But it is true that there are indicted

25   and unindicted coconspirators and others, and for purposes of

1   Rule 29, the source of the prescription, hydrocodone and the

2   references to the oxy and the -- the testimony regarding trying

3   to sell an ounce of crack for 13 to 14 and whether it would be

4   trying to get it to be sold for a lesser amount, that's

5   obviously something with -- being done with somebody talking

6   about sources of it.

7         So I think by, frankly, drawing all inferences in the

8   light most favorable to the government, that as for those three

9   substances only, which would be cocaine, marijuana, and

10   Percocet, which is oxycodone, that a jury could find beyond a

11   reasonable doubt with all inferences drawn in favor of the

12   government as the rule requires.

13         It is not clear in my mind whether it will be sufficient

14   to the jury to find that beyond a reasonable doubt, but that's

15   why we pay the jury the big bucks that we pay them.

16         So I will deny it as to those three substances in Counts

17   One.

18         As to Count Two, the possession with the intent to

19   distribute, well, there is plenty of reference in Mr. Frazer's

20   text messages and emails to weed.  Weed was mentioned, so

21   that's marijuana, obviously.

22         Now, I can't -- I only know of gas and gasoline by

23   outside references that are not evidence, so that's not

24   something that can be considered because it's not before the

25   jury, but there was at least one reference to weed in

1   Mr. Frazer's email about what he had available.  And then there

2   is reference to smoking.  And, of course, you can smoke other

3   substances.  You can smoke crack, for example, but you can also

4   smoke marijuana, and an inference that can be reasonably drawn

5   from the reference to smoking could be reference to smoking

6   marijuana.

7        So that, plus the reference to weed, plus the fact that

8   he was found with the backpack, the satchel, no money,

9   certainly not money that's really particularly probative of

10  selling drugs, but Mr. Moore was found with him, and he had

11  significantly more, and they had similar drug packaging

12  materials.

13       So I am going to find that, again, it's up to the jury to

14  reach the ultimate decision beyond a reasonable doubt, but that

15  with all reasonable inferences drawn in light most favorable to

16  the government, that a reasonable jury could find that.

17       And then as to the firearms, again, I think Mr. -- we

18  have got the evidence that Mr. Frazer -- or that Mr. Moore was,

19  you know, shot and injured.  And Mr. Lawlor certainly -- and we

20  also have the wound dressing in the satchel and we also have

21  the cross-examination where the government's expert

22  acknowledged that these are dangerous streets and that one way

23  that you could -- one reason that you could have a weapon is

24  for self-protection separate and apart from furthering a drug

25  trafficking offense.

1          On the other side, we have got the references to the text

2     messages back and forth on Mr. Frazer's phone regarding AR-15,

3     which is a, obviously, a firearm, a 9 is a 9 millimeter, which

4     is what he actually had, a MAC 10 or MAC 11, the photo of a

5     pump shotgun, and the -- and the response that said, We need

6     something smaller and Shamire needs one, too.

7          Now, I happen to know, again, from sources that the jury

8     doesn't know, that a Draco is a Romanian short AK-47 now being

9     manufactured by Century Arms in the United States, but that's

10    not evidence that's before the jury.

11         So there is at least that much evidence in the -- the

12    email exchanges that talk about needing it and how Moore needs

13    it, and the guns were there and it's dangerous streets.  From

14    that, a reasonable jury could draw the inference in favor of

15    the government and find beyond a reasonable doubt.  Whether

16    they will do that and whether they will find that beyond a

17    reasonable doubt is up to the jury.

18         I think the -- there is -- that's where the closing

19    arguments will focus the issues and that's where I think the

20    jury will have to decide, but I am going to deny the Rule 29

21    with the exception of the drugs that we have eliminated because

22    I think under the standard that I am required to apply without

23    drawing any inferences on credibility, that there is enough

24    there to get it to the jury.  So that's the ruling.

25         Now, I do want to talk about the jury instructions.  So

1   do we -- have we given them -- have we given them -- can you

2   give them to them now, Marysia?

3          Last night, after we all left the courtroom, Marysia and

4   I worked a little bit -- Marysia worked longer than I did --

5   and we now have the jury instructions.  There are a couple that

6   I want to flag to you where we, when we looked at -- went back

7   and looked at them this morning, we tweaked them a little bit,

8   and I want to make sure that we are all on board with that.

9          Do you want to say something, Mr. Lawlor?

10          MR. LAWLOR:  Yeah.

11          THE COURT:  Oh, absolutely.

12          MR. LAWLOR:  Do you want to do the advisement now or

13   do you want to do it in the morning?

14          THE COURT:  Yeah.  Let's do it now.  Do you want me

15   to do it or do you want to do it?

16          MR. LAWLOR:  I will defer to the Court.

17          THE COURT:  If you think I didn't do it well enough,

18   you can add in.

19          MR. LAWLOR:  All right.

20          THE COURT:  So, Mr. Moore --

21          MR. LAWLOR:  Mr. Frazer.

22          THE COURT:  Mr. Frazer, excuse me.  It's been a long

23   day.  Mr. Frazer, at this point in the case, sir, the

24   government has rested, and what that means, Mr. Frazer, is they

25   are not going to introduce any more evidence.  That's the only

1  evidence they are planning on introducing.

2      So now at this point, you, with the capable help of your

3  attorneys, have some options available to decide what to do

4  next.  All right?

5      As you may have heard us tell the jury when we picked the

6  jury the day before yesterday, you have an absolute right to

7  remain silent and not testify.  You have a Fifth Amendment

8  right not to be compelled to incriminate yourself.  You have no

9  burden of proof.  You have no obligation to prove anything.

10 Your innocence is presumed by the law.  So you don't have to do

11 anything, and you can elect to not testify and not present any

12 evidence.  All right?

13     Now, there was some exhibits that were offered that I

14 ruled out, but separate and aside from that ruling, you have

15 the right to not present a defense or testify in your own

16 defense.  And then what would happen is, is that tomorrow, the

17 government would get up and say, This is what we think we have

18 proved, and Mr. Lawlor would say, No, they haven't proved this,

19 and you can see from the cross-examination that he did the

20 directions that he's going to go to make those arguments.

21     So that's one option that you have.  All right?  And I

22 have been advised by Mr. Lawlor that that's the option that you

23 want to take, that you don't want to testify or offer any

24 further evidence other than the evidence that was offered that

25 I excluded, the text messages.  That's option one.

1          Option two is you could testify if you wished to do so.

2    You have an absolute right to testify.  If you did testify, you

3    would have to be testifying under oath, subject to

4    cross-examination by the government.  And in that -- and in

5    that testimony, I don't know anything about your prior criminal

6    history, but if there were prior convictions, they could be

7    brought out for purposes of impeachment.  You would just have

8    to do what any other witness does when they take the stand:

9    testify and be subject to cross-examination and potential

10   impeachment.

11         In addition, you could offer witnesses -- other witnesses

12   to come testify and you could offer exhibits.  Some exhibits

13   you have offered that I have excluded.  There were three or

14   four.

15         But those are the options that you have.  The decision

16   that you make is entirely yours, with the help of your lawyers'

17   advice, but I want to make sure you understand both directions,

18   that you have an absolute right to pursue one or the other.

19   You can't do both.  You can't not testify -- well, you could

20   not testify and produce other evidence, but you can't testify

21   and then not testify.  If you testify, then you are subject to

22   being cross-examined.

23         I have been told that you have discussed this with your

24   lawyer, and without asking you to say what they told you or

25   what you told them, Mr. Lawlor has said that the decision is

1   not to have you testify and not to have any further evidence

2   offered so that the case will end with what the government has

3   introduced and the argument that will be done in court

4   tomorrow.

5        Do you understand that, sir?

6             MR. FRAZER:  Yes, Your Honor.

7             THE COURT:  Are you satisfied that you have had a

8   chance to discuss this to your satisfaction with your lawyers

9   to make the decision as to what's best for you in this case,

10  sir?

11            MR. FRAZER:  Yes, Your Honor.

12            THE COURT:  And do you agree with the decision that

13  Mr. Lawlor has advised the Court that you wanted to pursue?

14            MR. FRAZER:  Yes, Your Honor.

15            THE COURT:  All right.  Is there anything further you

16  want me to say, Mr. Lawlor?

17            MR. LAWLOR:  No, Your Honor.

18            THE COURT:  Okay.  Now, at this point, if Mr. Frazer

19  does want to leave, he can leave while we kind of police up the

20  jury instructions.  Okay?  All right.  And it's up to you -- I

21  will let Mr. Lawlor finish speaking with Mr. Frazer.

22       (Whereupon Defendant Darryl Colton Frazer exits the

23  courtroom.)

24            THE COURT:  Thank you, sir.

25       You all have these instructions here.  What I'd like to

1   do is, number one, if you go to page 16, there is an

2   instruction that we talked about last night.  It was the

3   uncalled witnesses equally available.  There was some language

4   in there that began as follows:  There are several persons

5   whose names you have heard during the course of the trial but

6   who did not appear here to testify, and one or more of the

7   attorneys may refer to their absence from trial.  I instruct

8   that you each party had an equal opportunity...."

9        We said that that was going to come in.  As we looked at

10  it, I am not sure that there were any that were actually

11  identified.  And so what we propose to do and what is in on

12  page 16 is revise it slightly to say:  One of the lawyers may

13  argue to you that during the trial, the name of one or more

14  persons were mentioned but that person or persons were not

15  called to testify.  I instruct you that each party... because I

16  don't remember anybody actually having been called, and I don't

17  want to stay that there were if I can't recall it.

18       So if you can take a look at page 16 the way we have

19  revised it, are there any issues on that?

20           MR. AKE:  Your Honor, I think it looks fine.  We

21  would obviously still like to keep it in just because there

22  were -- it was mentioned in opening about --

23           THE COURT:  I am keeping it in, but I am revising it

24  to not make it state something that I don't recall having

25  happened.

1          MR. AKE:  Right.  I think it reads fine as it is

2     right now.

3          THE COURT:  Any other comments on that?  We can go to

4     the next one.

5          Now, page 33, which is the first element of the

6     conspiracy agreement, which, obviously, is a very important

7     element, so let's -- let's -- and we went through that.  One of

8     the things we have to do right now is take out the -- take out

9     the heroin, right, that's got to come out, and the MDMA,

10    commonly known as ecstasy, those have got to come out.  Right?

11         MR. AKE:  Yes, Your Honor.

12         THE COURT:  Okay.  So that's number one.

13         The next -- the next -- the way in which we left it last

14    night that I am now proposing to modify in light of

15    Mr. Lawlor's and Mr. Demetriou's submission is that the second

16    paragraph which talks about the agreement, that says that what

17    the government must prove is there is a mutual understanding,

18    spoken or unspoken, and then you may, of course, find the

19    existence has been established by direct proof, but it also may

20    be established by circumstantial circumstances, which is

21    circumstantial evidence.  That's fine.  And then in a very real

22    sense, conspiracy cases, actions speak louder than words.

23    That's the way we left it last night with the exception of

24    deleting the heroin and MDMA.

25         The defense has asked for an instruction that is based

1  upon the buyer/seller instruction that other circuits have

2  approved.  For example, the Ninth Circuit has approved one.

3  But in their submission, they correctly, with our thanks, made

4  reference to Maryland law which has addressed this not in the

5  sense of talking about a specific jury instruction but

6  certainly in the sense of talking about the elements of the

7  agreement in a conspiracy, and that was *United States vs.*

8  *Hackley,* H-A-C-K-L-E-Y, which is found at 662 F.3d 671, a 2011

9  decision that was authored by Judge Duncan.

10         And in that, they make reference to a Seventh Circuit

11 case called *United States vs. Townsend*, which was a 1991 case,

12 and I am going to read the language from the *Hackley* case

13 beginning at page 679.  And I am going to start off with the

14 language which is pretty standard, "The presence of a knowing

15 and voluntary agreement distinguishes conspiracy from the

16 completed crime and is therefore an essential element of the

17 crime of conspiracy."

18         And then they go on -- I am leaving some text out -- "The

19 agreement need only be a tacit or mutual understanding between

20 the defendant and his accomplice."  And then it says,

21 "Circumstantial evidence alone is sufficient to support a

22 conviction of conspiracy."  Well, that circumstantial evidence

23 language is already in there.

24         Here is the *Townsend* reference.  In *United States vs.*

25 *Townsend*, the Seventh Circuit held that in drug conspiracy --

1  oh, in drug conspiracy and conspiracy cases, quote, evidence of

2  a buyer/seller relationship standing alone is insufficient to

3  support a conspiracy conviction.

4      Two years later, in *United States vs. Mills*, we

5  interpreted that holding, saying, Evidence of a buy/sell

6  transaction is at least relevant, i.e., probative on the issue

7  of whether a conspiratorial relationship exists.  Since then,

8  we have held that evidence of a continuing buy/sell

9  relationship, when coupled with evidence of large quantities of

10  drugs, or continuing relationships and repeated transactions,

11  creates a reasonable inference of an agreement.

12      Now, I am not persuaded that the Ninth Circuit law that

13  has spawned the Ninth Circuit instruction is the law of the

14  Fourth Circuit, and, therefore, I am not going to give it.

15      But I do believe that it is appropriate to acknowledge

16  the holding of that *Hackley* case which appears to be the most

17  recent decision of the Court of Appeals of Maryland -- or,

18  excuse me, the Fourth Circuit, and that language -- so,

19  Marysia, help me out.  I know what I wrote, but what page is

20  that revised language on so that I can point --

21      MR. AKE:  I believe we have it, Your Honor.  It's on

22  a separate sheet.

23      THE COURT:  Oh, it's the very front.  It's says,

24  Court's proposed revision to Jury Instruction No. 29.  Thank

25  you, Marysia.  You are way ahead of me as usual.

1        If you go down, you will see, "Evidence of a buyer/seller

2   relationship standing alone is not sufficient to support a

3   conviction for conspiracy to distribute controlled substances.

4   However, evidence of a continuing buy/sell relationship, when

5   coupled with evidence of large quantities of drugs, or

6   continuing relationships and repeated transactions, can create

7   a reasonable inference of an agreement, and then everything

8   else is the way that it was.

9        In my mind, this gives the law that is correct under the

10  Fourth Circuit.  It raises an instruction that didn't exist

11  before about the fact that a buyer/seller relationship alone is

12  not sufficient, but it couples it with what all the

13  circumstances might show, and, in my mind, fairly allows each

14  side to argue their views of what has or has not been proved.

15       It allows the exact argument that the defense wants to

16  make in the buyer/seller relationship.  It's just buying and

17  selling.  He's not -- there is no -- nothing else showing that.

18  And it allows the government to say, Look at the number of

19  them; look at all the people; we had all those names; look at

20  the discussion about the -- you know, buying an ounce of

21  cocaine and then what that was.

22       Everybody gets to go back into the evidence and argue

23  what they want.  It's up to the jury to decide if it was a

24  buyer/seller relationship alone.

25       That's my proposed instruction.  So anybody want to be

1  heard on that?

2      MR. AKE:  Your Honor, I think that comports with my

3  understanding of the law, so I -- I was there already for you.

4  This is fine with the government.

5      THE COURT:  Anybody else want to say anything before

6  I go on to the next one?

7      MR. LAWLOR:  No, Your Honor.  That's acceptable to us

8  as well.

9      THE COURT:  I think the separate conspiracy

10  instruction is applicable.  Does anybody disagree with that?

11      MR. AKE:  Could -- could Your Honor just give your

12  thoughts on that?

13      THE COURT:  So here is what -- here is what I think

14  the argument might be.  Well, let me not do that.  Let me ask

15  you all to articulate the -- let's assume I give that

16  instruction.  Tell me what you think you would be arguing to

17  the jury on separate conspiracies so I can hear if they don't

18  agree that there has been an evidentiary trigger.

19      MR. LAWLOR:  The Court's indulgence.

20      THE COURT:  Yeah.

21      MR. LAWLOR:  So, Your Honor, I mean, part of the

22  problem is, at the risk of being critical of the government, is

23  that this is a pretty poorly defined conspiracy because it says

24  Mr. Moore, and I think the only evidence of Moore and Frazer

25  being in a conspiracy is the marijuana.  And then, obviously,

1   it listed other drugs that it -- you know, that there was no

2   proof of, so what remains now is cocaine and oxy.

3           THE COURT:  You are going to argue that Mr. Frazer

4   may have had a -- that Moore may have been in for the marijuana

5   but not for anything else?

6           MR. LAWLOR:  Well, I mean, Your Honor, honestly,

7   before I can answer the Court's question, the reason I think

8   it's a multiple conspiracy case is because I can't even define

9   what conspiracy the government is alleging here.  I mean, this

10  would have been maybe a case -- you know, I have never seen a

11  bill of particulars for conspiracy, but given that, who can the

12  government allege that Mr. Frazer -- the jury could find that

13  Mr. Frazer was in a conspiracy with and to what end?

14          And there is -- I mean, it's indisputable that at least

15  part of these transactions are mere buyer/seller.  I don't

16  think anyone could look at those texts and say at least some of

17  the, you know, dozen individuals that texted with Mr. Frazer

18  was anything more than buyer/seller.

19          And then you have -- the only evidence of cocaine is sort

20  of this one transaction, which, at best, it looks like maybe he

21  is middling, as Mr. Ake said.

22          And then you have a lot of references to percs, but,

23  again, that smacks of buyer/seller.  I mean, again, it's not in

24  the record.  But, you know, I know this, probably everybody

25  here knows this, I mean, we have an Oxycodone crisis in this

1  country because people are eating these like they are jujubes.

2  So, you know, I have clients using 150 grams a day, so five

3  grams is sort of a minuscule amount.

4       But anyway, Your Honor, I am sort of not trying to play

5  tennis here and hit this back onto the government's side, but I

6  am anxious to hear, when they stand up in closing, exactly what

7  they are going to argue.

8            THE COURT:  So let's go with this.  So help me out.

9  You all obviously want to convince the jury beyond a reasonable

10 doubt that there was a conspiracy with these remaining drugs,

11 and to the extent that you can pull Mr. Moore into that

12 conspiracy, which you do have for the marijuana, it helps

13 because there is an identified person whose name has been

14 mentioned.

15      You don't need to have an identified person under the

16 law, but it's always helpful if you do.  If not, then there

17 must be references to at least what those people's function --

18 those other unnamed coconspirators' functions were in the

19 conspiracy even if their identities are not known or they

20 weren't indicted.

21      So, without holding you to this tomorrow, could you just

22 articulate what you will say here is the conspiracy that we

23 have proved, just so, within that context, we can take a look

24 at whether this instruction applies.

25            MR. AKE:  All right, Your Honor.  So the government

1   will argue that there were agreements with -- that Mr. Frazer

2   made with different people at -- you know, during this time

3   span that was charged.  You know, the one individual that's

4   identified as Swindle, that really covered all the remaining

5   drugs that were in there because he, at different times, talked

6   about the King Louie, which we showed were -- and that's I

7   think at 21 -- let's see -- that's a text thread over time that

8   -- it incorporated still the cocaine, the, I think percs at

9   different times, and then the marijuana.

10          So that would be at least one where there was, over time,

11   conversations about all these different drugs over the span of

12   several weeks, so that would be one individual with whom he

13   conspired to distribute all three of the remaining drugs.

14          And the other folks would have been, you know, kind of in

15   and out.  Again, we are not clear where the sources of supply

16   are, although he talks about his man coming through in terms of

17   the marijuana, and he talks about getting percs from his

18   cousin, female cousin of his as being a supplier, so there is

19   obviously different suppliers for probably different drugs.

20   Maybe some of the suppliers overlap.

21          THE COURT:  Help me out with this, Mr. Ake.  So here

22   is some possibilities, okay.  One possibility is kind of the

23   classic conspiracy where one guy -- let's take a bank robbery,

24   okay, where they are all in it to rob the bank.  They all know

25   they are going to rob a bank.  But my job is to steal a car,

1    and, you know, another person's job is to steal the license

2    plate from some other car to put on the stolen car, and then

3    another person's is to, you know, sit and do surveillance of

4    the bank to see what times the bank people are there but there

5    is not a lot of traffic.

6         Another person's job is to drive the car, getaway car.

7    They are going to get out and sit there and idle it and warn

8    them.  And another person's -- two guys are going to go in with

9    the guns, so somebody's job is to get the guns.  And they are

10   all separately involved in this one thing to rob a bank and

11   split the proceeds, but I don't know anything about the guy who

12   is going to get the guns, and the guy who was going to get the

13   guns doesn't know about me stealing the car or the other person

14   stealing the plates.

15        Clearly, all those people, if they are in the conspiracy,

16   I don't need to know what they are doing; they don't need to

17   know what I am doing.  It can all be part of the same

18   conspiracy.  That's classic conspiracy law.

19             MR. AKE:  Yes.

20             THE COURT:  So under that process, you could say that

21   Mr. Moore was in it for the marijuana part.  Okay?  We are

22   going to distribute -- we are part of this conspiracy to

23   distribute these controlled substances, and I am the marijuana

24   guy.  That's what I do.  I am the marijuana guy, and I am going

25   to have -- I need some protection, too, you know, because I am

1   out there on the street, and that's that person.  But then I

2   have got my cousin, and I can get the oxycodone from the

3   cousin, and then I have got this.

4        Is that your argument is it's one conspiracy and all

5   those people are spokes that go into the wheel and the spokes

6   don't have to know about the other spokes?

7             MR. AKE:  Yes, Your Honor.  If there is spokes

8   emanating out from Mr. Frazer, and I would characterize

9   Mr. Frazer's role in this -- like, his only direct sales that

10  we can show are the marijuana and the Percocet, but he seems to

11  be middling deals for the other types of substances, including

12  at one point sending -- but also middling even Percs deals

13  because he -- one -- a correspondent on the text message chain

14  inquires, and then he sends that guy the contact card for Bush,

15  so he was essentially putting in touch another, you know,

16  connection or, you know, linking him up with -- with this Bush.

17  He's also had text messages with Bush -- did we put in any with

18  Bush? -- separately.

19        So he's playing a different role for different members,

20  but this is -- but it's much more of a hub and spoke as opposed

21  to a nucleus where there is a fixed objective because these are

22  ongoing objectives, ongoing sales.

23             THE COURT:  So, for the multiple conspiracy

24  instruction, according to the -- to the materials that -- that

25  Mr. Lawlor and Mr. Demetriou provided yesterday, says that the

1  defendants are going to say that the government's proof fails

2  to show the existence of only one overall conspiracy and that

3  there were actually several separate independent conspiracies

4  with various groups of members.  Now, I am going to ask about

5  what those several conspiracies were in just a minute.

6         And then it goes on to say, Whether there existed a

7  single unlawful agreement, or many such agreements, or indeed,

8  no agreement at all, is a question of fact for the jury to

9  determine in accordance with the instructions.

10        When two or more people join together to further one

11  common unlawful design or purpose, a single conspiracy exists.

12  By way of contrast, multiple conspiracies exist when there are

13  separate unlawful agreements to achieve distinct purposes.

14        Proof of several separate and independent conspiracies is

15  not proof of a single, overall conspiracy charged in the

16  indictment, unless one of the conspiracies proved happens to be

17  the single conspiracy described in the indictment.

18        You may find that there was a single conspiracy despite

19  the fact that there were changes in either personnel by the

20  termination, withdrawal, additions of new members, or

21  activities, or both, so long as you find that some of the

22  coconspirators continued to act within -- for the entire

23  duration of the conspiracy for the purposes charged in the

24  indictment.

25        And then, of course, this is a -- this would be an

1  introductory before you get to it, and then you have that whole

2  definition of a conspiracy and you don't all need to know what

3  everybody else is doing and everything else.

4       So I understand your single conspiracy.  Mr. Lawlor,

5  Mr. Demetriou, what are the multiple separate conspiracies that

6  -- that you think the facts are there so that you want to argue

7  that and so that the instruction has to be there for you to

8  argue?

9            MR. LAWLOR:  Your Honor, I am still trying to count,

10  but up until about text 36 or 37, I have identified texts

11  between Mr. Frazer from Ross, Laurin, Amber, Jonny Boy, Wood,

12  Jean, Bush, Monica, African Mike, Kadija, and several that were

13  unknown.  So, you know, to the degree there was a single

14  conspiracy here, which, given that I just spouted out one, two,

15  three, four, five, six, seven, eight, nine names and people who

16  didn't have a name, different phone numbers, and Mr. Frazer and

17  Mr. Moore, it's sort of -- it's almost impossible to suggest

18  that there is only one conspiracy here.  I mean, I almost think

19  as a matter of law, there is not one conspiracy here.

20       You have -- you know, you have a cocaine suggestion with

21  Swindle, but that may not even be a conspiracy because it looks

22  like, at best, there was a discussion for Mr. Frazer to middle

23  some deal.  That may or may not have occurred.  Okay?

24       Then you have Moore and weed.  That could be another

25  conspiracy.  There is no reason to believe that he knows -- he

1  maybe knows some of these people, but I am not sure there is

2  evidence in this record that he knows any of them.

3       So you can have a weed conspiracy, a cocaine conspiracy.

4  Again, I think the evidence --

5       THE COURT:  Hold on one second, please.

6       Do we have the standard Sand multiple conspiracy

7  instruction?  Can you get that for me, please?  Go ahead.

8       MR. LAWLOR:  We modified it slightly.

9       THE COURT:  You didn't modify it much.  I just want

10  to see what that says.

11       MR. LAWLOR:  But, that is, we did submit Sand.

12       So you could have a weed conspiracy, a cocaine

13  conspiracy, a Percocet conspiracy, and then there is

14  undoubtedly relationships in here that are mere buyer/seller.

15       So, Your Honor, like I said, I almost feel like as a

16  matter of law -- in fact, I am not sure we argued this in our

17  MJOA, but to the degree that we can reopen that discussion, I

18  would submit to the Court that the government, on its face, has

19  not proved the single conspiracy charged in Count One.

20       THE COURT:  All right.  Well, I am not going to

21  reopen it because I think that there is enough to go to the

22  jury on that.  But I do think that, notwithstanding your view

23  that it's a -- as a matter of law, the instruction itself is a

24  matter of fact.  It has to be proved.

25       And the question I have to ask myself is whether there is

1  enough evidence in this case under which a jury could find that

2  there were multiple separate conspiracies; to use your example,

3  a, you know, a cocaine conspiracy, separate and apart from a

4  oxycodone conspiracy, separate and apart from a -- a marijuana

5  conspiracy, separate and apart from Percocet.

6        MR. LAWLOR:  And Your Honor, just on that -- forgive

7  me -- but, you know, the -- remember, conspiracy almost has two

8  intents.  It's the intent to agree and intent to agree to do a

9  specific thing.  And I don't think here there can be any

10  suggestion that the people who were asking for weed, the people

11  that were asking or discussing cocaine and Percs, there is no

12  overlap there, in addition to, you know, the number of people,

13  but there is -- how can you say what is the one agreement that

14  all these different people signed on for?

15        THE COURT:  Well, I don't think that they are going

16  to take that position.  The government is not arguing that

17  every single person asking to buy pills or weed is part of the

18  conspiracy.  They are purchasers.

19        But they are saying that there is a conspiracy that the

20  individuals from whom Mr. Frazer is getting the Percocet,

21  oxycodone, there is the marijuana, there is the -- the cocaine

22  being referenced to that, but that's part of what they are

23  saying is a single conspiracy, that all these other unnamed

24  conspirators, separate and apart from the individual buyers,

25  are part of that single conspiracy that Mr. Moore was part of

1   as well, and he's a named conspirator.

2          You are saying that doesn't make any sense from the

3   evidence.  There were multiple separate conspiracies.  The law

4   of conspiracy that we have already talked about sets forth what

5   all that has to be, and you are free to argue to the jury

6   whether it's there or not based on the evidence that's in, and

7   the jury has got to assimilate that and decide which way they

8   want to go on that.

9          But it seems to me that there is a factual basis under

10  which you can say that -- pull out all the people just trying

11  to buy these drugs if they weren't conspirators, you had to get

12  the -- the oxy from one place, you had to get the -- the

13  marijuana from another place, and whatever the other --

14  whatever the other drug is that we say is still in here --

15          MR. AKE:  Cocaine, Your Honor.

16          THE COURT: -- cocaine from another, and whether that

17  was three separate conspiracies where all these people were

18  completely -- did not agree to do anything with marijuana or

19  did not agree to do anything with Percocet, or whether they

20  were all part of a single conspiracy just to sell drugs, and

21  each one did this little chunk as part of the single

22  conspiracy, that's the fact dispute, and that's what I think

23  makes it so that that instruction ought to go in there before

24  we get to the elements of the conspiracy.

25          That's what I think is --

1           MR. AKE:  That's fine, Your Honor.

2           THE COURT:  All right.  So we are going to give the

3    instruction.  Now, where are we going to put it?  Before we

4    actually talk about the elements of conspiracy, is that what

5    you are suggesting is a logical place for it, Mr. Demetriou?

6           MR. DEMETRIOU:  I probably would think it would be at

7    the end of Count One.

8           MR. LAWLOR:  Yeah.

9           THE COURT:  So let's be specific.  Go to the page and

10   tell me where you want it to be.  We are going to put it in.

11   Now we are trying to figure out where.

12          MR. AKE:  Before Count Two, is that what you said?

13          THE COURT:  So what page?

14          MR. AKE:  42 to 43.

15          THE COURT:  So it's going to go where page -- all

16   right.  So it's going to go after 42 and before 43.  Right?

17          MR. AKE:  Yes, Your Honor.

18          THE COURT:  So it will become Jury Instruction No.

19   36, and 36 becomes 37, and all the rest are numbered

20   sequentially.  Right?  Marysia, do you have that?  Got it.  All

21   right.  Done deal.

22       Now, the defense has asked for a definition of beyond a

23   reasonable doubt, and they have proposed the one from the

24   Maryland Pattern Jury Instructions, which if I were inclined to

25   give an instruction on beyond a reasonable doubt seems like a

1  pretty reasonable definition of beyond a reasonable doubt.

2       It has always sort of bothered me that we say that there

3  is this standard which is so enhanced and so important, but we

4  give almost no guidance other than just a definition itself to

5  the jury itself about what it is.  That's just bothered me

6  because our job is to explain the law to the jury, and the law

7  of the Fourth Circuit is almost like this is so bad that if you

8  try to even explain it, you will mess it up, so just don't

9  explain it, which seems very unsatisfying to me.  But that's

10 the law, and that's the law I have always adhered to in my

11 entire time with this Court.

12       MR. LAWLOR:  Your Honor, this is your last chance to

13 change.  Become enlightened, Your Honor.  This is your last

14 opportunity.

15       THE COURT:  Yes.  Thank you.

16       And it's always, you know, struck me as somewhat judicial

17 cowardice, frankly.  But on the other hand, I don't -- I also,

18 although this won't apply in my case, operate under the maxim

19 that I am only going to try one case one time, so I am not

20 going to -- I am not going to mess it up.

21       But if both sides agree to give the instruction, then I

22 will give it because, otherwise, if there were an appeal, it

23 would be invited error, and I think I would be okay on that.

24       But I really think in a -- if we were doing for the jury

25 what we sort of aspire to do, an instruction would be -- would

1   be appreciated by the jury.  I know I would appreciate it if I

2   were the jury.  And that instruction seems pretty reasonable.

3   But I am not going to do it unless both parties agree.

4           MR. AKE:  And Your Honor, I philosophically align

5   with you on that, but I am not going to cause the breach in the

6   wall for my office, and our office policy is to hold you on

7   that.

8           THE COURT:  I understand that.  So, for the record, I

9   think -- your proposal is absolutely in the record.  Maybe this

10  will be the case where the Fourth Circuit -- what was that from

11  Macbeth, Screw your courage to the sticking point, ma'am --

12  maybe that's where the Fourth Circuit will screw its courage to

13  the sticking point, and say, Grimm was wrong; he should have

14  done it; he had the perfect example there; he was right to

15  leave when he did; he should have left earlier.

16      I am not going to do it.  It's in the record.  My heart

17  is with you guys, but my head is with the law in the Fourth

18  Circuit.

19      So on that, I think we are okay.  We have the

20  instructions.  Okay?

21      All right.  Hard work today.  Thank you very much,

22  everybody.  Go and get yourself ready for tomorrow.  We will

23  have the instructions.  It will just be the numbers.  The

24  parenthetical definition of what it is and the source will not

25  be there, but we will keep these with them on there as the

1   Court exhibit.  It goes to the Fourth Circuit, but not to the

2   jury.  That will at least say what prompted me to do that which

3   I was doing.  Okay?

4        All right, everyone.  Long, hard day today.

5            MR. AKE:  9:30 tomorrow?

6            THE COURT:  Yeah, 9:30.

7            MR. LAWLOR:  Thank you, Your Honor.

8        (The proceedings were concluded at 4:50 p.m.)

9

10                          - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                        INDEX TO TESTIMONY

1

2  GOVERNMENT'S WITNESSES:

3  KAREN CARVAJAL                                        PAGE

4      Direct examination by Mr. Kibbe              29
       Cross-examination by Mr. Lawlor             62
5      Redirect examination by Mr. Kibbe           73

6  FERNANDO JARAMILLO                                    PAGE

7      Direct examination by Mr. Ake               76
       Cross-examination by Mr. Lawlor            158
8      Redirect examination by Mr. Ake            177
       Recross-examination by Mr. Lawlor         180

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, Renee A. Ewing, an Official Court Reporter

3 for the United States District Court for the District of

4 Maryland, do hereby certify that the foregoing is a true and

5 correct transcript of the stenographically reported proceedings

6 taken on the date and time previously stated in the above

7 matter; that the testimony of witnesses and statements of the

8 parties were correctly recorded in machine shorthand by me and

9 thereafter transcribed under my supervision with computer-aided

10 transcription to the best of my ability; and that I am neither

11 of counsel nor kin to any party in said action, nor interested

12 in the outcome thereof.

13

14

          Renee A  Ewing
15                                     _____

          Renee A. Ewing, RPR, RMR, CRR
16        Official Court Reporter
          May 13, 2023
17

18

19

20

21

22

23

24

25